## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| X CORP.,<br><br>                 Plaintiff,<br><br>    v.<br><br>OPERATION BLUEBIRD, INC.<br><br>                 Defendant. | Case No. _____<br><br>INJUNCTIVE RELIEF SOUGHT<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiff X Corp. ("X Corp."), by its attorneys Ashby & Geddes and Debevoise & Plimpton LLP, for its complaint against Defendant Operation Bluebird, Inc. ("Bluebird"), alleges as follows:

### **Nature of the Case**

1.  As part of a self-described "heist," Defendant Bluebird is brazenly attempting to steal the world-famous TWITTER brand.[1]  Despite having no rights, and expressly acknowledging that it does "not own the Twitter marks," Bluebird recently announced that it is making the "bold" move to "bring[] [Twitter] back" by starting a social media network with the name, color scheme, trade style and logo that consumers around the world associate with

---

[1] *See* Ex. 1 (LinkedIn posts and user comments from Bluebird's principals and founders) at 55.

TWITTER.[2]  Even Defendant's name—Operation Bluebird—is a reference to the iconic Twitter

logo .

2.     Bluebird has made its motives clear: Bluebird views X Corp.'s TWITTER brand

as "one of the most valuable . . . assets in tech," which it proclaims it has "the guts" to "try and

take advantage of."[3]  Bluebird's
plan to "bring back" and "reclaim
Twitter[]" fails to account for one
major flaw: the TWITTER brand is
alive and well, owned by X Corp.,
and is not ripe for the picking.[4]
Bluebird's infringing website,
along with its infringing domain
name, infringing bluebird favicon
(the "Infringing Logo"), and the
misleading message that Bluebird
is "bringing [Twitter] back" can be
seen at right.[5]

---

[2] *See* Ex. 1 at 2, 52; Ex. 5 (subsequently deleted comment from LinkedIn by Bluebird's
principals and founders, originally posted on December 10, 2025 and last accessed on
December 10, 2025); *see also* Ex. 2 (Bluebird's infringing TWITTER.new website).

[3] *See* Ex. 1 at 14, 50, 55.

[4] *See* Ex. 1 at 14, 36.

[5] *See* Ex. 2.

3.      Despite Bluebird's purported plan, it cannot bring Twitter "back"—Twitter never left and continues to be exclusively owned by X Corp.  The TWITTER and TWEET trademarks, the bluebird Twitter logo (collectively, the "TWITTER Marks," as further defined with registration numbers below), and all associated consumer goodwill and recognition, were purchased by X Corp. in a transaction valued at billions of dollars and remain X Corp.'s exclusive property.  X Corp. brings this lawsuit to protect its valid, subsisting, and incontestable intellectual property and to protect consumers from being deceived by Bluebird's admitted attempt to steal X Corp.'s rights and to co-opt the TWITTER Marks' reputation and goodwill.

4.      Introduced in 2006, the TWITTER platform, with its iconic logo, changed the Internet forever.  For the last 20 years, X Corp. and its corporate predecessor, Twitter, Inc., have provided a world-renowned virtual town square—a social networking platform focused on real-time exchanges of ideas, news, media, photos and other content.  While Twitter, Inc. merged into X Corp. in March 2023, and the Twitter platform was later rebranded to "X" in 2023, TWITTER continues to persist in many ways.  The TWITTER brand has evolved over time, but X Corp. still utilizes the brand—intentionally maintaining its rights to its world-famous assets, in large part to avoid loss of consumers who continue to think of the platform as TWITTER—and it is still recognized and loved by millions of consumers.  Indeed, even as X Corp. moves the Twitter platform towards its predominant X brand, X Corp.'s use of the TWITTER Marks continues on, and its goodwill inures to X Corp. and X Corp. alone.

5.      Each day, more than four million users access the X platform through the TWITTER.com domain; users around the world continue to refer to the platform as TWITTER and posts as TWEETS; consumer- and client-facing webpages continue to use each of the TWITTER Marks; third-party licensees continue to display the TWITTER logo as the social

media favicon on their business websites; and X Corp. actively maintains and enforces its rights in the TWITTER Marks.  TWITTER is one of the world's most recognized brands, and it belongs to X Corp.  Simply put, a rebrand is not an abandonment of trademark rights.

6.    On December 2, 2025, "[a]fter 12 months of quiet work," Bluebird, led and counseled in part by Stephen Coates, Twitter Inc.'s former intellectual property counsel, "stepp[ed] out of stealth mode to share something bold": Bluebird filed a petition to cancel X Corp.'s rights in its own TWITTER Marks and also launched its infringing platform, called "TWITTER.new"—a familiar name for a familiar service—a "social media experience . . . with real-time news, announcements, entertainment, and conversations you can trust."[6]  Bluebird's infringing use is not limited to its use of "TWITTER.new"; it has stolen the accompanying TWITTER assets as well—including a blue bird icon (easily confused with the Twitter bird logo), use of a specific hue of blue commonly referred to in popular hex code libraries as "Twitter Blue," and repeated uses of the TWITTER name standing alone (*i.e.*, without the .new suffix accompanying Bluebird's use of the TWITTER wordmark).  Shortly after its launch, Bluebird undertook a public relations campaign claiming that Bluebird is "repairing what broke" and "rebuilding the public square."[7]

---

[6] *See* Ex. 1 at 2; Trademark Trial and Appeal Board Cancellation Proceeding No. 92090266; Ex. 2 at 34.

[7] *See* Ex. 1 at 2, 36.





7.      Based on Coates' announcement, there can be no question that Bluebird intends to confuse consumers into believing Bluebird's platform is associated with X Corp. and its TWITTER Marks.  Indeed, as the above LinkedIn post shows, Coates used X Corp.'s TWITTER Marks and X logo to confuse consumers into believing the new platform is associated with X Corp., even though it is not.

8.      Unsurprisingly, Bluebird's public announcement of a "new" TWITTER, has garnered significant attention and questions about how it could launch a brand that it does not own.  For example, a LinkedIn user questioned: "I don't understand why you think you have any claim to the Twitter trademarks?"[8]  In a now-deleted response, one of Bluebird's co-founders,

---

[8] *See* Ex. 5.

Michael Peroff, readily conceded: "At this time, we do not own the Twitter marks."[9]  That is because, contrary to suggestions made in Bluebird's press blitz, X Corp. continues to use and own the TWITTER Marks.

9.     Bluebird has made no secret of the fact that it is trying to trade on TWITTER's goodwill and reputation.  Although Bluebird could have chosen from nearly limitless options of brand names (like any of X Corp.'s other competitors), it instead wants to capitalize off the goodwill of a brand that is already worth billions of dollars.  According to Mr. Peroff, no other social media network that has sprung up in recent years (such as Bluesky or Threads) has the scale or brand recognition as Twitter.[10]  Similarly, Kevin Raper, one of Bluebird's financial backers, has admitted that Bluebird is intentionally capturing users who are searching for the X platform through its Twitter.com domain.  Raper explained that "400M people search 'twitter' monthly"—evidencing the continuing vitality of the brand—and now, they are "finding TWITTER.new."[11]  Raper acknowledged that associating Bluebird's platform with X Corp.'s TWITTER Marks will benefit Bluebird—explaining, "[t]he nostalgia play gets the headlines."[12]

10.     Bluebird's conduct is not accidental or negligent—it is a calculated, bad-faith scheme to appropriate X Corp.'s TWITTER Marks and the goodwill they embody.  With full knowledge of X Corp.'s numerous incontestable trademark registrations, Bluebird has intentionally adopted the TWITTER Marks to create the false impression that its TWITTER.new

---

[9] *Id.*

[10] Cyrus Farivar, *Operation Bluebird wants to relaunch "Twitter," says Musk abandoned the name and logo*, ARS TECHNICA (Dec. 10, 2025), https://arstechnica.com/information-technology/2025/12/can-twitter-fly-again-startup-wants-to-pry-iconic-trademark-from-musks-x/.

[11] *See* Ex. 1 at 50.

[12] *See* Ex. 1 at 36.

platform is X Corp.'s brand.  This is textbook willful trademark and copyright infringement and counterfeiting, undertaken to exploit consumer recognition and siphon goodwill built over many years.  Bluebird has not concealed this intent; to the contrary, it has openly acknowledged that users are demanding the return of the original TWITTER brand and that Bluebird's platform will "look very similar" to it.[13]  These admissions confirm that confusion is not merely foreseeable—it is the objective.

11.     Bluebird's campaign is already causing, and will continue to cause, immediate and irreparable harm.  Consumers will be deceived into believing that Bluebird's platform is a new product launched by X Corp., a continuation of the TWITTER brand, or otherwise authorized, sponsored, or affiliated with X Corp.  This intentional deception strips X Corp. of control over its trademarks, dilutes its famous marks, and diverts millions of consumers through outright fraud.  The resulting destruction of goodwill—particularly where, as here, Bluebird seeks to pass off its platform as the genuine article—is the paradigmatic form of irreparable injury.  The TWITTER brand remains a valuable, in-use asset, integrated into core features of X Corp.'s platform and accessed daily by millions of users.  Unless enjoined, Bluebird's unlawful conduct will continue to deceive the public and inflict lasting harm on X Corp. and its customers.  X Corp. seeks injunctive relief to immediately halt Bluebird's infringement and counterfeiting and prevent further damage throughout Delaware and the United States.

## The Parties

12.     Plaintiff X Corp. is a corporation organized under the laws of the State of Nevada, with its principal place of business located in Bastrop, Texas.

---

[13] *See* Ex. 1 at 61.

13.     Defendant Bluebird is a corporation registered in and operating under the laws of Delaware with its principal place of business located at 3057 Nutley Street #801 Fairfax, Virginia, 22031.  Upon information and belief, intellectual property lawyer Michael A. Peroff is one of the principal founders of Bluebird and the original applicant of some of the TWITTER trademarks at issue in this case.  Stephen Coates, former counsel for Twitter, Inc., is also a principal in Bluebird and serves as its general counsel.

## Jurisdiction and Venue

14.     This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 and has supplemental jurisdiction over X Corp.'s state-law claims pursuant to 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over Bluebird because Bluebird is incorporated within the state of Delaware, transacts business within the state, and committed, and continues to commit, trademark infringement within the state.  *See* Fed. R. Civ. P. 4(k)(1)(A).

16.     Venue is proper under 28 U.S.C. §§ 1391(b) and (c).  Bluebird is located in this District and does business in this District, and a substantial part of the events giving rise to the claims in this case occurred in this District.

## *Origin of the TWITTER Marks and Services*

17.     The origin of the TWITTER Marks, now wholly and exclusively owned by X Corp., dates back to at least 2006.  Initially referred to as "twttr," the brand exploded in popularity under the ownership of Twitter, Inc.  TWITTER was and remains a social networking platform (now owned by X Corp.) that allows for "micro-blogging" and sharing short text-messages, commonly referred to as TWEETS or posts.  The platform—available both as an app on mobile devices and as an online website—is a way for users to stay instantly connected with

the world around them, including connecting with friends, family, and celebrities, keeping updated on sports and news, sharing opinions, debating, or just having pure fun.

18.     Over the last 20 years, TWITTER became a fixture of American culture.  The platform has played a large role in media, pop culture, and even our democratic elections.  By 2009, popular accounts were amassing millions of followers interested in seeing the latest TWEET, from either a celebrity or news outlet.  By 2011, a single newsworthy event was capable of generating nearly 8,868 TWEETS per second.

19.     By 2012, TWITTER had 140 million users, with over 240 million TWEETS per day—a number that more than doubled by 2019.  TWITTER also became a popular platform for discussing and otherwise being involved in live television programs.  In 2015, 2.2 million users in the U.S. alone sent 21.4 million TWEETS about the MTV Video Music Awards, a phenomenon that continued for years to come.

20.     Over time the platform evolved, allowing users to eventually share photos, videos, and other types of content, but its mission and function have remained the same: to allow users to exchange and receive information, news, ideas, media, and other content, in real time.

### *Twitter Inc.'s Merger Into X Corp. and X Corp.'s TWITTER Trademark Portfolio*

21.     In 2013, Twitter, Inc. became a publicly traded company.  It debuted on the New York Stock Exchange at an initial price of $26 per share.  After raising $1.8 billion in funding, the company was then valued at over $31 billion.

22.     In 2022, Twitter, Inc. once again became a private company—purchased for approximately $44 billion, by and through two entities—X Holdings I, Inc. and X Holdings II, Inc.  By March 2023, the TWITTER product and Twitter Inc.'s assets were consolidated under the newly formed X Corp.

23.     Included in X Corp.'s 2023 merger was the flagship TWITTER platform, along with its intellectual property portfolio, the trademark and copyright registrations that X Corp. continue to own today, and the brand value and goodwill.  X Corp. owns and continues to maintain rights in the following incontestable registered TWITTER Marks, all of which are valid and subsisting.  X Corp.'s registrations are *prima facie* evidence that X Corp. owns the valid and protectible right to exclusive use of the TWITTER name for these and related services.  In addition to the marks below, X Corp. continues to own additional valid and subsisting TWITTER- and TWEET-formative marks.

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| TWITTER [Classes 009, 035] | 4422235 | Oct. 2006 *Incontestable* | Software and software applications to enable transmission, access, organization and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; downloadable software . . . in the field of social networking; downloadable software in the nature of a mobile application; downloadable software in the nature of a mobile application for real-time delivery of data, messages, location, photographs, links, text and other data related thereto; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for providing strategy, insight, marketing, and predicting consumer behavior. |
| TWEET [Classes 038, 041, 045] | 4338963 | May 2008 *Incontestable* | Telecommunications services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing on-line journals, namely, blogs featuring user- |

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| | | | defined content; online social networking services. |
| TWEET<br><br>[Classes 009, 035] | 7374642 | May 2008<br><br>*Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; computer software used to enhance the capabilities and features of other software and nondownloadable online software; downloadable software in the nature of a mobile application for social networking; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for tracking users and advertising of others to provide strategy, insight, marketing, and predicting consumer behavior. |
| TWITTER<br><br>[Classes 038, 041, 045] | 3619911 | August 2006<br><br>*Incontestable* | Telecommunication services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing an online community forum for registered users to share information, photos, audio and video content; Providing a website on the internet for the purpose of social networking. |
| **twitter**<br><br>[Classes 038, 041, 045] | 4179739 | December 2006<br><br>*Incontestable* | Telecommunications services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing an online community forum for users to share information, photos, audio and video content; online social networking services. |

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| TWITTER<br><br>[Classes 006, 016, 021, 022, 025] | 4362656 | Nov. 2008<br><br>*Incontestable* | Promotional items; clothing, namely, t-shirts, sweatshirts, shorts, panties, hats, visors, socks, tank tops, jackets and polo shirts. |
| <br><br>[Classes 009, 016, 018, 021, 025, 035, 036, 038, 041, 042, 045] | 5001027 | Jun. 2012<br><br>*Incontestable* | Software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, web links, and images via the Internet and other communications networks; downloadable software in the nature of a mobile application for social networking; printed matter; articles of clothing; online business networking services; dissemination of advertising for others via an online electronic communications network; financial services; education services; application service provider services; hosting an interactive website and online non-downloadable software for uploading, downloading, posting, showing, displaying, tagging, sharing and transmitting messages, comments, multimedia content, videos, movies, films, photos, audio content, animation, pictures, images, text, information, and other user-generated content; online social networking services. |
| <br><br>[Classes 009, 016, 018, 021, 025, 035, 038, 041, 042, 045] | 4552274 | Jun. 2012<br><br>*Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; software for accessing information on a global computer network; downloadable software via the internet and wireless devices; downloadable software for computers, mobile devices, and other devices for facilitation of communication and data transmission in the field of social networking; downloadable software in the nature of a mobile application for real-time |

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| | | | delivery of data, messages, location, photographs, links, text and other data related thereto; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for providing strategy, insight, marketing, and predicting consumer behavior; application programming interface for third-party software; magnets. |
|  [Classes 009, 035, 038, 041, 045] | 4187348 | Dec. 2010 *Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; downloadable software for computers, portable handheld digital electronic communication devices, mobile devices, and wired and wireless communication devices for facilitation of communication and data transmission in the field of social networking; telecommunication services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing on-line journals, namely, blogs featuring user-defined content in the field of social-networking; online social networking services. |
| TWITTER AMPLIFY [Class 041] | 6992306 | May 2013 *Incontestable* | Providing a website featuring non-downloadable videos, audio, and text in the fields of general news, information, and commentary, and in the fields of entertainment, fashion, education, sports, recreation, training, celebrities, popular culture, current events, and blogging via the internet. |

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| TWITTER FLIGHT [Class 035] | 7152556 | Sep. 2014 Incontestable | Organization of trade shows, exhibitions and events for commercial or advertising purposes; market research and business analyses; providing information and advice in the fields of advertising, marketing, and market research; advertising and marketing consulting services. |
| TWITTER FLIGHT [Classes 035, 041, 042] | 4867983 | Sep. 2014 Incontestable | Arranging, hosting, and conducting educational conferences; educational and entertainment services; organizing exhibitions and events in the field of software development; providing news, commentary and information in the fields of current events relating to entertainment media and education; providing a website featuring non-downloadable electronic publications of others, namely, journals, articles, presentations and interviews featuring information on the topic of computers, computer software, software development, application programming interfaces and social networking; organizing and hosting conferences. |
| TWITTER FLIGHT [Class 041] | 7152555 | Sep. 2014 Incontestable | Arranging, hosting, and conducting business conferences and educational exhibitions in the fields of advertising, marketing, promotional services, social media, social networking, computers, computer software, software development, and application programming interfaces; organizing and hosting educational conferences and exhibitions; providing online non-downloadable publications, namely, blogs, written articles, images, videos, and webinars in the fields of advertising, marketing, promotional services, social media, social networking, computers, computer software, software development, and application programming interfaces; educational services; providing online non-downloadable educational course materials. |

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| TWITTER AMPLIFY [Class 009] | Application Pending Serial No.: 90403442 | N/A | Downloadable software and downloadable mobile applications for monitoring and reporting on the effectiveness of advertisements. |
| TWITTER AMPLIFY [Class 035] | Application Pending Serial No.: 90403436 | N/A | Providing a website for connecting brands and advertisers with social media users. |
| TWITTER AMPLIFY [Class 038] | Application Pending Serial No.: 90403448 | N/A | Transmission of data, namely, advertising data, user statistics, advertising statistics, ad placement data, software performance statistics, and mobile application performance statistics via the internet and other communications networks. |

### *X Corp.'s Social Media Platform Today*

24.    Two and half years ago, in July 2023, and shortly after Twitter Inc. merged into X Corp., it was announced that the TWITTER platform was rebranding to "X."  This rebrand reflected the extension of TWITTER's product lines and customers, its technology-focused innovations, and the promised expansion of its business.  Despite a platform rebrand, X Corp. never relinquished its rights and never ceased use of the TWITTER Marks, in part to ensure that its hundreds of millions of registered users remained aware of and able to access the platform they know and love.  The TWITTER name remains a vital part of X Corp.'s value, history and identity on its platform and in the minds of its clients and general consumers.

25.    The "X" name is frequently found and used alongside the TWITTER mark, given the decades of goodwill built up in the mark.  Millions of consumers continue to refer to X as TWITTER and refer to posts as TWEETS.  Both the media and X Corp. itself refer to the social networking platform as "X (formerly Twitter)."  X Corp. has also approved the use of the "X

(formerly Twitter)" brand for national ad campaigns with its partners like the NBA and high-profile events like the Grammys.

26.     As recently as December 11, 2025, in a single day, over four-million unique users accessed X Corp.'s social networking platform through the twitter.com domain name—meaning these users intentionally typed, searched for, or otherwise directed themselves (*i.e.*, through a webpage bookmark) to the "TWITTER" domain in order to access the site.  Further, more than 200,000 mobile users continue to maintain the original TWITTER mobile application, together with the TWITTER logo, on their mobile devices for accessing the X platform.

27.     In addition to its use and promotion of the platform under its X mark, X Corp. further promotes and provides its services under the TWITTER Marks.  X Corp. hosts client events that bring together customers and leaders across various industries to help customers understand X Corp.'s product offerings, grow their businesses and expand their networks.  X Corp.'s marketing representatives attending such events often use the TWITTER name in their client-facing communications.

28.     X Corp. operates a blog that is available at https://blog.twitter.com and https://blog.x.com, with many of its articles still referring to the company and platform as "Twitter."  X Corp. also maintains its TWITTER branding on other social media platforms like Facebook under the name Twitter; on Instagram under the handle @Twitter; on LinkedIn as Twitter; and on YouTube at @TwitterBusiness.

29.     X Corp. further maintains its TWITTER branding on websites and client materials including, but not limited to: its ads help page for its customers; webpages to help customers publish or embed TWEETS or posts on its own media; marketing and business guides explaining some of its TWITTER Amplify and other advertising products; and its Vendor and Supplier

onboarding guidelines and other materials.[14]  A simple search of the X Corp. Help Center shows that "TWITTER" and "TWEET" appear on hundreds of active X Corp. webpages, all of which are directed to users of X Corp.'s platform.[15]

30.      Third parties also use the TWITTER Marks with the permission of X Corp., which use inures directly to X Corp.'s benefit; and consumers and the media consistently refer to X Corp.'s core product as TWITTER and its posts as TWEETS.  For example, the popular airline JetBlue utilizes the TWITTER Bird Logo on its website to direct users to its @JetBlue handle on the X Corp. platform, which has 1.7 million followers.[16]



31.      The continuing popularity and use of TWITTER is readily apparent and often the subject of reporting—both on television and in the media.[17]  For instance, the popular Netflix television show "Running Point" starring Kate Hudson joined in the conversation this year, with

---

[14] *See* Ex. 4 (X Corp. maintained websites and customer-facing materials).

[15] *See* X HELP CENTER, https://help.x.com/en (last visited Dec. 16, 2025).

[16] *See* JETBLUE, https://www.jetblue.com/ (last visited Dec. 15, 2025); JetBlue (@JetBlue), X, https://x.com/jetblue.

[17] Ashleyprillaman, Comment on image posted by Netflix Is A Joke (@netflixisajoke), INSTAGRAM (March 4, 2025), https://www.instagram.com/p/DGyb1wdPo8s/?hl=en.

consumers aptly agreeing with Hudson's co-stars that they'll "never stop calling it Twitter." News reports have also reported on the continued brand presence and importance of the TWITTER name to X Corp. and its X platform in articles such as "One year later: Why 89% of brands still call it Twitter," and "2 Years After Elon Musk's X Rebrand: Why 55% of Americans Still Call It 'Twitter.'"[18]



---

[18] Aistė Jočytė, *One year later: Why 89% of brands still call it Twitter*, OMNISEND (July 22, 2024), https://www.omnisend.com/blog/why-brands-still-call-it-twitter/; Katherine Maclang, *2 Years After Elon Musk's X Rebrand: Why 55% of Americans Still Call It 'Twitter'*, DESIGNRUSH (July 23, 2025), https://news.designrush.com/two-years-after-elon-musk-x-rebrand-why-americans-still-call-it-twitter.

32.      Because of this X Corp. takes its rights in the TWITTER Marks seriously—investing in continuous monitoring and enforcement before the United States Patent and Trademark Office ("USPTO") to ensure its rights in the TWITTER name remain with its rightful owner.  Specifically, X Corp., through its counsel, uses services such as Alt Legal to monitor similar trademark application filings, uses MarkMonitor to monitor domain name registrations, and works with counsel around the world to evaluate potentially infringing marks.  X Corp. has also carefully maintained its rightfully owned and used registrations for its active TWITTER Marks by filing the relevant maintenance documents—including after its July 2023 rebrand.

33.      The TWITTER brand is famous in the United States and abroad.  X Corp.'s social networking platform maintains users in hundreds of countries and territories around the world – with hundreds of relevant media mentions as TWITTER weekly, if not daily.  With over 400 million consumer searches for "TWITTER" per month, and hundreds of millions of dollars in continued brand value, X Corp. would never have thought that a third-party start-up would unilaterally sweep in and attempt a swift theft of its incontestable rights.

### *Bluebird's Infringing Uses and Attempted Registration of "TWITTER" AND "TWEET"*

34.      On July 25, 2023, Michael Peroff, along with Bryan Peroff and PEROFF IP (the firm apparently led by the Peroff brothers), filed a trademark application with the USPTO to register TWITTER for computer software, advertising services, and telecommunications services, U.S. Ser. No. 98100526—all services offered by and registered by X Corp.  Notably, Mr. Michael Peroff filed the applications a mere 24 hours after X Corp. adopted its new X logo—attesting he had developed a genuine intent to use the already registered and occupied TWITTER Marks in less than a day.  Mr. Peroff's application was refused on the ground that it was likely to cause confusion with X Corp.'s registrations.  As a result, his application did not

(and has not) proceeded to the publication stage—meaning that the Trademark Office has not yet opened the applications to public objections.

35.    About a year later, PEROFF IP filed another trademark application for TWITTER for payment processing services, education services, and application services provider for payments, U.S. Ser. No. 98647535 (together with Ser. No. 98100526 the "Peroff Applications")—again in classes that X Corp. already owned valid TWITTER trademark registrations.  The USPTO once again issued an Office Action, preliminarily refusing registration on the grounds of X Corp.'s pre-existing rights in its TWITTER Marks.  In response, Peroff IP stated it would "explicitly forego any intention to use its Twitter mark in commerce as applying directly and specifically to 'social media' services."[19]  Peroff IP went on to certify that any references to social media were "unintended."[20]

36.    Bluebird claims to have acquired the Peroff Applications on June 26, 2025 and Dec. 1, 2025.  Today, the Peroff Applications remain (rightfully) suspended, in part because those applications are likely to cause confusion with X Corp.'s incontestable TWITTER registrations.

37.    On Dec. 2, 2025, Bluebird filed two intent-to-use trademark application with the USPTO seeking to register the stand-alone word mark "TWITTER" and "TWEET" in

---

[19] Bryan Peroff, *Response to Office Action*, Trademark Application of Bryan Peroff, U.S. Ser. No. 98647535 (USPTO April 7, 2025), *available at* https://tsdr.uspto.gov/documentviewer?caseId=sn98647535&docId=ROA20250408123150 &linkId=4#docIndex=3&page=1, at "Original PDF File."

[20] *Id.*

overlapping classes and the same services with X Corp.'s incontestable registrations for

TWITTER and TWEET.  *See* U.S. Ser. Nos. 99524594, 99524598.[21]

38.    A summary of Bluebird's applied-for-marks, including the recently assigned

Peroff Applications are included in the below chart.  Copies of the as-filed applications are

attached hereto as Exhibit 3.  All of the applications remain suspended and/or are otherwise

pending.

| Bluebird's Applied-For Marks | Ser. No. | Sampling of Applied-For Goods and Services |
|---|---|---|
| TWITTER | 99524594 [Classes 42 and 45] | Software; computer services, namely, creating an online community for registered users to participate in discussions and engage in social networking services; online social networking services; providing an internet website portal for engaging in social networking; online social networking services accessible by means of downloadable mobile applications. |
| TWITTER | 98100526 [Classes 09, 35, 38, 45] | Downloadable computer application software for mobile phones, namely, software for sending messages, posting photographs and videos via social media; downloadable computer software for controlling the operation of audio and video devices; downloadable computer software for managing and validating cryptocurrency transactions using blockchain-based smart contracts; downloadable computer software for use as an application programming interface (API); software development tools for the creation of mobile internet applications and client interfaces; advertising by transmission of on-line publicity for third parties through electronic communications networks; social media strategy and marketing consultancy focusing on helping clients create and extend their product and brand strategies by building virally engaging marketing solutions; analyzing and compiling data for measuring the |

---

[21]    *See* Ex. 3 (Peroff and Bluebird Applications).

| | | performance of advertising campaigns; digital advertising services; marketing services in the nature of promotion of third-party goods and services by social media influencers; providing and rental of advertising space on the internet; providing business information in the field of social media; telecommunication services, namely, local and long distance transmission of voice, data, graphics and video by means of broadband optical or wireless networks; computer services, namely, providing on-line facilities for real-time interaction with other computer users concerning topics of general interest; transfer of data by telecommunications; online social networking services. |
|---|---|---|
| TWITTER | 98647535 [Classes 36, 41, 42] | Payment and funds verification services; Payment processing services, namely, credit card and debit card transaction processing services; electronic commerce payment services, namely, establishing funded accounts used to purchase goods and services on the Internet; financial transaction services, namely, providing secure commercial transactions and payment options using a mobile device at a point of sale; Prepaid services in the nature of making advance payments to add value to prepaid or pay-as-you-go cards for the purchase of retail goods, services and internet content created by social media influencers, microbloggers and advertisers; education services; entertainment services in the nature of arranging social entertainment events; entertainment services in the nature of hosting live social entertainment events; entertainment services, namely, providing a website featuring advice concerning personal relationships, such advice being for entertainment purposes only; organization of entertainment exhibition events; providing a website featuring entertainment information; providing information in the field of entertainment; providing user reviews for entertainment or cultural purposes; research in the field of education via the internet; application service provider (ASP) featuring e-commerce software for use as a payment gateway that authorizes processing of credit cards or direct payments for merchants. |
| TWEET | 99524598 [Class 045] | Online social networking services; providing an internet website portal for engaging in social networking; providing information, news, commentary |

| | | in the field of social networking; online social networking services accessible by means of downloadable mobile applications; providing a website featuring information regarding social networking and online discussions. |
|---|---|---|

39.     Bluebird launched its "TWITTER" website, currently publicly accessible on https://www.twitter.new.  Based on a review of publicly available WHOIS data, the TWITTER.new domain was registered in November 2025.[22]  According to Bluebird, its "new" TWITTER social networking platform is meant to "reclaim[] Twitter with an AI verification infrastructure to evolve the social media experience and bring back the public square with real-time news, announcements, entertainment and conversations you can trust."[23]

40.     Consumers visiting the TWITTER.new website can sign up for early access to "reserve a handle."[24]  When prospective businesses and target consumers of Bluebird's product sign up for a handle reservation, they are prompted to fill in their handle request, email, name and country—subject to "Twitter's Terms of Service, Privacy Policy, Community Guidelines and any applicable laws."[25]  Bluebird's infringing website further states that "Twitter reserves the right to deny or reassign handles at any time."[26]



-  All requested handles must comply with Twitter's Terms of Service, Privacy Policy, Community Guidelines and any applicable laws. Twitter reserves the right to deny or reassign handles at any time.

---

[22] WHOIS Database, GODADDY, https://www.godaddy.com/whois/results.aspx?itc=dlp_domain_whois&domain=twitter.new (last visited Dec. 15, 2025).

[23] Ex. 2 at 37.

[24] Ex. 2 at 2.

[25] Ex. 2 at 4.

[26] Ex. 2 at 4.

41.     Once signed up, consumers are then "welcome[d] back" to the "public square," even though it never went away to begin with.



42.     Bluebird's inclusion of a small-font disclaimer at the very bottom of its infringing website, stating "Operation Bluebird Inc. is not affiliated with X Corp or Twitter, Inc.," does nothing to dispel confusion.  Indeed, Bluebird's inclusion of such a disclaimer itself recognizes that consumers are likely to be confused into believing that X Corp. and/or Twitter is associated with Bluebird's website.

43.     Bluebird is also promoting its "new" TWITTER social networking platform on its LinkedIn account @Operation Bluebird, and through its employees and executives.[27]  In the short time since its first public announcement on December 8, 2025, its founders and financiers have been vocal about their new project that they had been silently working on for over a year.

44.     According to public statements by its founders, Bluebird is looking to "improve the social media experience" and has more surprises in store for those following its early development.[28]  But despite its teased improvements and developments, Bluebird appears to be offering the same exact product as X Corp.—a social media networking site where users can share, upload and publish content, relying on new AI technological advancements, allowing for payment processing services, and a place for businesses to advertise their services.

45.     Bluebird is intentionally attempting to draw a false association between X Corp. and Bluebird's "new" product.  Bluebird utilizes the same distinctive blue color scheme, a confusingly similar bird logo to X Corp.'s currently registered bird logo, inaccurately referring to itself as "TWITTER," telling users to get "#BackWithYourEx," and using the same #TWITTER hashtag that has been emblematic of the



_____

[27] *See, e.g.,* Ex. 1 at 2, 29, 39, 42; Operation Bluebird Inc. (@Operation Bluebird Inc.), LINKEDIN, https://www.linkedin.com/company/operation-bluebird/ (last visited Dec. 15, 2025).

[28] *See* Ex. 1 at 13, 24, 25.

TWITTER brand for decades.[29]

46.    Not only is it likely, but it is certain that Bluebird's use of "TWITTER" will cause confusion with X Corp.'s TWITTER-branded goods and services.  Consumers are already drawing an association between X Corp. and Bluebird—asking if they can transfer their existing X handle to TWITTER.new.[30]  Instead of correcting the confusion and explaining that there is no affiliation between X Corp. and Bluebird, one of Bluebird's founders and former trademark counsel at Twitter Inc.,



Stephen Coates, instead encouraged the poster to simply reserve his sought-after handle on the TWITTER.new website.  Similarly, the media is conflating X Corp.'s platform and Bluebird's announcement—including a recent article discussing Bluebird's new platform, alleging that "Old Twitter" is "set to come back."[31]

---

[29] Operation Bluebird Inc. (@Operation Bluebird Inc.), LINKEDIN, https://www.linkedin.com/company/operation-bluebird/ (last visited Dec. 15, 2025).

[30] *See* Ex. 1 at 19.

[31] Harry Boulton, *'Old Twitter' set to come back and compete against Elon Musk's X as startup seeks to reclaim trademarks*, UNILAD TECH (Dec. 11, 2025), https://www.uniladtech.com/social-media/twitter/old-twitter-could-return-company-seeks-reclaim-trademarks-152325-20251210.

47.     Bluebird also has received repeated inquiries about the legality of its actions, including from users on LinkedIn pointing out X Corp.'s senior and continuing rights.[32]  And despite clear knowledge of X Corp.'s current rights, Bluebird doubled down on its intention to infringe X Corp.'s rights—opting to simultaneously use the TWITTER name while it petitioned to cancel X Corp.'s incontestable registrations.[33]

48.     Bluebird's infringing "TWITTER" offering does not appear to target any specific type of industry or consumer and, upon information and belief, is targeted at a wide variety of individuals and businesses interested in posting on or utilizing social media—the same consumers that X Corp. targets.  In the short time since its launch, Bluebird has amassed over 144,000 handle requests, including more than 100,000 new requests only one day after Bluebird announced its launch.[34]

49.     Bluebird is specifically targeting X Corp.'s exact customers with its brand messaging encouraging users to switch from X to "new" TWITTER.  Bluebird further promotes its product with the same messaging that X Corp. uses—referring to itself as a town square, and emphasizing the need for freedom of expression and creating an "environment to express, share and find information."[35]  But as one of X Corp.'s active webpages explains, "Twitter continues to offer the opportunity to be a part of the global town square," "is still the place to join the best

---

[32] Ex. 1 at 9, 16, 59.

[33] Indeed, the lawyer who filed Bluebird's TWITTER and TWEET trademark applications also previously filed and maintained trademark applications on behalf of Twitter, Inc.

[34] *See* Ex. 2 at 2.

[35] *See* Ex. 1 at 13.

conversations," and "continues to be a place where your ads can reach influential and plugged-in audience with a discovery mindset."[36]

50.    As Bluebird officially launches and expands its offerings and its use of "TWITTER" becomes more widespread, the initial association and likely confusion highlighted above will only be exacerbated. Consumers, businesses, and investors alike will believe that Bluebird's "TWITTER"-branded platform is the latest offering under X Corp.'s marks—or vice versa, that the TWITTER Marks now belong to Bluebird—neither of which are true. Given that Bluebird's "TWITTER" platform is being advertised by Bluebird as "the all-new TWITTER," it is inevitable that consumers will think that Bluebird's platform is now just part of X Corp.'s family of brands.[37]

### ***Bluebird's Conduct Further Infringes Upon X Corp.'s Valid and Subsisting Copyrights***

51.    X Corp. is also the owner of all right, title, and interest in and to four copyrighted "bird logo" designs (collectively, the "Twitter Bird Copyrights"), which are original works of authorship fixed in tangible media of expression.

52.    The Twitter Bird Copyrights are registered with the United States Copyright Office as follows: Twitter Bird Logo 1 (Registration No. VA0001939828); Twitter Bird Logo 2 (Registration No. VA0001950612); Twitter Bird Logo 3 (Registration No. VA0001939830); and Twitter Bird Logo 4 (Registration No. VA0001950611).

53.    Each of X Corp.'s registrations for the Twitter Bird Copyrights were registered on December 11, 2014. Copies of the registration certificates for each of the Twitter Bird Copyrights are publicly accessible at the United States Copyright Office.

---

[36] X HELP CENTER, https://help.x.com/en/resources/t-service (last visited Dec. 15, 2025).

[37] *See, e.g.,* Ex. 1 at 27.

54.     The Twitter Bird Copyrights are original works of visual art that embody creative and distinctive design elements, including but not limited to the stylized shape, proportions, angles, curves, and overall aesthetic presentation of a bird in flight rendered in a minimalist style.

55.     The Twitter Bird Copyrights have been used extensively by X Corp. in commerce since at least 2010 in connection with X Corp.'s social media platform and related services.  In blatant disregard for X Corp.'s valid and persisting registrations for the Twitter Bird Copyrights, Bluebird has, without authorization or license from X Corp., copied, reproduced, displayed, and distributed a bird logo (the "Infringing Logo") in the identical blue color in which the Twitter Bird Copyrights often appear, that infringes X Corp.'s Twitter Bird Copyrights.  Specifically, the Infringing Logo depicts a stylized bird in flight rendered in blue, featuring design elements that are substantially similar to the protected expression embodied in X Corp.'s Twitter Bird Copyrights.  The substantial similarity is further underscored by Bluebird's admitted intent to associate its platform with both TWITTER and X Corp., through its use of trade style and hashtags like #TWITTER, #BackWithYourEx, and even references to X Corp.'s current primary logo and color scheme.[38]

---

[38] *See generally,* Ex. 2.

| X Corp.'s Use | Bluebird's Use |
|---|---|
|  | |

56.    The Infringing Logo is identical to the Twitter Bird Copyrights, and there can be no doubt that Bluebird's copying was intentional.  Bluebird has used and continues to use the Infringing Logo in connection with its own social media platform and related services, including but not limited to: displaying the Infringing Logo on Bluebird's website and displaying the Infringing Logo on Bluebird's social media accounts and profiles.[39]

57.    There is no dispute that Bluebird had access to X Corp.'s registered Twitter Bird Copyrights prior to creating and adopting the Infringing Logo given the widespread use of the Twitter Bird Copyrights.  Additionally, Stephen Coates, Bluebird's General Counsel, served as intellectual property counsel to Twitter, where, upon information and belief, he assisted in managing Twitter's intellectual property portfolio, which included the Twitter Bird Copyrights.  Indeed, Coates' time at Twitter overlapped with the filing of the registrations for the Twitter Bird Copyrights, an event someone in Coates' position would undoubtedly have been privy to.

---

[39] *See, e.g.*, TWITTER.NEW HOME PAGE, https://www.twitter.new/ (last visited Dec. 15, 2025); Operation Bluebird Inc. (@Operation Bluebird Inc.), LinkedIn, https://www.linkedin.com/company/operation-bluebird/ (last visited Dec. 15, 2025).

58.    Bluebird's infringement of X Corp.'s copyrights is willful.  Bluebird knew of X

Corp.'s copyrights in the Twitter Bird Copyrights, and despite such knowledge, deliberately

chose to copy X Corp.'s protected expression and adopt a substantially similar logo for its own

commercial purposes.  If Bluebird is not enjoined from further willful infringement of X Corp.'s

TWITTER Marks and copyrights, X Corp. will suffer irreparable harm, and the goodwill that X

Corp. and its predecessor Twitter, Inc. spent decades cultivating and investing in will be

unacceptably eroded.

**COUNT ONE**
**(Registered Trademark Infringement**
**Under Section 32 of the Lanham Act, 15 U.S.C. § 1114)**

59.    X Corp. repeats and realleges each and every allegation in the foregoing

paragraphs as if fully set forth herein.

60.    X Corp. is the owner of the TWITTER Marks, which are registered with the

USPTO and are valid, subsisting, used in commerce, and inherently distinctive.

61.    Bluebird's "TWITTER" mark and its Infringing Logo are the same and/or are

confusingly similar to the registered TWITTER Marks.  Bluebird's "TWITTER" mark and

Infringing Logo are used in connection with social networking products and services that are

overlapping and related to the products and services offered by X Corp.  Bluebird has applied to

register the trademark TWITTER in the same classes and for similar goods and services as the

registered TWITTER Marks.

62.    Bluebird's uses of "TWITTER," along with its Infringing Logo, are therefore

likely to cause confusion, or to cause mistake, or to deceive as to the source, origin, sponsorship

or affiliation of X Corp.'s products and services, and are likely to cause consumers to believe,

incorrectly, that Bluebird's products and services originate from, or have been authorized,

sponsored, approved, or endorsed by X Corp., or that Bluebird's businesses are otherwise

31

connected to, sponsored by, or affiliated with X Corp. in some way; whereas, in fact, X Corp. does not approve of Bluebird's appropriation of its trademarks for Bluebird's products, services, or businesses.

63.    Bluebird's uses of "TWITTER" and its Infringing Logo are likely to cause irreparable injury to the reputation of X Corp. as well as the goodwill developed by X Corp. and its predecessor Twitter, Inc. for its services and the TWITTER brand.  The extent of this harm cannot be ascertained at this time, leaving X Corp. without any adequate remedy at law.

64.    The foregoing acts by Bluebird constitute trademark infringement of X Corp.'s federally registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

65.    By reason of the foregoing, X Corp. is entitled to injunctive relief against Bluebird, restraining Bluebird from further acts of infringement of the registered TWITTER Marks.

66.    Bluebird's actions also present an exceptional case, entitling X Corp. to recovery of any damages (to the extent calculable) proven to have been caused by reason of Bluebird's aforesaid acts, and its costs and fees associated with bringing this litigation.

## <u>COUNT TWO</u>
**(Delaware Common Law Trademark Infringement and Unfair Competition)**

67.    X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

68.    X Corp. is the common law owner of the TWITTER Marks, which are strong, distinctive, valid, and enforceable trademarks at common law.

69.    Bluebird's promotion, advertising, offering for sale, and sale of its services in connection with the "TWITTER" mark (and Infringing Logo) is likely to cause confusion, to cause mistake, and/or to deceive as to affiliation, connection, or association between X Corp. and

Bluebird, and is likely to cause members of the public to believe, incorrectly, that Bluebird's products and services originate from, or have been authorized, sponsored, approved, or endorsed by X Corp., or that Bluebird's business is otherwise connected to, sponsored by, or affiliated with X Corp. in some way; whereas, in fact, X Corp. does not approve of Bluebird's appropriation of its trademarks for Bluebird's products, services, or businesses.

70.     Bluebird's use of the identical and confusingly similar "TWITTER" mark, and Infringing Logo, is likely to cause irreparable injury to the reputation of X Corp., as well as the goodwill developed by X Corp., and its predecessor Twitter, Inc., for its services and the TWITTER Marks.

71.     The aforementioned acts and practices constitute infringement of X Corp.'s valid and enforceable common law trademarks.

72.     By reason of the foregoing, X Corp. is entitled to injunctive relief against Bluebird, restraining Bluebird from further acts of infringement of the registered TWITTER Marks and, recovery of any damages (to the extent calculable) proven to have been caused by reason of Bluebird's aforesaid acts.

## COUNT THREE
### (Federal Counterfeiting Under 15 U.S.C. § 1114)

73.     X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

74.     X Corp.'s TWITTER Marks are registered on the Principal Register of the United States Patent and Trademark Office.

75.     Through extensive and continuous use, the TWITTER Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of

significant value, are highly distinctive and arbitrary or fanciful, and have become universally associated in the public mind with X Corp., its products and services.

76.    Bluebird is intentionally distributing and advertising services bearing counterfeits of the registered TWITTER Marks, as defined pursuant to 15 U.S.C. § 1127, insofar as Bluebird's use of the TWITTER Marks includes use of a spurious mark identical to, or substantially indistinguishable from, X Corp.'s registered TWITTER Marks.

77.    Bluebird's counterfeiting activities are likely to cause confusion, mistake, and deception among the general consuming public as to X Corp.'s actual goods and services. Bluebird's unlawful acts are intended to reap the benefit of the immense goodwill associated in X Corp.'s TWITTER Marks, and its goods and services, and constitute counterfeiting of the registered TWITTER Marks in violation of 15 U.S.C. § 1114.

78.    Unless enjoined from its counterfeiting conduct, Bluebird will continue to deceive the public, and X Corp. will continue to suffer immediate and irreparable injury.  X Corp. has no adequate remedy at law.

79.    Because Bluebird's conduct is willful, X Corp. is entitled to statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117.

## <u>COUNT FOUR</u>
### (False Designation of Origin and Unfair Competition Under 15 U.S.C. § 1125)

80.    X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

81.    X Corp. is the owner of the TWITTER Marks, which are strong, distinctive, valid, and enforceable trademarks both under federal and common law.

82.     The TWITTER Marks are distinct and significant, and have been used in commerce prior to Bluebird, such that the use of the name "TWITTER" identifies X Corp.  X Corp. has an established brand which is capable of protection.

83.     Bluebird is using its "TWITTER" marks and Infringing Logo in commerce in connection with the distribution or sale of its services.

84.     Bluebird's false and misleading use of the "TWITTER" mark and its Infringing Logo is likely to deceive consumers, in that it is likely to cause members of the public to believe, incorrectly, that Bluebird's products and services originate from, or have been authorized, sponsored, approved, or endorsed by X Corp., or that Bluebird's businesses are otherwise connected to, sponsored by, or affiliated with X Corp. in some way; whereas, in fact, X Corp. does not approve of Bluebird's appropriation of its trademarks for Bluebird's products, services, or businesses.

85.     The above-described acts and practices constitute actionable false designation of origin and unfair competition under 15 U.S.C. § 1125(a) and have damaged X Corp.

86.     X Corp., and its predecessor Twitter, Inc., have invested significant time and resources into developing the goodwill associated with the TWITTER Marks.  The goodwill of the marks is of continuing value to X Corp., and X Corp. has and will continue to suffer irreparable harm should unfair competition in the form of Bluebird's use of the "TWITTER" mark and Infringing Logo be allowed to continue.

87.     By reason of the foregoing, X Corp. is entitled to injunctive relief against Bluebird, restraining Bluebird from further acts of infringement of X Corp.'s trademark rights and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Bluebird's aforesaid acts.

## COUNT FIVE
### (Deceptive Trade Practices under Delaware Law; 6 Del. C. § 2532)

88.    X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

89.    X Corp. is the owner of the TWITTER Marks, which are strong, distinctive, valid, and enforceable trademarks at federal and common law.

90.    Bluebird's promotion, advertising, offering for sale, and sale of its services in connection with the "TWITTER" mark, and Infringing Logo, is likely to cause confusion, to cause mistake, and/or to deceive as to affiliation, connection, or association between X Corp. and Bluebird, and is likely to cause members of the public to believe, incorrectly, that Bluebird's products and services originate from, or have been authorized, sponsored, approved, or endorsed by X Corp., or that Bluebird's business is otherwise connected to, sponsored by, or affiliated with X Corp. in some way; whereas, in fact, X Corp. does not approve of Bluebird's appropriation of its trademarks for Bluebird's products, services, or businesses.

91.    Bluebird's use of the "TWITTER" mark and Infringing Logo is likely to cause confusion or misunderstanding as to the source, sponsorship, approval or certification of its goods and services and/or the affiliation, connection, or association with, or certification of X Corp.

92.    Bluebird's use of the same and confusingly similar "TWITTER" mark and Infringing Logo is likely to cause irreparable injury to the reputation of X Corp., as well as the goodwill developed by X Corp. and its predecessor Twitter, Inc., for its services and the TWITTER Marks.

93.    The aforementioned acts and practices constitute deceptive trade practices and infringement of X Corp.'s valid and enforceable trademarks.

94.     By reason of the foregoing, X Corp. is entitled to injunctive relief against Bluebird, restraining Bluebird from further acts of infringement of X Corp.'s trademarks.

### COUNT SIX
### (Trademark Dilution Under the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c))

95.     X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

96.     X Corp. is the owner of the TWITTER Marks, which are registered with the USPTO and are valid, subsisting, used in commerce, and inherently distinctive.

97.     The TWITTER Marks are famous marks that are widely recognized by consumers, businesses, and industry around the globe, and that identify the services of X Corp. in the minds of consumers.  Bluebird's unauthorized use of the TWITTER Marks and the Infringing Logo began long after X Corp.'s marks became famous.

98.     Bluebird's unauthorized use of the TWITTER Marks and its Infringing Logo in connection with the distribution or sale of its services dilutes, and will continue to dilute, the distinctiveness of the TWITTER Marks, which consumers, businesses, and industry associate uniquely with X Corp. and its services.

99.     Bluebird's unauthorized use of the TWITTER Marks and its Infringing Logo has, and will continue to have, an adverse effect upon the value and distinctive quality of the TWITTER Marks.  Bluebird's acts blur and whittle away at the distinctiveness and identity-evoking quality of the TWITTER Marks.

100.     Bluebird's acts dilute the value of X Corp.'s goodwill in connection with the TWITTER Marks and destroy the exclusive association between X Corp and its TWITTER Marks.

101.     Bluebird's acts constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

102.    The aforementioned acts of trademark dilution have caused, and are causing, irreparable injury to X Corp.  Unless enjoined by the Court, Bluebird will continue to dilute the distinctiveness of the TWITTER Marks, causing further injury to X Corp.

**COUNT SEVEN**
**(Trademark Dilution Under Delaware Law; 6 Del. C. § 3313)**

103.    X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

104.    X Corp. is the owner of the TWITTER Marks, which are registered with the USPTO and are valid, subsisting, used in commerce, and inherently distinctive.

105.    The TWITTER Marks are famous marks that are widely recognized by consumers, businesses, and industry around the globe, and that identify the services of X Corp. in the minds of consumers.  Bluebird's unauthorized use of the TWITTER Marks and the Infringing Logo began long after X Corp.'s marks became famous.

106.    Bluebird's unauthorized use of the TWITTER Marks and its Infringing Logo in connection with the distribution or sale of its services dilutes, and will continue to dilute, the distinctiveness of the TWITTER Marks, which consumers, businesses, and industry associate uniquely with X Corp. and its services.

107.    Bluebird's unauthorized use of the TWITTER Marks and its Infringing Logo has, and will continue to have, an adverse effect upon the value and distinctive quality of the TWITTER Marks.  Bluebird's acts blur and whittle away at the distinctiveness and identity-evoking quality of the TWITTER Marks.

108.    Bluebird's acts dilute the value of X Corp.'s goodwill in connection with the TWITTER Marks and destroy the exclusive association between X Corp. and its TWITTER Marks.

109.    Bluebird's acts constitute trademark dilution in violation of 6 Del. C. § 3313.

110.    The aforementioned acts of trademark dilution have caused, and are causing, irreparable injury to X Corp.  Unless enjoined by the Court, Bluebird will continue to dilute the distinctiveness of the TWITTER Marks, causing further injury to X Corp.

## COUNT EIGHT
### (Copyright Infringement Under 17 U.S.C. §§ 101 et seq.)

111.    X Corp. repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

112.    X Corp. owns the registered copyrights in the Twitter Bird Copyrights, which are protected works of authorship and subject to copyright under 17 U.S.C. § 102(a)(5).

113.    The Twitter Bird Copyrights were first published between 2009 and 2013 and were registered with the United States Copyright Office on December 11, 2014, under registration numbers VA0001939828, VA0001950612, VA0001939830, and VA0001950611.

114.    Bluebird copied protected expression from X Corp.'s copyrighted Twitter Bird Copyrights in creating and using the Infringing Logo.  Bluebird then displayed the Infringing Logo on its website, in promotional material, and on social media profiles in violation of X Corp.'s rights under 17 U.S.C. § 106(1)-(2), (5).

115.    The Infringing Logo is substantially similar to X Corp.'s copyrighted Twitter Bird Copyrights in their protected elements of expression.

116.    Bluebird's unauthorized copying, reproduction, display, and distribution of the Infringing Logo constitutes infringement of X Corp.'s exclusive rights under 17 U.S.C. § 106.

117.    Upon information and belief, Bluebird's infringement of X Corp.'s copyrights has been willful.  Bluebird's willful infringement entitles X Corp. to enhanced statutory damages and attorney fees pursuant to 17 U.S.C. §§ 504(c) and 505.

118.    As a direct and proximate result of Bluebird's copyright infringement, X Corp. has suffered, or will suffer, substantial damages, including but not limited to loss of licensing revenues, diminution in the value of its copyrighted works, and harm to its business reputation and goodwill.

119.    Bluebird has unjustly benefited, or will unjustly benefit, from its unauthorized use of X Corp.'s copyrighted works and has realized, or will realize, profits attributable to such infringement.

120.    X Corp. has no adequate remedy at law for Bluebird's ongoing infringement and will suffer irreparable harm unless Bluebird is enjoined from further infringing conduct.

## PRAYER FOR RELIEF

WHEREFORE, X Corp. respectfully demands judgment:

1.    That Bluebird and all those in active concert or participation with Bluebird (including, but not limited to, its officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and contracting parties) be temporarily, preliminarily, and then permanently enjoined and restrained from:

i.    using and registering the "TWITTER" mark, or any other logo, device, design, or word mark that is a colorable imitation of, or is similar to, the TWITTER Marks, or any of them, in connection with the advertising, distribution, marketing, offering for sale, or sale of any product or service neither originating from nor authorized by X Corp.;

ii.    representing in any manner or by any method whatsoever, that goods, services or other products provided by Bluebird are sponsored, approved, authorized by or originate from X Corp. or otherwise taking any action likely to cause confusion, mistake or

deception as to the origin, approval, sponsorship, or certification of such goods, products, or services;

2.      That Bluebird and all those in active concert or participation with Bluebird (including, but not limited to, its officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and contracting parties) take affirmative steps to dispel such false impressions that heretofore have been created by Bluebird's use of the TWITTER Marks, including, but not limited to, recalling from any and all channels of distribution any and all advertising, marketing, or promotional material and the like, bearing or distributed under the TWITTER Marks, or any confusingly similar variations thereof; and undertaking corrective advertising to remedy such false impressions as have heretofore been created by Bluebird's use of the TWITTER Mark.

3.      That Bluebird, within thirty days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon X Corp.'s attorneys a written report under oath setting forth in detail the manner in which Bluebird has complied with the above-mentioned paragraphs 1 through 2.

4.      That Bluebird account to X Corp. for its profits and any damages sustained by X Corp., to the extent calculable, arising from the foregoing acts of trademark infringement, false designation of origin, unfair competition and deceptive acts and practices.

5.      That, in accordance with such accounting, X Corp. be awarded judgment for three times such profits or damages (whichever is greater), pursuant to 15 U.S.C. § 1117.

6.      That X Corp. be awarded its reasonable costs and attorneys' fees and disbursements.

7.    That the USPTO be directed to deny and invalidate Bluebird's application to register the infringing TWITTER mark.

8.    Awarding X Corp. statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117, in an amount to be determined at trial;

9.    Awarding X Corp. actual damages suffered as a result of Bluebird's copyright infringement, together with Bluebird's profits attributable to such infringement that are not taken into account in computing actual damages, pursuant to 17 U.S.C. § 504(b), in an amount to be determined at trial;

10.    In the alternative to actual damages and profits, awarding X Corp. statutory damages for Bluebird's infringement of each copyrighted work, in an amount up to $150,000 per work infringed for willful infringement, or such other amount as the Court deems just, pursuant to 17 U.S.C. § 504(c);

11.    Injunctive relief restraining Bluebird from any further acts of infringement of X Corp.'s copyrights;

12.    Awarding X Corp. its reasonable attorney fees and full costs incurred in this action pursuant to 17 U.S.C. § 505;

13.    That X Corp. have such other and further relief as the Court may deem equitable.

[remainder of page intentionally left blank]

## <u>JURY DEMAND</u>

X Corp. hereby demands a trial by jury on all issues so triable.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

*Of Counsel:*                                      Andrew C. Mayo (#5207)
                                                   Randall Teti (#6334)
Megan K. Bannigan                                  500 Delaware Avenue, 8th Floor
Jared I. Kagan                                     P.O. Box 1150
Nicole M. Flores                                   Wilmington, DE  19899
Daniel N. Cohen                                    (302) 654-1888
DEBEVOISE & PLIMPTON LLP                            amayo@ashbygeddes.com
66 Hudson Boulevard                                rteti@ashbygeddes.com
New York, NY  10001
(212) 909-6000                                     *Attorneys for Plaintiff X Corp.*
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
dncohen@debevoise.com

Dated:  December 16, 2025