IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| X CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-1510-CFC |
| | ) | |
| OPERATION BLUEBIRD, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF X CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

*Of Counsel:*
Megan K. Bannigan*
Jared I. Kagan*
Nicole M. Flores*
Daniel N. Cohen*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
dncohen@debevoise.com

*\*Motion for pro hac vice admission
forthcoming*

Dated: December 26, 2025

ASHBY & GEDDES
Andrew C. Mayo (#5207)
Randall Teti (#6334)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
rteti@ashbygeddes.com
*Attorneys for Plaintiff X Corp.*

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ...............................................1

SUMMARY OF ARGUMENT...............................................................................1

STATEMENT OF FACTS .....................................................................................2

    I.  X Corp. and the Twitter Brand. ...............................................................2

    II.  Operation Bluebird and "New Twitter." .................................................3

ARGUMENT ..........................................................................................................5

    I.  X Corp. is Likely to Succeed on its Trademark Infringement Claims. ...........5

        A.  The TWITTER Marks are Valid and Protectable. ....................................6

        B.  Bluebird's Use of the TWITTER Marks is Likely to Cause Consumer Confusion...........................................................................8

           i.  The Strength of the TWITTER Marks Favors X Corp. .......................8

           ii.  The Parties' Use of Identical TWITTER Marks Favors X Corp. .......10

           iii. The Parties' Offering of Identical Services Through Identical Marketing Channels to Identical Consumers Favors X Corp. ............11

           iv. Bluebird's Bad Faith Intent in Adopting the TWITTER Mark Favors X Corp. ...............................................................................13

           v.  The Potential for Significant Actual Confusion Favors X Corp. ........14

           vi. The Remaining *Lapp* Factors Further Favor X Corp. or Are Neutral. ....................................................................................15

    II.  X Corp. is Likely to Succeed on the Merits of its Trademark Dilution Claim...............................................................................................16

    III. X Corp. Will Be Irreparably Harmed Absent a Preliminary Injunction........18

    IV. The Public Interest Favors an Injunction...............................................20

    V.  The Balance of Equities Favors an Injunction. .......................................20

i

CONCLUSION ................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) ...................................................................8, 10

*Astrazeneca AB v. Camber Pharms., Inc.*,
    2015 WL 7307101 (D. Del. Nov. 19, 2015)......................................................17

*Brown & Brown, Inc. v. Cola*,
    2011 WL 1103867 (E.D. Pa. Mar. 23, 2011) ......................................................7

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
    921 F.2d 467 (3d Cir. 1990) .................................................................................14

*Checkpoint Sys., v. Check Point Software Techs.*,
    269 F.3d 270 (3d Cir. 2001) .................................................................................16

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp.*,
    458 F.3d 931 (9th Cir. 2006) ...................................................................................8

*Inkit, Inc. v. airSlate, Inc.*,
    2025 WL 2662150 (D. Del. Sept. 17, 2025)........................................................5

*Interspace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983) ...........................................................................8, 15

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) .........................................................................*passim*

*Maya Swimwear, Corp. v. Maya Swimwear, LLC*,
    789 F. Supp. 2d 506 (D. Del. 2011)......................................................9, 10, 12, 16

*Med. Sec. Card Co. v. Scriptwell, Inc.*,
    2024 WL 5697438 (D. Del. Oct. 29, 2024)..................................................15, 19

*Mil. Certified Residential Specialist v. Fairway Indep. Mortg.*,
    251 F. Supp. 3d 750 (D. Del. 2017)......................................................................6

*New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd.*,
    424 F. Supp. 3d 334 (D. Del. 2019)...............................................9, 16, 17, 18

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ..................................................................14

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990) ..................................................................20

*Peter Luger Inc. v. Silver Star Meats Inc.*,
  2002 WL 1870066 (W.D. Pa. May 17, 2002) .......................................7

*S&P Glob. Inc. v. S&P Data LLC*,
  619 F. Supp. 3d 445 (D. Del. 2022)..................................9, 10, 16, 18

*Sabinsa Corp. v. Creative Compounds, LLC*,
  609 F.3d 175 (3d Cir. 2010) ...........................................................*passim*

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006).......................................8, 10, 12

*Three Rivers Confections, LLC v. Warman*,
  660 F. App'x 103 (3d Cir. 2016) .............................................................6

*Times Mirror Mags., v. Las Vegas Sports News, L.L.C.*,
  212 F.3d 157 (3d Cir. 2000) ..................................................................16

*U.S. Jaycees v. Philadelphia Jaycees*,
  639 F.2d 134 (3d Cir. 1981) ....................................................................7

*Whelan Assocs. v. Jaslow Dental Lab'y, Inc.*,
  797 F.2d 1222 (3d Cir. 1986) ................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................5

**Statutes**

15 U.S.C. § 1065 ...........................................................................................6

15 U.S.C. § 1072 .........................................................................................13

15 U.S.C. § 1115 ...........................................................................................6

15 U.S.C. § 1116 .........................................................................................18

iv

15 U.S.C. § 1125 .......................................................................................6, 16, 17

15 U.S.C. § 1127 .................................................................................................7

Delaware Deceptive Trade Practices Act ...............................................................5

**Other Authorities**

5. J. Thomas McCarthy, McCarthy on Trademarks and Unfair
      Competition (5th ed. 2025)..................................................................18

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff X Corp. filed its complaint on December 16, 2025 and now submits this memorandum in support of its motion to preliminarily enjoin Defendant Operation Bluebird, Inc. ("Bluebird") from further infringing and diluting its rights.

## SUMMARY OF ARGUMENT

X Corp. owns the iconic "TWITTER Marks" (including incontestable registrations for TWITTER, TWEET, and the Bird Logo, *see* Baseer Ex. 1) and brings this motion to halt Bluebird's brazen theft and self-described "heist" of the TWITTER brand and goodwill for a directly competing social media platform. Defendant's gambit disregards that TWITTER is alive, in use and exclusively owned by X Corp.

Bluebird has adopted an identical "TWITTER" mark, a confusingly similar blue bird logo, and Twitter's specific blue hue for identical social networking services at its infringing website "TWITTER.new." Bluebird compounds the deception by directing consumers to "request your handle" subject to "Twitter's Terms," using the hashtag #TWITTER, and describing TWITTER.new as "the familiar brand" consumers already "know." Statements by Bluebird's founders lay out Bluebird's scheme to intentionally trade on the goodwill of X Corp.'s rights. They have touted TWITTER's presence "in millions of minds," its immense brand value, and the hundreds of millions of consumers who search for TWITTER each

1

month but are now finding TWITTER.new instead. Bluebird's deliberate mimicry confirms that confusion is its objective.

Rather than innovating and competing in good faith, Defendant is intentionally deceiving consumers and free-riding on a brand it does not own. Bluebird's ongoing scheme will continue to cause irreparable harm by eroding X Corp.'s control over the TWITTER brand, deceiving the public and diluting the distinctiveness of the famous TWITTER Marks. The potential for confusion is already manifesting. With Bluebird's marketing of its platform as the "all-new TWITTER," and strong evidence that consumers continue to associate the TWITTER Marks with X Corp.'s social media platform, confusion will only intensify absent immediate relief.

## STATEMENT OF FACTS

### I.    X Corp. and the Twitter Brand.

Twitter launched in 2006 and became a world-renowned social networking platform and cultural touchstone, with its iconic TWITTER Marks identifying real-time exchanges of ideas, news, photos, and more. Baseer Decl. ¶¶ 9-11. TWITTER amassed massive followings and usage, with single events generating thousands of TWEETS per second and hundreds of millions of daily posts. *Id.* ¶¶ 12-13.

In 2022, Twitter, Inc. was acquired for $44 billion, and, in March 2023, its assets—including the flagship platform, intellectual property, brand value, and

2

goodwill associated with the TWITTER Marks—were consolidated into X Corp. *Id.* ¶¶ 18-19, 72. X Corp. is the exclusive owner of all rights in the TWITTER brand, including multiple valid, subsisting, and incontestable federal trademark registrations for TWITTER Marks across various goods and services. Baseer Ex. 1. These registrations constitute prima facie evidence of exclusive rights to use the marks in commerce. Baseer Decl. ¶ 21.

Although the platform was rebranded to "X" two and a half years ago, and the ways X Corp. uses the TWITTER Marks today have changed over time, X Corp.'s use never ceased. *Id.* ¶ 27, 39-40. X Corp. continues to use the TWITTER Marks, in sales, licensing arrangements, client-facing communications and other TWITTER-branded pages and materials, and continuously enforces and maintains its rights in the TWITTER Marks. *Id.* ¶¶ 27-29, 38, 43-52. The TWITTER Marks remain among the most recognizable trademarks in the world—with millions of users still accessing the active TWITTER.com daily. *Id.* ¶ 41. X Corp. (and even Bluebird) continue to value the TWITTER Marks for hundreds of millions of dollars (Baseer Decl. ¶ 71, Ex. 14 at 52), and a recent consumer perception survey confirms the fame of the TWITTER Marks, with 95% recognition among the general public. Jay Decl. ¶ 4, Ex. 1 at 1-2, 12-13.

## II.    Operation Bluebird and "New Twitter."

On December 2, 2025, Bluebird—led by Stephen Coates, Twitter's former

intellectual property counsel—filed applications to register TWITTER and TWEET with the United States Patent and Trademark Office ("USPTO") and simultaneously petitioned to cancel several of the TWITTER Marks. Baseer Decl. ¶ 59, Ex. 12.

Shortly thereafter, Bluebird's founders and principals took to LinkedIn and announced the launch of TWITTER.new—a social media platform described as "very similar" to X Corp.'s. Baseer Ex. 14 at 65. Bluebird describes its mission as "bring[ing] back the public square" and "repairing what broke"—overt references to X Corp.'s platform. Baseer Ex. 13 at 3, 50, Ex. 14 at 6, 50, 56. Bluebird touts its new venture as a "heist" designed to capitalize on "one of the most valuable … assets in tech," while simultaneously conceding that it "do[es] not own the Twitter marks." Baseer Ex. 14 at 54, 59, 83. Bluebird's website, domain name, favicon, and messaging all copy the TWITTER name, logo and blue color scheme, all of which consumers associate with X Corp.'s platform. Baseer Decl. ¶¶ 61, 64.

Bluebird is intentionally drawing an association between X Corp. and Bluebird, telling consumers that TWITTER.new is "the familiar brand" they already know, as an "all-new Twitter," and that "the bird is back." Baseer Ex. 14 at 31, 50, 69, 73. Bluebird misleadingly claims, with language synonymous with X Corp.'s platform: "[w]e're bringing it back to a place we all know. The public square." Baseer Ex. 14 at 3. Bluebird is prompting users to sign up for its infringing platform subject to "Twitter's" terms of service—suggesting both continuity with the old

4

TWITTER and connection to the current X platform. Baseer Decl. ¶ 69, Ex. 13 at 4.

Bluebird claims more than 152,000 handle reservation requests as of December 21, 2025. Baseer Ex. 13 at 35. Bluebird's CMO touts that the company has not spent a single dollar in marketing, yet still has 850 million media impressions and $10.5 million in earned media. Baseer Ex. 14 at 81. Such a feat is only possible because, as Bluebird admits, consumers search for X Corp.'s TWITTER platform and are diverted to Bluebird's infringing platform. *Id*. ¶ 71, Ex. 14 at 54. The survey of Hal Poret confirms that confusion and association is likely, showing that more than 37% of respondents mistakenly believed that X Corp. is behind, or associated with, the TWITTER.new platform—a rate routinely accepted as strong evidence of a likelihood of confusion. Poret Decl. ¶¶ 4-5, Ex. 1 at 4, 51-52.

## ARGUMENT

All elements for a preliminary injunction weigh in X Corp.'s favor: (1) likelihood of success on the merits, (2) likelihood of irreparable injury, (3) the balance of equities, and (4) the relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**I.     X Corp. is Likely to Succeed on its Trademark Infringement Claims.**[1]

To prevail on a claim for trademark infringement, plaintiff must demonstrate:

---

[1]   X Corp.'s Delaware common law trademark infringement and unfair competition, false designation of origin and unfair competition, and Delaware Deceptive Trade Practices Act claims "are evaluated under generally the same standards as analogous federal Lanham Act claims." *Inkit, Inc. v. airSlate, Inc.*, 2025 WL 2662150, at *2 (D. Del. Sept. 17, 2025); *see also*

(i) ownership of a legally protectable mark; and (ii) that defendant's use of a similar mark is likely to cause confusion. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004). This includes confusion as to source, affiliation, connection, association, sponsorship, or approval. *See id.* at 711; 15 U.S.C. § 1125(a)(1)(A).

### A. The TWITTER Marks are Valid and Protectable.

X Corp. owns multiple federal trademark registrations and pending applications for the TWITTER Marks. Baseer Decl. ¶¶ 20-21, Ex. 1. All of X Corp.'s presently registered TWITTER Marks have become incontestable pursuant to 15 U.S.C. § 1065, and constitute conclusive evidence of the validity, ownership, and exclusive rights to use by X Corp. 15 U.S.C. § 1115(b); *see also Three Rivers Confections, LLC v. Warman*, 660 F. App'x 103, 106 (3d Cir. 2016). X Corp. also owns common law rights in the TWITTER Marks dating back to 2006. Baseer Decl. ¶¶ 9, 20. TWITTER is one of the most recognized brands in social media and digital communications worldwide and continues to serve as a source identifier for X Corp.'s platform, notwithstanding a rebrand. *Id*. ¶¶ 10, 15, 27; Jay Decl. ¶ 4, Ex. 1 at 1-2, 12-13.

Based on its public statements, Bluebird apparently intends to argue that X Corp. legally abandoned the TWITTER Marks. Baseer Decl. ¶¶ 40, 59, Ex. 14 at 44,

---

*Mil. Certified Residential Specialist v. Fairway Indep. Mortg.*, 251 F. Supp. 3d 750, 756-58 (D. Del. 2017).

52, 65, 71, 73, 75. Bluebird bears a heavy burden on that affirmative defense and cannot succeed. *See U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 137-139 (3d Cir. 1981).

A trademark is legally abandoned only when its use has been discontinued and there is an intent not to resume such use. 15 U.S.C. § 1127. X Corp.'s continued use of its TWITTER Marks, as described throughout this brief and the declaration of Naser Baseer, defeats any claim that X Corp.'s use was discontinued. Even Bluebird concedes that abandonment cannot apply here because "after the platform rebranded . . . at least one remnant of the original Twitter brand has stuck around: TWITTER.com still redirects to X.com." Baseer Ex. 14 at 89; *see Brown & Brown, Inc. v. Cola*, 2011 WL 1103867, at *11 (E.D. Pa. Mar. 23, 2011) ("Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith."). And X Corp.'s ongoing use of its TWITTER Marks extend far beyond the TWITTER.com domain name. Baseer Decl. ¶¶ 26, 27, 38, 41-52, Exs. 3-9. Moreover, the Jay and Poret Surveys confirm that the TWITTER Marks continue to enjoy substantial goodwill and recognition among consumers. Jay Decl. ¶ 4, Ex. 1 at 1-2, 12-13; Poret Decl. ¶ 4, Ex. 1 at 4, 51-52. Such enduring consumer association bars Defendant from establishing its affirmative defense. *See Peter Luger Inc. v. Silver Star Meats Inc.*, 2002 WL 1870066, at *2 (W.D. Pa. May 17, 2002).

Bluebird appears to rest its entire argument on the "intent" factor, premised on statements regarding the phasing out of the Twitter Bird Logo. Baseer Ex. 14 at 20, 75. Not only were there no statements that the TWITTER Marks would not be used *at all*, but intent is irrelevant where use continues. "[U]nless the trademark use is actually terminated, the intent not to resume use prong of abandonment does not come into play." *Electro Source, LLC v. Brandess-Kalt-Aetna Grp.*, 458 F.3d 931, 937-38 (9th Cir. 2006); *see also Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 846-47 (D. Del. 2006) (no abandonment where use continued).

**B.  Bluebird's Use of the TWITTER Marks is Likely to Cause Consumer Confusion.**

Courts in this Circuit assess likelihood of confusion using the ten *Lapp* factors: similarity of marks; strength of owner's mark; consumer care; length of defendant's use; defendant's intent; actual confusion; marketing channels; target consumers; relationship of goods; and other facts suggesting plaintiff manufactures both products or is likely to expand into defendant's market. *Kos Pharms.*, 369 F.3d at 709 (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). Courts may find a likelihood of confusion even without finding for plaintiff on a majority of these factors. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).

i.  The Strength of the TWITTER Marks Favors X Corp.

This factor looks at both the conceptual and commercial strength of an

owner's mark. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184-85 (3d Cir. 2010).

Conceptually, trademarks are classified from strongest to weakest as: fanciful or arbitrary, suggestive, descriptive, and generic. *Maya Swimwear, Corp. v. Maya Swimwear, LLC*, 789 F. Supp. 2d 506, 515 (D. Del. 2011). The TWITTER Marks are "arbitrary," having no clear relationship to social media platform services, thereby affording them the broadest protection available. *See id.*; *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd.*, 424 F. Supp. 3d 334, 348 (D. Del. 2019).

To evaluate commercial strength, courts consider marketplace recognition and the extensiveness of advertising and sales. *S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 457 (D. Del. 2022); *see New Balance*, 424 F. Supp. 3d at 347-48. The evidence overwhelmingly confirms the commercial strength of the TWITTER Marks. Baseer Decl. ¶¶ 11-15, 19, 26, 38, 40-41, 53-54, 71-72, 74, 82. Further, the Jay Survey establishes that TWITTER is a famous mark: 95% of survey respondents confirmed that they had heard of or seen the social media platform called TWITTER. Jay Decl. ¶ 4, Ex. 1 at 1-2, 12-13.

The commercial strength of the TWITTER Marks is precisely the reason Bluebird is trying to misappropriate them. Bluebird's "mission" to "reclaim" the TWITTER Marks was summarized by Bluebird's Founder: "[i]f [a brand] has any value of some kind, it is not uncommon for someone to try and take advantage of

9

it." Baseer Ex. 13 at 50, Ex. 14 at 59. Similarly, Bluebird's financier explained that "[t]he Twitter brand isn't dead . . . it's one of the most valuable dormant assets in tech." *Id.*, Ex. 14 at 54. Bluebird's own words prove the extraordinary value of the TWITTER Marks' commercial strength. Its deliberate targeting of the TWITTER brand—rather than developing its own distinctive identity—acknowledges the immense marketplace recognition that Bluebird seeks to steal.

ii.     <u>The Parties' Use of Identical TWITTER Marks Favors X Corp.</u>

The Third Circuit has held that mark similarity is "the single most important factor in determining likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 183. "Where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable." *Maya Swimwear*, 789 F. Supp. 2d at 514. Similarity takes on "great prominence" when the goods are "directly competing." *A&H Sportswear*, 237 F.3d at 214.

Here, Bluebird has copied X Corp.'s registered TWITTER wordmark wholesale, identical in every respect. Baseer Decl. ¶¶ 61, 64. Bluebird's use of ".new" in its domain fails to distinguish the marks—rather, it implies Bluebird's platform is an extension of, and linked to, X Corp.'s. Defendant cannot justify its confusingly similar use of X Corp.'s mark simply by tacking on an additional word. *See S&P Glob.*, 619 F. Supp. 3d at 456; *Sanofi-Aventis*, 453 F.Supp.2d at 846 (collecting cases). Further, consumers often encounter Bluebird's TWITTER mark

10

without the ".new" suffix, *see generally* Baseer Ex. 14, exposing them to TWITTER alone and rendering the parties' marks identical.

Bluebird not only copied the TWITTER name, it entirely co-opted the TWITTER branding. Bluebird's website uses the same color scheme and a nearly identical logo to X Corp.'s Bird Logo.[2] Baseer Decl. ¶¶ 61, 64. Bluebird has even used X Corp.'s exact Bird Logo to promote the launch of TWITTER.new. *Id.* ¶ 64, Ex. 14 at 6, 53, 78. Bluebird's inclusion of a small-font disclaimer at the bottom of its infringing website attempting to disclaim affiliation only concedes the similarity. *Id.* ¶ 70, Ex. 13 at 37. Indeed, if the parties' respective uses were sufficiently dissimilar, Bluebird would have no reason to include such a disclaimer.

      iii.    <u>The Parties' Offering of Identical Services Through Identical Marketing Channels to Identical Consumers Favors X Corp.</u>

***Similarity of Services.*** Where the goods or services offered by the parties are related, i.e., those which would be reasonably thought by the consuming public to come from the same source, there is a greater likelihood of confusion. *Kos Pharms.*, 369 F.3d at 722-23.

The services Bluebird and X Corp. offer under the "TWITTER" name are

---

[2] Bluebird has also misappropriated X Corp.'s protected, copyrighted material. *See Whelan Assocs. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1231 (3d Cir. 1986). Bluebird had access to X Corp.'s copyrighted Bird Logo and Bluebird's bluebird favicon conveys a substantially similar commercial impression to reasonable consumers. For those reasons, X Corp. will likely succeed on the merits of its copyright infringement claim as well. *See id.* at 1248; Baseer Decl. ¶¶ 19, 22-24, 64-65; Compl. ¶¶ 51-58, 111-120.

identical. Both parties provide social media platforms for communication and content sharing, with an emphasis on technological advancements like AI and payment processing. Baseer Decl. ¶¶ 56, 57, 66, Ex. 13 at 50, Ex. 14 at 40, 65. As part of its launch, Bluebird has been telling consumers that Bluebird is "rebuilding" and "reclaiming Twitter" as "the familiar brand [they] know," and "will look very similar." Baseer Ex. 13 at 63, Ex. 14 at 40, 65, 69. There can be no dispute that the parties' platforms are, for all intents and purposes, identical.

***Similarity of Marketing Channels.*** Both X Corp. and Bluebird offer their social media platform services to consumers exclusively online, and both parties promote their platforms through online advertising and promotional posts across social media. *Compare* Baseer Decl. ¶ 67, Ex. 4 *with* Baseer Exs. 13, 14. Given the overlap here, Bluebird's infringing TWITTER mark will create an amplified opportunity for confusion to occur. *See Sabinsa Corp.*, 609 F.3d at 188-89

***Similarity of Consumers.*** Likelihood of confusion increases when parties target overlapping consumer groups—i.e., the same demographic groups, user communities, and/or market segments. *See, e.g.*, *id.* at 188; *Maya Swimwear*, 789 F. Supp. 2d at 516; *Sanofi-Aventis*, 453 F. Supp. 2d at 852. Bluebird is directly targeting X Corp.'s consumers using X Corp.'s TWITTER Marks by promoting its product to those who "want Twitter back." Baseer Decl. ¶ 77, Ex. 14 at 46. Accordingly, this factor weighs in favor of X Corp.

12

iv.    Bluebird's Bad Faith Intent in Adopting the TWITTER Mark Favors X Corp.

A defendant's intent in adopting a mark is "highly relevant" to the likelihood of confusion analysis. *Kos Pharms.*, 369 F.3d at 721. Where, as here, the defendant had actual knowledge of the plaintiff's mark, adopted an identical or nearly identical mark for competing services, and engaged in conduct designed to create an association with the plaintiff's mark, this factor weighs strongly in favor of finding a likelihood of confusion. *See id.* This case is the textbook definition of bad faith: an "intentional, willful and admitted adoption" of an identical name for an identical service with the admitted intent to hijack the consumer goodwill that belongs to X Corp. *See id.*

Bluebird was indisputably aware of the TWITTER Marks because X Corp.'s registrations provide constructive notice, 15 U.S.C. § 1072, and Bluebird's founder, former intellectual property counsel for Twitter, Inc., had unique access to Twitter's intellectual property portfolio. Baseer Decl. ¶¶ 59, 65. Simply put, Bluebird's founders are practicing trademark attorneys who know better. Despite explicitly recognizing that they "do not own the Twitter Marks," Bluebird has declared its mission to take advantage of a brand that millions still recognize. Baseer Ex. 14 at 54, 59, 75, 84. Bluebird's financier conceded that "the Twitter name still carries weight." *Id.* at 75-76. Bluebird's actions are not merely evidence of bad faith—they are a confession. This factor weighs decisively in favor of X Corp.

13

v.    The Potential for Significant Actual Confusion Favors X Corp.

"Evidence of actual confusion is . . . highly probative of a likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 187. In just a few weeks, the potential for actual confusion has already manifested. Media reports have invited an association between Bluebird's platform and X Corp.'s TWITTER Marks with headlines such as "Old Twitter" and "Twitter Relaunch." Baseer Decl. ¶ 75. Consumers have inquired about transferring their handles from X to TWITTER.new—something that would only be possible if the platforms were associated. Baseer Decl. ¶¶ 74, 77, Ex. 14 at 23.

Survey evidence is also highly probative on the issue of actual confusion, and "courts have held that survey evidence of 15% confusion is sufficient to demonstrate actual confusion." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 594 (3d Cir. 2002); *see also Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475 (3d Cir. 1990) (surveys are "the most direct method of demonstrating . . . likelihood of confusion"). Here, X Corp. has submitted the Poret Survey, which used the gold standard *Eveready* methodology, and demonstrates that over 37% of consumers are confused. Poret Decl. ¶ 4, Ex. 1 at 4, 7-8, 51-52. As Poret explained, the 37.7% confusion rate is highly conservative—driven *only* by Bluebird's use of the TWITTER mark (not its further confusing uses of the color blue or bluebird logo)—and still resulted in a net

14

confusion rate above that which courts routinely find supports a likelihood of confusion. *Id.*, Ex. 1 at 25, 52. The Poret Survey, coupled with Bluebird's actions to invite confusion (i.e., using phrases like "the bird is back," a "familiar brand [they] know," and #TWITTER), establishes this factor undoubtedly favors X Corp. Baseer Ex. 14 at 3, 69, 73.

> vi.    The Remaining *Lapp* Factors Further Favor X Corp. or Are Neutral.

***Length of Bluebird's Use of the TWITTER Mark.*** Where "there has been no meaningful opportunity for actual confusion to have arisen," this factor is neutral. *Med. Sec. Card Co. v. Scriptwell, Inc.*, 2024 WL 5697438, at *6 (D. Del. Oct. 29, 2024). Because Bluebird only announced its "Twitter.new" platform on December 8, 2025, it would be premature to consider this factor in the likelihood of confusion analysis.

***Degree of Care of Target Consumers.*** This factor examines "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *Lapp*, 721 F.2d at 463. The appropriate standard of care expected of consumers should be "equal to that of the least sophisticated consumer in the class." *Sabinsa Corp.*, 609 F.3d at 186. When considering *free* social media services, consumers are likely to exercise less care, thereby increasing likelihood of confusion, and favoring X Corp. *See Med. Sec. Card*, 2024 WL 5697438, at *6.

***Other Facts Suggesting the Public Might Expect the Prior Owner to***

15

***Manufacture Both Products.*** Courts also consider "circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Kos Pharms.*, 369 F.3d at 724. Where the parties operate in the same market—as is the case here—this factor necessarily favors the plaintiff. *See Checkpoint Sys., v. Check Point Software Techs.*, 269 F.3d 270, 290 (3d Cir. 2001). Bluebird's use of the TWITTER mark on their website and URL further pushes this factor in X Corp.'s favor. *See Maya Swimwear*, 789 F. Supp. 2d at 516 (favoring plaintiffs where defendants operated in the same market and used mark in website and URL).

## II.    X Corp. is Likely to Succeed on the Merits of its Trademark Dilution Claim.

To establish federal trademark dilution, a plaintiff must prove: (i) its mark is famous; (ii) the defendant is making use of its mark in commerce; (iii) defendant's use of its mark began after the senior mark became famous; and (iv) a likelihood of dilution. 15 U.S.C. § 1125(c)(1); *Times Mirror Mags., v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000) (affirming preliminary injunction). X Corp. satisfies each element.[3]

First, X Corp.'s TWITTER Marks have been the focus of extensive advertising and media coverage. Baseer Decl. ¶¶ 14, 38, 53-54; *see also New Balance*, 424 F. Supp. 3d at 350-51 (famous mark where plaintiff demonstrated

---

[3]  For the same reasons, X Corp. is also likely to succeed on the merits of its claim for Trademark Dilution Under Delaware Law. *See S&P Glob. Inc.*, 619 F. Supp. 3d at 468-69.

extensive advertising, robust sales, actual recognition and incontestable registration). X Corp.'s Jay Survey also demonstrates that 95% of respondents consisting of the general consuming public recognized TWITTER. Jay Decl. ¶ 4, Ex. 1 at 1-2, 12-13.

As for the second and third elements, Bluebird cannot dispute that it is using the TWITTER Marks in commerce, having launched its website, began reserving consumer accounts and promoting the platform on social media; nor can Bluebird dispute that such conduct occurred in 2025, long after the TWITTER Marks acquired their fame. *See* Baseer Decl. ¶ 15.

Lastly, Bluebird's infringing use risks blurring the distinctiveness of the TWITTER Marks. Dilution by blurring is "association arising from the similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Each statutory factor weighs in X Corp.'s favor.

***Similarity.*** Bluebird's TWITTER mark is identical to X Corp.'s, and its bluebird favicon is nearly identical to X Corp.'s Bird Logo. Baseer Decl. ¶¶ 61, 64; *see New Balance*, 424 F. Supp. 3d at 351; *Astrazeneca AB v. Camber Pharms., Inc.*, 2015 WL 7307101, at *4 (D. Del. Nov. 19, 2015).

***Distinctiveness.*** The TWITTER Marks are inherently distinctive, having no clear connection to social media services. *See New Balance*, 424 F. Supp. 3d at 351.

***Substantially Exclusive Use.*** X Corp. has maintained substantially exclusive

use of the TWITTER Marks since their adoption, routinely policing and enforcing its federally registered incontestable trademark rights. Baseer Decl. ¶ 28; *see S&P Glob.*, 619 F. Supp. 3d at 468-69; *New Balance*, 424 F. Supp. 3d at 351-52.

***Degree of Recognition.*** The TWITTER Marks achieved widespread marketplace recognition over the last two decades and are famous. Baseer Decl. ¶ 71; *see, e.g.*, 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:120 (5th ed. 2025); *New Balance*, 424 F. Supp. 3d at 351.

***Intent to Create Association.*** Bluebird admits it is trying to create an association, telling consumers "the bird is back" and that TWITTER.new is the "familiar brand [they] know." Baseer Ex. 14 at 69, 73. Bluebird's admitted scheme to become the "all-new Twitter" demonstrates Bluebird's intent to create an association with X Corp.'s TWITTER Marks. *Id*. ¶ 78, Ex. 14 at 31, 50.

***Actual Association.*** The Poret Survey demonstrates that over 37% of respondents viewing Bluebird's website were confused. Poret Decl. ¶ 4, Ex. 1 at 4, 51-52. This empirical evidence confirms what common sense suggests: consumers encountering Bluebird's TWITTER mark inevitably associate it with X Corp.'s platform.

### III.    X Corp. Will Be Irreparably Harmed Absent a Preliminary Injunction.

Because X Corp. is likely to succeed on the merits of all its claims, X Corp. is entitled to a statutory presumption of irreparable harm. 15 U.S.C. § 1116(a); *Med.*

18

*Sec. Card*, 2024 WL 5697438, at *7 (applying presumption and granting preliminary injunction).

Notwithstanding the presumption, if Bluebird is not enjoined, X Corp. will lose control of how its TWITTER Marks are used—risking loss of consumer goodwill and brand loyalty. Baseer Decl. ¶ 80. Those harms are the very kind not redressable by monetary damages. *See Kos Pharms.*, 369 F.3d at 726. Bluebird is brazenly exploiting the TWITTER brand to bootstrap its own competing platform. *See* Baseer Decl. ¶¶ 63, 72, 74, Ex. 14 at 54, 59, 71. A theft this bold—conducted openly by trademark attorneys and with complete disregard for X Corp.'s well-established rights—demands immediate injunctive relief.

Every day that Bluebird continues to use the TWITTER Marks further erodes their distinctiveness of X Corp.'s marks and deepens consumer confusion. Although Bluebird has not fully launched its platform, the irreparable harm to X Corp. has already begun. All of Bluebird's self-proclaimed success with "no marketing," Baseer Ex. 14 at 81, is because users are being diverted to the infringing platform based on goodwill associated with the TWITTER Marks. *Id*. at 48, 54. Each of those diverted consumers, who may not return to X Corp.'s platform in the future, manifests irreparable harm, and all of Bluebird's claimed media impressions dilutes the distinctiveness of the TWITTER Marks. There is no telling what Bluebird plans to do with its platform if not stopped now, given it has stated that the public "[does

19

not] know the half of" what is coming and that Bluebird "has many surprises in store." Baseer Ex. 14 at 27, 29.

## IV.   The Public Interest Favors an Injunction.

The public interest concern in trademark infringement cases is "the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730. Where "there is a likelihood of consumer confusion created by the use of confusingly similar marks, it follows that if such use continues, the public interest would be damaged." *Id.* Accordingly, having established a likelihood of confusion, it would be in the public interest to eliminate the risk of such confusion by enjoining Bluebird's use of its infringing TWITTER mark.

## V.   The Balance of Equities Favors an Injunction.

In weighing the balance of equities, courts consider the extent to which a defendant will suffer irreparable harm if the injunction is issued. Bluebird made a calculated business decision to appropriate X Corp.'s trademarks rather than invest in developing its own brand identity. Having chosen this path with full knowledge of the legal risks, Bluebird cannot now feign hardship from being required to cease its unlawful conduct where it intentionally chose to appropriate X Corp.'s intellectual property. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (defendant "can hardly claim to be harmed, since it brought

20

any and all difficulties occasioned by the issuance of an injunction upon itself."). Further, as compared to the risk of irreparable harm to X Corp., Bluebird has no meaningful claim of irreparable harm where its platform was announced less than a month ago and is not even in full release. *See* Baseer Ex. 13 at 63, Ex. 14 at 6. Enjoining Bluebird's infringing use while it is in the early stages of development risks no harm to Bluebird. Bluebird invited this litigation by openly engaging in a self-described "heist," and has no equitable standing to complain. The balance tips decisively—indeed, overwhelmingly—in favor of X Corp.

## **CONCLUSION**

X Corp. respectfully requests that this Court immediately enjoin Bluebird from any use of the TWITTER Marks and Bluebird's infringing bluebird favicon.

21

*Of Counsel:*

Megan K. Bannigan*
Jared I. Kagan*
Nicole M. Flores*
Daniel N. Cohen*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
dncohen@debevoise.com

*\*Motion for pro hac vice admission forthcoming*

Dated: December 26, 2025

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

---

Andrew C. Mayo (#5207)
Randall Teti (#6334)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for Plaintiff X Corp.*

22

## WORD COUNT CERTIFICATION

The undersigned hereby certifies that Plaintiff X Corp.'s Memorandum In Support Of Its Motion For Preliminary Injunction contains 4,989 words (exclusive of the table of contents and signature block) in Times New Roman 14-point font, counted using Microsoft Word's word count feature.

/s/ *Andrew C. Mayo*

Andrew C. Mayo

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of December, 2025, the attached

**PLAINTIFF X CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION**

**FOR PRELIMINARY INJUNCTION** will be served upon the below-named

registered agent at the address and in the manner indicated:


Operation Bluebird, Inc.                                    HAND DELIVERY
c/o Corporate Creations Network Inc. (registered agent)
1521 Concord Pike, Suite 201
Wilmington, DE 19803


                                        */s/ Andrew C. Mayo*
                                        _____
                                        Andrew C. Mayo