IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| X CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-1510-CFC |
| | ) | |
| OPERATION BLUEBIRD, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF NASER BASEER IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

*Of Counsel:*

Megan K. Bannigan
Jared I. Kagan
Nicole M. Flores
Daniel N. Cohen
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY  10001
(212) 909-6000
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
dncohen@debevoise.com

Dated: December 26, 2025

ASHBY & GEDDES
Andrew C. Mayo (#5207)
Randall J. Teti (#6334)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for Plaintiff X Corp.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| X CORP., | Case No. 1:25-cv-01510-CFC |
| Plaintiff, | |
| v. | DECLARATION OF NASER BASEER IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION |
| OPERATION BLUEBIRD, INC. | |
| Defendant. | |

I, Naser Baseer, hereby declare as follows:

1.      I am a Director, Legal at X Corp. ("X Corp."). I am over the age of 18 and competent to testify. I submit this declaration based on my personal knowledge and a review of company records, and on information from individuals at X Corp. upon whom I regularly rely, in support of X Corp.'s motion for a preliminary injunction against Operation Bluebird Inc. ("Bluebird").

2.       In my current role at X Corp., I oversee a range of legal matters, including intellectual property protection and enforcement of trademark rights, as well as advising our product development team and engineering teams on a variety of matters. As in-house counsel, I have a broad range of litigation, enforcement, prosecution, transactional and management responsibilities. I am responsible, in part, for advising on trademark portfolio management, monitoring potential infringements, and coordinating responses to unauthorized uses of X Corp.'s intellectual property.

3.      I joined X Corp. (then known as Twitter, Inc.) on August 17, 2015, as Senior Legal Counsel and a member of the legal team. I was hired by, and worked directly with,

Stephen Coates.  At the time, Mr. Coates was Associate Director, Legal.  Mr. Coates left Twitter Inc. in 2016, and I understand he is now General Counsel for Defendant in this case, Bluebird.

4.    In 2017, I was promoted to Associate Director, Intellectual Property, and I held that role for approximately two and a half years, at which time I was promoted to Director, Associate General Counsel.  In these roles, I worked with the company when it was Twitter, Inc. and now X Corp., and helped monitor, enforce, and build out the companies' intellectual property portfolios.  Specifically, since joining the company I have worked on managing, monitoring, and enforcing our portfolio of TWITTER-formative wordmarks and design marks, including the TWITTER Bird Logo, , and still do today.  I have also advised the companies in a variety of ways including development and deployment of brand guidelines, licensing agreements, and other legal agreements surrounding our intellectual property and product development.

5.    I previously held an in-house legal position as Director, Corporate Counsel, Intellectual Property at Starbucks Coffee Company, where I focused on intellectual property law. During my time with Starbucks, I managed the prosecution and maintenance of thousands of Starbucks trademark, copyright and domain name applications and registrations throughout the world.  I was responsible for routinely conducting intellectual property clearance searches, drafting cease and desist letters, and negotiating and drafting co-existence agreements, licensing agreements, professional service agreements, and other diligence related tasks.

6.    I also have experience working at multiple law firms, including Holland & Knight LLP, and Schiff Hardin, LLP where I worked as an Associate.  In these roles, I prosecuted and litigated patent, trademark and copyright matters, as well as drafted agreements and conducted Intellectual Property due diligence.

2

7.      I hold a Juris Doctor (J.D.) from Chicago-Kent College of Law and am admitted to practice law in Washington State and Illinois.  While in law school, I worked as a clerk and paralegal, developing a strong foundation in intellectual property and licensing law.

8.      Throughout my legal career, I have had the opportunity to speak and write on matters of legal significance including trademarks, social media, and other intellectual property issues.  I have also taught at Seattle University School of Law, including a course entitled "Internet Platforms: Policy and Litigation" which covered topics at the intersection of e-commerce, social media, and intellectual property.  I am an active member of the bar and have contributed to bar associations such as the International Trademark Association.

**HISTORY OF THE TWITTER BRAND**

9.      X Corp.'s origins in the social media space date back to 2006, when Twitter, Inc., X Corp.'s predecessor-in-interest, launched the TWITTER platform.  Twitter, Inc. was a pioneer in social networking, developing an internet platform that allowed users to share short messages, or posts, known as "TWEETS," in real time.

10.      Twitter, Inc. began with a small team and quickly grew into one of the world's largest and leading social media platforms.  The TWITTER platform has been a world-renowned virtual town square focused on real-time exchanges of ideas, news, media, photos, and other content.  Over time, Twitter, Inc. expanded its product offerings to include features like live streaming, multimedia sharing, advanced user engagement tools, and business-oriented advertising opportunities.

11.      TWITTER and our iconic Twitter Bird Logo changed the internet forever.  The TWITTER platform—available both as an app on mobile devices and as an online website—is a way for users to stay instantly connected with the world around them, including connecting with

3

friends, family, and celebrities, keeping updated on sports and news, sharing opinions, debating, or just having pure fun.  For nearly 20 years, the platform has been referred to as "TWITTER," and its posts as "TWEETS," including in advertisements, on user interfaces, and in company documents.

12.    TWITTER became a fixture of American culture, playing a large role in media, pop culture, and even our democratic elections.  In just three short years after its launch, popular user accounts were capable of amassing millions of followers interested in seeing the latest TWEET, from either a celebrity or news outlet.[1]  By 2011, a single newsworthy event was capable of generating nearly 9,000 user TWEETS per second.[2]

13.    By 2012, TWITTER had 140 million users, with over 340 million TWEETS per day—a number that more than doubled by 2019.[3]  TWITTER also became a popular platform for discussing and otherwise being involved in live television programs.  In 2015, 2.2 million users in the U.S. alone sent 21.4 million TWEETS about the MTV Video Music Awards, a phenomenon that continued for years to come.[4]

14.    TWITTER and its famous marks are often the topic and praise of unsolicited media coverage and had a cult-like following by fans of the platform.  The TWITTER brand

---

[1] *See* Lauren Alexis Fisher, *The 12 Biggest Pop Culture Moments On Twitter This Decade*, HARPERS BAZAAR (Mar. 21, 2016), https://www.harpersbazaar.com/culture/features/a14717/twitter-10th-anniversary/.

[2] *Id*.

[3] X, *Twitter Turns Six,* X BLOG (Mar. 21, 2012), https://blog.x.com/official/en_us/a/2012/twitter-turns-six.html; *Number of monthly active X (formerly Twitter) users worldwide from 1st quarter 2010 to 1st quarter 2019,* STATISTA (Dec. 18, 2025), https://www.statista.com/statistics/282087/number-of-monthly-active-twitter-users/#:~:text=X/Twitter:%20number%20of%20monthly%20active%20users%202010%2D2019&text=As%20of%20the%20first%20quarter,the%20first%20quarter%20of%202018.

[4] Fisher, *supra* n. 1.

recognition is the result of millions of dollars of investment in advertising and protecting the brand for nearly 20 years.

15.    Without a doubt, the TWITTER name, brand, copyrights and trademarks were famous and recognizable in the hearts and minds of consumers by the 2010's and continue to be famous today.

16.    In 2013, Twitter, Inc. became a publicly traded company.  It debuted on the New York Stock Exchange at an initial price of $26 per share.[5]  After raising $1.8 billion in funding, the company was then valued at over $31 billion.[6]

17.    By 2016, it was reported that multiple companies were interested in taking over and buying Twitter, Inc. including Alphabet (parent company of Google), Microsoft, Salesforce.com, Verizon, and the Walt Disney Company.[7]  Reports at the time had valued the company anywhere from $18 billion to $30 billion total.[8]

18.    In 2022, Twitter, Inc. was purchased for approximately $44 billion, by and through two entities—X Holdings I, Inc. and X Holdings II, Inc.  By March 2023, the TWITTER product and Twitter Inc.'s assets were consolidated under the newly formed X Corp.

---

[5] *Twitter shares jump 73% in market debut*, BBC (Nov. 7, 2013), https://www.bbc.com/news/business-24851054

[6] *Id*.

[7] *Twitter, Inc.*, WIKIPEDIA, https://en.wikipedia.org/wiki/Twitter,_Inc.#:~:text= Twitter%20also%20expanded%20its%20office,was%20reported%20at%20$1.05%20billion (last visited Dec. 22, 2025).

[8] David Faber & Anita Balakrishnan, *Twitter may soon get formal bid, suitors said to include Salesforce and Google*, CNBC (Sep. 23, 2016), https://www.cnbc.com/2016/09/23/twitter-may-receive-formal-bid-shortly-suitors-said-to-include-salesforce-and-google.html.

**THE TWITTER FAMILY OF TRADEMARKS AND COPYRIGHTS**

*Acquisition and Trademark Portfolio*

19.   Included in the 2022 acquisition and X Corp.'s 2023 merger was the flagship TWITTER platform, along with its intellectual property portfolio including the trademark and copyright registrations.  The purchase, valued at billions of dollars, included all TWITTER and TWEET trademarks, the bluebird Twitter logo (collectively, the "TWITTER Marks"), and all associated consumer goodwill and recognition.

20.   X Corp.'s TWITTER Marks, as outlined below, are registered (or pending) on the Principal Register of the United States Patent and Trademark Office.  X Corp. owns and continues to maintain both registered and common law rights in the following incontestable TWITTER Marks, all of which are valid and subsisting.

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| TWITTER [Classes 009, 035] | 4422235 | Oct. 2006 *Incontestable* | Software and software applications to enable transmission, access, organization and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; downloadable software . . . in the field of social networking; downloadable software in the nature of a mobile application; downloadable software in the nature of a mobile application for real-time delivery of data, messages, location, photographs, links, text and other data related thereto; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for providing strategy, insight, marketing, and predicting consumer behavior. |
| TWEET | 4338963 | May 2008 | Telecommunications services, namely, providing online and telecommunication |

6

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| [Classes 038, 041, 045] | | *Incontestable* | facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing on-line journals, namely, blogs featuring user-defined content; online social networking services. |
| TWEET [Classes 009, 035] | 7374642 | May 2008 *Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; computer software used to enhance the capabilities and features of other software and nondownloadable online software; downloadable software in the nature of a mobile application for social networking; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for tracking users and advertising of others to provide strategy, insight, marketing, and predicting consumer behavior. |
| TWITTER [Classes 038, 041, 045] | 3619911 | August 2006 *Incontestable* | Telecommunication services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing an online community forum for registered users to share information, photos, audio and video content; Providing a website on the internet for the purpose of social networking. |
| **twitter** [Classes 038, 041, 045] | 4179739 | December 2006 *Incontestable* | Telecommunications services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing an online community forum for users to share |

7

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| | | | information, photos, audio and video content; online social networking services. |
| TWITTER [Classes 006, 016, 021, 022, 025] | 4362656 | Nov. 2008 *Incontestable* | Promotional items; clothing, namely, t-shirts, sweatshirts, shorts, panties, hats, visors, socks, tank tops, jackets and polo shirts. |
| [Classes 009, 016, 018, 021, 025, 035, 036, 038, 041, 042, 045] | 5001027 | Jun. 2012 *Incontestable* | Software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, web links, and images via the Internet and other communications networks; downloadable software in the nature of a mobile application for social networking; printed matter; articles of clothing; online business networking services; dissemination of advertising for others via an online electronic communications network; financial services; education services; application service provider services; hosting an interactive website and online non-downloadable software for uploading, downloading, posting, showing, displaying, tagging, sharing and transmitting messages, comments, multimedia content, videos, movies, films, photos, audio content, animation, pictures, images, text, information, and other user-generated content; online social networking services. |
| [Classes 009, 016, 018, 021, 025, 035, 038, 041, 042, 045] | 4552274 | Jun. 2012 *Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; software for accessing information on a global computer network; downloadable software via the internet and wireless devices; downloadable software for computers, mobile devices, and other devices for facilitation of communication and data |

8

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| | | | transmission in the field of social networking; downloadable software in the nature of a mobile application for real-time delivery of data, messages, location, photographs, links, text and other data related thereto; downloadable software to facilitate online advertising, business promotion, connecting social network users with businesses and for providing strategy, insight, marketing, and predicting consumer behavior; application programming interface for third-party software; magnets. |
| [Classes 009, 035, 038, 041, 045] | 4187348 | Dec. 2010 *Incontestable* | Software and software applications to enable transmission, access, organization, and management of text messaging, instant messaging, online blog journals, text, weblinks, and images via the internet and other communications networks; downloadable software for computers, portable handheld digital electronic communication devices, mobile devices, and wired and wireless communication devices for facilitation of communication and data transmission in the field of social networking; telecommunication services, namely, providing online and telecommunication facilities for real-time interaction between and among users of computers, mobile and handheld computers, and wired and wireless communication devices; providing on-line journals, namely, blogs featuring user-defined content in the field of social-networking; online social networking services. |
| TWITTER AMPLIFY [Class 041] | 6992306 | May 2013 *Incontestable* | Providing a website featuring non-downloadable videos, audio, and text in the fields of general news, information, and commentary, and in the fields of entertainment, fashion, education, sports, recreation, training, celebrities, popular |

9

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|---|---|---|---|
| | | | culture, current events, and blogging via the internet. |
| TWITTER FLIGHT [Class 035] | 7152556 | Sep. 2014 Incontestable | Organization of trade shows, exhibitions and events for commercial or advertising purposes; market research and business analyses; providing information and advice in the fields of advertising, marketing, and market research; advertising and marketing consulting services. |
| TWITTER FLIGHT [Classes 035, 041, 042] | 4867983 | Sep. 2014 Incontestable | Arranging, hosting, and conducting educational conferences; educational and entertainment services; organizing exhibitions and events in the field of software development; providing news, commentary and information in the fields of current events relating to entertainment media and education; providing a website featuring non-downloadable electronic publications of others, namely, journals, articles, presentations and interviews featuring information on the topic of computers, computer software, software development, application programming interfaces and social networking; organizing and hosting conferences. |
| TWITTER FLIGHT [Class 041] | 7152555 | Sep. 2014 Incontestable | Arranging, hosting, and conducting business conferences and educational exhibitions in the fields of advertising, marketing, promotional services, social media, social networking, computers, computer software, software development, and application programming interfaces; organizing and hosting educational conferences and exhibitions; providing online non-downloadable publications, namely, blogs, written articles, images, videos, and webinars in the fields of advertising, marketing, promotional services, social media, social networking, computers, computer software, software development, and application programming interfaces; |

10

| Mark | Reg. or App. No. | Date of First Use | Sampling of Goods and Services |
|------|------------------|-------------------|-------------------------------|
| | | | educational services; providing online non-downloadable educational course materials. |
| TWITTER AMPLIFY [Class 009] | Application Pending Serial No.: 90403442 | N/A | Downloadable software and downloadable mobile applications for monitoring and reporting on the effectiveness of advertisements. |
| TWITTER AMPLIFY [Class 035] | Application Pending Serial No.: 90403436 | N/A | Providing a website for connecting brands and advertisers with social media users. |
| TWITTER AMPLIFY [Class 038] | Application Pending Serial No.: 90403448 | N/A | Transmission of data, namely, advertising data, user statistics, advertising statistics, ad placement data, software performance statistics, and mobile application performance statistics via the internet and other communications networks. |

21.     Attached hereto, as Exhibit 1, are true and correct copies of X Corp.'s trademark registrations and applications referenced above.  Based upon my experience as an attorney and trademark professional, X Corp.'s registrations are *prima facie* evidence that X Corp. owns the valid and protectible right to exclusive use of the TWITTER Marks for these and related services.  In addition to the marks above, X Corp. continues to own additional valid and subsisting TWITTER- and TWEET-formative trademarks.

***Copyright Portfolio***

22.     X Corp. is also the owner of all right, title, and interest in and to four copyrighted "bird logo" designs (collectively, the "Twitter Bird Copyrights"), which are original works of authorship fixed in tangible media of expression.

23.     The Twitter Bird Copyrights are registered with the United States Copyright Office as follows: Twitter Bird Logo 1 (Registration No. VA0001939828); Twitter Bird Logo 2

11

(Registration No. VA0001950612); Twitter Bird Logo 3 (Registration No. VA0001939830); and

Twitter Bird Logo 4 (Registration No. VA0001950611).  Each of X Corp.'s registrations for the

Twitter Bird Copyrights were registered on December 11, 2014.  Copies of the registration

certificates for each of the Twitter Bird Copyrights are publicly accessible at the United States

Copyright Office, and attached hereto as Exhibit 2.

24.     The Twitter Bird Copyrights are original works of visual art that embody creative

and distinctive design elements, including but not limited to the stylized shape, proportions,

angles, curves, and overall aesthetic presentation of a bird in flight rendered in a minimalist style.

*TWITTER Trade Style and History of Use*

25.     Since its inception, the TWITTER platform has been accompanied by a

distinctive blue color scheme.  Pictured below, is a web capture taken on the WayBack Machine

of the

TWITTER

website in 2006,

showcasing

early use of its

distinctive blue

color scheme,

alongside the

TWITTER word

and design mark

12

still registered today.[9]

26.    By 2008, Twitter, Inc. had adopted its first bird logo for use on its original micro-blogging site.  The Twitter Bird Logo and Copyrights have been used extensively by X Corp. in commerce since at least 2010 in connection with X Corp.'s social media platform and related services.  By the 2010's, the still beloved Twitter Bird Logo reached worldwide notoriety and fame.  The below infographic illustrates the evolution of the Twitter Bird Logo over time.[10]



27.    After its initial merger, and to embody the modern and technology-focused company, X Corp. rebranded the TWITTER platform to X in July 2023.  At that time—two and half years ago—X Corp. adopted an X logo (pictured above) as its predominant mark and gradually rolled out its X mark on the TWITTER platform.  Despite a platform rebrand however,

---

[9] TWITTER, https://www.twitter.com/, WEBARCHIVE (Mar. 2, 2001), https://web.archive.org/web/20061203201128/http://twitter.com/ (captured Dec. 19, 2025).

[10] @juliahobsbawm, X (Jul. 30, 2023, 1:44 AM), https://x.com/juliahobsbawm/status/1685541949325881344?s=46&t=C5zov1reKVQwWbjagGerDA (last visited Dec. 22, 2025).

X Corp. never relinquished its trademark rights and never ceased use of the TWITTER Marks or Twitter Bird Copyrights, in part to ensure that our hundreds of millions of registered users remained aware of and able to access the platform they know and love.

28.     X Corp. to date continues to actively maintain and enforce its rights in the TWITTER Marks and Twitter Bird Copyrights.  Specifically, X Corp., through our outside counsel, uses services such as Alt Legal to monitor trademark application filings for confusingly similar TWITTER marks, uses MarkMonitor to monitor domain name registrations, and works with counsel around the world to evaluate marks that may infringe our rights in the TWITTER Marks.

29.     X Corp. has also carefully maintained registrations for its active TWITTER Marks by filing the appropriate renewals and maintenance documents—including after our July 2023 rebrand.  Because of these continued efforts, X Corp. has been able to maintain its rights in the TWITTER Marks without other confusingly similar third-party marks.  What this means is that the arbitrary TWITTER Marks are strong and distinctive, because no one else owns rights in marks like TWITTER or TWEET for competing goods and services.

**X CORP.'S SOCIAL MEDIA PLATFORM TODAY**

### *Products, Services and Customers*

30.     Today, X Corp. continues to operate a social networking platform providing services to hundreds of millions of users, including individuals, celebrities, businesses, and even governments.  Our platform offers an ecosystem of solutions focused on real-time communication, news dissemination, and community building, featuring an expertise in building personalized experiences, seamlessly embedded software features, and data-driven insights.

14

31.     X Corp.'s software helps users connect, share, and engage in real time, including real-time messaging networks and advertising capabilities.  These solutions power user interactions, including posting updates, following topics, and engaging in conversations.  X Corp. simplifies user engagement by providing stakeholders a feature-rich software platform that automates and streamlines processes.  Through robust data analytics, we help users understand trends and engagement, as well as benchmarking against similar accounts.  These capabilities enable us to provide personalized, relevant content to users.

32.     Additionally, empowered by proprietary data generated across X Corp.'s ecosystem, we deploy artificial intelligence ("AI") models in support of our product set, such as integrating our sister company X.AI LLC's flagship "Grok" chatbot, as well as providing users and businesses with insights, recommendations, scalable data, analytics, subscription services, content verification, and other features.  Through these insights, X Corp. enables users to exercise free speech, make better, more informed decisions, and share and discover relevant content more quickly.

33.     X Corp.'s advertising offerings provide tools for businesses to reach audiences, including promoted posts, targeted ads, and analytics for campaign performance.  X Corp. has hundreds of advertising customers worldwide, which include diverse clientele ranging from large corporations, small businesses, to non-profits.  X Corp.'s key source of differentiation in social media advertising is the enhanced data and engaged audience we offer to advertisers.  Customers can access their X Corp. account information through our online platform with real-time interfaces delivering insights, alternative ad formats, comprehensive analytics, cost-optimization, and mobile tools.

34.    X Corp. also allows users to connect with businesses and make purchases. X Corp. has also been very public about its plans to expand its product offering to include a built-in digital payment system, aiming to create an "everything app" by integrating wallet storage, peer-to-peer payments, and more.

35.    Across the globe, there are hundreds of millions of individuals that interact with the X platform daily. Our ability to gain rich insights enables us to deliver targeted features that connect with users where they are. Our products are designed to reduce friction, simplify interactions, and lower barriers to participation, enabling global conversations.

### Advertising, Promotion & Distribution

36.    X Corp.'s platform is accessible on its mobile app, which is available through the Apple App Store (for iOS devices) and the Google Play Store (for Android devices). The platform is also accessible through the internet, specifically available at: https://twitter.com/ and https://x.com/. Services in connection with particular features of the platform are also available and distributed by X Corp.'s partnership channels, sales agents, at tradeshows (such as CES), at industry events (such as NewFronts), and on our app.

37.    X Corp. predominately advertises its services through client events, trade shows, industry events and on its own app, website, blogs and other social media platforms. X Corp. employees will also promote the brand at events and panels.

38.    X Corp. advertises its products both under its X mark, and its TWITTER Marks—both of which are famous in the United States and abroad. X Corp.'s social networking platform maintains users in hundreds of countries and territories around the world – with hundreds of relevant media mentions of TWITTER weekly. X Corp. attributes hundreds of millions of dollars in continued brand value to its TWITTER Marks and Twitter Bird Copyrights.

16

***Continued Use of TWITTER Marks***

39.     Despite rebranding its platform to X, and because rebrands are often gradual, X Corp. has intentionally maintained its rights to the TWITTER Marks in large part to avoid loss of consumers who continue to think of the platform as TWITTER.  Even as X Corp. moves the platform towards its predominant X brand, X Corp.'s use of the TWITTER Marks continues on and its goodwill inures to X Corp. and X Corp. alone.

40.     I understand that the Defendant in this action, Operation Bluebird, is attempting to argue that X Corp. has abandoned its rights in the TWITTER Marks.  But a rebrand was not a relinquishment of X Corp.'s trademark rights.  X Corp. can and does use both the new "X" mark and the TWITTER Marks to refer to its social media platform, as do its customers, users, and the world at large.  The TWITTER Marks remains a vital part of X Corp.'s value and identity on its platform and in the minds of its clients and general consumers.

41.     Millions of consumers continue to refer to X as TWITTER and refer to posts as TWEETS.  As of December 11, 2025, over four-million users per day were accessing X Corp.'s social networking platform through the still active twitter.com domain name—meaning these users intentionally typed, searched for, or otherwise directed themselves (*i.e.*, through a webpage bookmark) to the "TWITTER" domain in order to access the site.

42.     Further, more than 200,000 mobile users continue to maintain a version of the TWITTER mobile application, together with the TWITTER Marks and Bird Logo, on their mobile devices for accessing the X platform.  Pictured below, are true and accurate copies, captured on and about December 14, 2025, of how the TWITTER branded platform continues to appear on certain users' mobile phones.

17



43.     X Corp. continues to promote and provide services under the TWITTER Marks.

For example, X Corp. hosts client events that bring together customers and leaders across various

industries to help customers understand X Corp.'s product offerings, grow their businesses and

expand their networks.  X Corp.'s marketing representatives attending such events, or otherwise corresponding with clients, also use the TWITTER name in their client-facing communications.

44.    X Corp. operates a blog that is available at https://blog.twitter.com and https://blog.x.com, with many of its available articles still referring to the company and platform as "Twitter."  Attached hereto as Exhibit 3[11] are true and correct copies of exemplar blog articles currently available on the blog.x.com featuring the TWITTER Marks.

45.    X Corp. also maintains its TWITTER branding on other social media platforms like Facebook under the name "Twitter;" on Instagram under the handle @Twitter; on LinkedIn as Twitter; and on YouTube at @TwitterBusiness.  Attached hereto as Exhibit 4[12] are true and correct copies of some of X Corp.'s social media profiles, which predominately feature the TWITTER Marks, and are still viewable by millions of consumers today.

---

[11] X, *Twitter Turns Six,* X BLOG (Mar. 21, 2012), https://blog.x.com/official/en_us/a/2012/twitter-turns-six.html (captured Dec. 22, 2025); X, *An update of Twitter Transparency Reporting,* X BLOG (Apr. 25, 2023), https://blog.x.com/en_us/topics/company/2023/an-update-on-twitter-transparency-reporting  (captured Dec. 22, 2025);  X, *A new era of transparency for Twitter,* X BLOG (Mar. 31, 2023), https://blog.x.com/en_us/topics/company/2023/a-new-era-of-transparency-for-twitter (captured Dec. 22, 2025); X, *An update on two-factor authentication using SMS on Twitter*, X BLOG (Feb. 15, 2023), https://blog.x.com/en_us/topics/product/2023/an-update-on-two-factor-authentication-using-sms-on-twitter (captured Dec. 22, 2025); X, *Twitter 2.0: Our continued commitment to the public conversation*, X BLOG (Nov. 30, 2022), https://blog.x.com/en_us/topics/company/2022/twitter-2-0-our-continued-commitment-to-the-public-conversation (captured Dec. 22, 2025); X, *Helping identify 2020 US election candidates on Twitter*, X BLOG (Dec. 12, 2019), https://blog.x.com/en_us/topics/company/2019/helping-identify-2020-us-election-candidates-on-twitter (captured Dec. 22, 2025).

[12] @Twitter, FACEBOOK, https://www.facebook.com/TwitterInc/ (captured Dec. 22, 2025); @Twitter, LINKEDIN, https://www.linkedin.com/company/twitter/ (captured Dec. 22, 2025); @Twitter, INSTAGRAM, https://www.instagram.com/twitter/?hl=en (captured Dec. 22, 2025); Twitter for Business (@TwitterBusiness), YOUTUBE, https://www.youtube.com/c/TwitterBusiness (captured Dec. 22, 2025); Twitter Marketing (@TwitterAds), YOUTUBE, https://www.youtube.com/@TwitterAds (captured Dec. 22, 2025).

46.  X Corp. further maintains its TWITTER branding on websites and client materials including, but not limited to: our ads help page for our customers; webpages to help customers publish or embed TWEETS or posts on its own media; marketing and business guides explaining some of our TWITTER Amplify and other advertising products; developer materials; our Vendor and Supplier Onboarding materials; and other consumer-facing materials.  Attached hereto as Exhibit 5[13] are true and correct copies of some of the aforementioned materials, all of which were accessed and/or captured in December 2025.

---

[13] *Grow Your Business With X*, TWITTER ADS, https://ads.twitter.com/getstarted (captured Dec. 15, 2025); *How To Get Started With X Ads*, X BUSINESS, https://business.x.com/en/resources/get-started-with-twitter-ads (captured Dec. 22, 2025); TWITTER PUBLISH, https://publish.twitter.com/# (captured Dec. 15, 2025); *Twitter Objective Playbook: Amplify Your Videos*, TWITTER BUSINESS, https://business.twitter.com/content/dam/business-twitter/en/resources/downloadables/objective-playbooks/pre-roll-playbook.pdf (last visited Dec. 22, 2025); *Twitter Amplify*, TWITTER BUSINESS, https://business.twitter.com/content/dam/business-twitter/en/resources/downloadables/twitter-amplify.pdf (last visited Dec. 22, 2025); *Developer Terms: Display Requirements*, X DEVELOPER PLATFORM, https://developer.x.com/en/developer-terms/display-requirements (captured Dec. 22, 2025); *X API for Enterprise*, X DEVELOPER PLATFORM, https://developer.x.com/en/products/x-api/enterprise (captured Dec. 22, 2025); E-mail from Twitter Vendor Management, vendor_mgmt@twitter.com, RE: Twitter Supplier Registration Invitation (Oct. 28, 2025) (on file with author); *Twitter Supplier Onboarding Guide*, X LEGAL, https://legal.x.com/content/dam/legal-twitter/suppliers/TwitterSupplierOnboardingGuide032019.pdf (last visited Dec. 22, 2025); *Twitter Supplier Portal Overview*, X LEGAL, https://cdn.cms-twdigitalassets.com/content/ dam/legal-twitter/suppliers/TwitterSupplierPortal Overview032019.pdf (last visited Dec. 22, 2025); *About Public and Protected Posts*, X HELP CENTER, https://help.x.com/en/safety-and-security/public-and-protected-posts (captured Dec. 22, 2025); *How To Use Two-Factor Authentication*, X HELP CENTER, https://help.x.com/en/managing-your-account/two-factor-authentication (captured Dec. 22, 2025).

47.     A search of the X Corp. Help Center shows that "TWITTER" and "TWEET" (as pictured and captured below in December 2025) appear on hundreds of active X Corp. webpages, all of which are directed to users of X Corp.'s platform.[14]



48.     Additionally, a search on Google for "Twitter" yields dozens of images, posts, and support pages published within X Corp.'s website which still utilize the Twitter Bird Copyright and Logo.

---

[14] *See* X HELP CENTER, https://help.x.com/en (last visited Dec. 22, 2025)



49.     Third parties also use the TWITTER Marks with the permission of X Corp., which use inures directly to X Corp.'s benefit.  Attached hereto as Exhibit 6[15] is a true and correct copy of the "Twitter Brand Guidelines," accessed and downloaded on December 21, 2025, which are available to X Corp.'s customers looking to utilize the TWITTER Marks.

---

[15] *Twitter Brand Guidelines*, ABOUT TWITTER (Oct. 2020),
     https://about.twitter.com/content/dam/about-twitter/en/brand-toolkit/downloads/twitter-external-brand-guidelines-01272021.pdf (captured Dec. 21, 2025).

50.    For example, the popular airline JetBlue utilizes the TWITTER Bird Logo on its website to direct users to its @JetBlue handle on the X Corp. platform, which has 1.7 million followers.[16]  Other well-known brands which continue to utilize the TWITTER Marks on their websites to link directly to X Corp.'s platform include L'Oréal Groupe, Comcast Business, Bilt Rewards, and Snap, Inc.  Attached hereto as Exhibit 7[17] are true and accurate copies of webpages featuring the TWITTER Marks, in accordance with the Twitter Brand Guidelines referenced in Ex. 6.

51.    The TWITTER Marks also continue to appear alongside the company's current X name and logo, including in X Corp.'s correspondence with clients, in conversations with potential customers at trade events, and even on X Corp.'s app store listing.  Attached hereto as Exhibit 8[18] is a true and correct copy of X Corp.'s app store listing on the Apple App Store for its

---

[16] *See* JETBLUE, https://www.jetblue.com/ (last visited Dec. 22, 2025); JetBlue (@JetBlue), X, https://x.com/jetblue.

[17] JETBLUE, https://www.jetblue.com/ (captured Dec. 22, 2025); L'OREAL, https://www.loreal.com/en/ (captured Dec. 22, 2025); COMCAST,https://business.comcast.com/ (captured Dec. 22, 2025);  BILT, https://www.biltrewards.com/ (captured Dec. 22, 2025); SNAP AR, https://ar.snap.com/ (captured Dec. 22, 2025).

[18] *App Store*, APPLE, https://apps.apple.com/us/app/x/id333903271 (captured Dec. 22, 2025).

social media networking platform, which refers to "X (formerly known as Twitter) as the trusted digital town square."

52.    X Corp. has also approved the use of the "X (formerly Twitter)" brand for national ad campaigns with its clients and partners like the NBA, Brand Watch and Sprout Social.  Attached hereto as Exhibit 9[19] are a true and correct copy of a press release from 2024 submitted by the NBA and approved for use by X Corp.'s marketing team, along with uses of TWITTER by X Corp.'s Official Partners in its marketing materials as well.

53.    The continuing popularity and use of TWITTER is often the subject of reporting—both on television and in the media.  For instance, the popular Netflix television show "Running Point" starring Kate Hudson discussed the rebrand of Twitter to X, noting pointedly "It's Twitter."  X customers joined in the conversation on Netflix's Instagram account, aptly agreeing with Hudson's co-stars that they'll "never stop calling it Twitter."  Pictured below, is a true and correct copy of the Netflix Instagram post, which appeared on its account in March 2025.[20]

---

[19] *Boston Celtics and Fanduel Sportsbook Announce Partnership*, NBA (May 22, 2024), https://www.nba.com/celtics/news/boston-celtics-and-fanduel-sportsbook-announce-partnership (captured Dec. 22, 2025); *X, Formerly Twitter*, BRANDWATCH, https://www.brandwatch.com/datanetworks/x (captured Dec. 22, 2025); *X (formerly known as Twitter) Management Tools for Business*, SPROUTSOCIAL, https://sproutsocial.com/integrations/twitter (captured Dec. 22, 2025).

[20] Ashleyprillaman, Comment on image posted by Netflix Is A Joke (@netflixisajoke), INSTAGRAM (Mar. 4, 2025), https://www.instagram.com/p/DGyb1wdPo8s/?hl=en.



54.    The media has also reported on the continued brand presence and importance of

the TWITTER name to X Corp. and its X platform, in articles such as "One year later: Why 89%

of brands still call it Twitter," and "2 Years After Elon Musk's X Rebrand: Why 55% of

Americans Still Call It 'Twitter.'"[21]

---

[21] Aistė Jočytė, *One year later: Why 89% of brands still call it Twitter*, OMNISEND (Jul. 22,
2024), https://www.omnisend.com/blog/why-brands-still-call-it-twitter/; Katherine Maclang,
*2 Years After Elon Musk's X Rebrand: Why 55% of Americans Still Call It 'Twitter'*,
DESIGNRUSH (Jul. 23, 2025), https://news.designrush.com/two-years-after-elon-musk-x-
rebrand-why-americans-still-call-it-twitter.

**BLUEBIRD HAS ANNOUNCED ITS SOCIAL MEDIA PLATFORM USING OUR TWITTER BRAND**

55.    Because of X Corp.'s continued use of the TWITTER Marks, we were surprised to learn that Defendant Bluebird was intentionally adopting and already using the TWITTER Marks on competing goods and services.

56.    On July 25, 2023, Michael Peroff, along with Bryan Peroff and PEROFF IP filed a trademark application with the USPTO to register TWITTER for computer software, advertising services, and telecommunications services—all services offered by and registered by X Corp.  Based upon my review of USPTO records, Mr. Michael Peroff filed the applications 24 hours after X Corp. adopted its new X logo—attesting he had developed a genuine intent to use the already registered and occupied TWITTER Marks in less than a day.  The trademark examiner issued a refusal of Mr. Peroff's application on the ground that it would likely cause confusion with X Corp.'s registrations for its TWITTER Marks.  As a result, his application did not (and has not) proceeded to the publication stage—meaning that the Trademark Office has not yet opened the applications to public objections.  Attached hereto as Exhibit 10 is a true and correct copy of Michael Peroff's first TWITTER application, U.S. Ser. No. 98100526, along with the Office Action from the USPTO and current suspension letter.

57.    About a year later, PEROFF IP filed another trademark application for TWITTER for payment processing services, education services, and application services provider for payments, U.S. Ser. No. 98647535 (together with Ser. No. 98100526 the "Peroff Applications")—again in classes that X Corp. already owned valid TWITTER trademark registrations.  The USPTO issued an office action refusing registration on the ground of likely confusion with X Corp.'s existing rights in its TWITTER Marks.  In response, Peroff IP stated it would "explicitly forego any intention to use its Twitter mark in commerce as applying directly

26

and specifically to 'social media' services."  PEROFF IP went on to certify that any references to social media were "unintended."  Attached hereto as Exhibit 11 is a true and correct copy of PEROFF IP's TWITTER application, U.S. Ser. No. 98647535, along with the Office Action from the USPTO, PEROFF IP's response and current suspension letter.

58.    Based upon my review of Bluebird's recent filings with the USPTO, Bluebird claims to have acquired the Peroff Applications on June 26, 2025 and Dec. 1, 2025.  Further, based upon my review of USPTO records, today, the Peroff Applications remain suspended,[22] in part because the USPTO trademark examiner has concluded that those applications are likely to cause confusion with X Corp.'s incontestable TWITTER registrations.

59.    On Dec. 2, 2025, Bluebird filed two intent-to-use trademark applications with the USPTO seeking to register the stand-alone word mark "TWITTER" and "TWEET" in overlapping classes and the same services with X Corp.'s incontestable registrations for TWITTER and TWEET.  These applications were filed by Stephen Coates, Twitter Inc.'s former intellectual property counsel.  Attached hereto as Exhibit 12 are true and correct copies of Bluebird's trademark applications, U.S. Ser. Nos. 99524594, 99524598.  On the same date it filed its trademark applications, Bluebird also filed a petition to cancel X Corp.'s rights in our TWITTER Marks, alleging that the marks had been abandoned.  *See* TTAB Proceeding No. 92090266.

60.    Based upon my review of publicly available sources, Bluebird has already begun using the TWITTER Mark on its website, marketing materials, and in the press, to promote its directly competing services, without any rights in the TWITTER Marks.

---

[22] *See* Ex. 10 at 56; Ex. 11 at 63.

61.    Bluebird publicly announced the launch of its platform which is accessible at https://twitter.new.  Attached hereto as Exhibit 13 is a true and correct copy of Bluebird's twitter.new website.  Based upon my review of its website, Bluebird's "TWITTER" website utilizes many of the hallmarks of X Corp.'s original TWITTER product—including a blue bird icon, use of a specific hue of blue commonly referred to in popular hex code libraries as "Twitter Blue," and repeated uses of the TWITTER name standing alone.  The



twitter.new website also includes a confusingly similar domain to the currently active twitter.com domain, as well as confusingly similar domains at twitter.new/blog (akin to the active twitter.com/blog) and twitter.new/faq (akin to the twitter.com/faq).[23]

---

[23] Ex. 13 at 39, 60 (captured Dec. 22, 2025).

28

62.     Bluebird appears to be promoting its "new" TWITTER social networking platform on its LinkedIn account @Operation Bluebird, and through its employees and executives.[24]  I have reviewed many of the LinkedIn comments and posts from Bluebird's employees, executives, founders and financial backers from December 8, 2025 through December 21, 2025 available at the links included in the Appendix to this declaration.  Based on my review, Exhibit 14, attached hereto, contains true and accurate web captures of the pages that I viewed and that correspond to the links in the Appendix.

63.     Based upon my review of LinkedIn posts, Bluebird has described its applications and current use of the TWITTER Marks as a "heist,"[25] of the world-famous TWITTER brand and associated goodwill.

64.     Bluebird has, without authorization or license from X Corp., also copied, reproduced, displayed, and distributed a bird logo in the identical blue color in which the Twitter Bird Copyrights often appear.  Specifically, its website favicon depicts a stylized bird in flight rendered in blue, featuring design elements that are similar to the protected expression embodied in X Corp.'s Twitter Bird Copyrights.  Based on my review of its website and posts on LinkedIn, Bluebird is also using its bird logo in a similar trade style and color scheme, alongside hashtags like #TWITTER, #BackWithYourEx, and even references to X Corp.'s current primary logo and

---

[24] Based upon my review of LinkedIn profiles and posts, it appears that Michael Peroff, Jeff Brooks, Stephen Coates, Rick Baker, J. David Walton, Kevin Raper, Durk Barnhill, and Demtrius Mobley are all principals and/or team members of Bluebird.  *See generally* Ex. 14. Bluebird has also represented on its newly launched FAQ page that the following individuals are founders of the platform: Michael Peroff, Stephen Coates, Tiffany Valeriano, Jeff Brooks, Rick Baker and David Walton. Ex. 13 at 62.

[25] Ex. 14 at 59.

color scheme.[26]  As pictured below, Bluebird has also used X Corp.'s exact Twitter Bird Copyright and trademarked logo in its own marketing materials on LinkedIn.[27]

| X Corp.'s Use | Bluebird's Use |
|---|---|
|  | |

65.    X Corp.'s pre-existing rights in the TWITTER Marks and Twitter Bird Copyrights are well-known.  Indeed, Bluebird's own counsel, Mr. Coates, was likely involved in the very registration that he is now petitioning to cancel.  Bluebird further had access to X Corp.'s registered Twitter Bird Copyrights prior to creating and adopting its own bird logo given the widespread use of the Twitter Bird Copyrights.

66.    Based upon my review of publicly available sources, Bluebird's appears intent to offer a social media experience with real-time news, announcements, entertainment and conversations—all services that X Corp. offers in connection with its TWITTER Marks. Bluebird, like X Corp., also apparently intends to leverage AI to evolve the social media experience.[28]

---

[26] *See* Exs. 13 and 14.

[27] Ex. 14 at 78.

[28] Ex. 13 at 50, 57, 62.

67.    Bluebird's "TWITTER" offering does not appear to target any specific type of industry or consumer and, upon information and belief, is targeted at a wide variety of individuals and businesses interested in posting on or utilizing social media—the same consumers that X Corp. targets.

68.    According to Bluebird's website and social media campaign, it is asserting it wants to "bring back" or "rebuild" "the public square"—playing on the very same language that X Corp. uses to describe its own services.[29]

69.    I understand that Bluebird has not officially launched its social media platform to the public, but consumers visiting the TWITTER.new website can sign up for early access to "reserve a handle."[30]  Based upon my review of the TWITTER.new website, when prospective businesses and target consumers of Bluebird's product sign up for a handle reservation, they are prompted to fill in their handle request, email, name and country—subject to "Twitter's Terms of Service, Privacy Policy, Community Guidelines and any applicable laws."[31]  Bluebird's

> - All requested handles must comply with Twitter's Terms of Service, Privacy Policy, Community Guidelines and any applicable laws. Twitter reserves the right to deny or reassign handles at any time.

website further states that "Twitter reserves the right to deny or reassign handles at any time."[32]

70.    These continued references to TWITTER are likely to create confusion and draw a false association between Bluebird and X Corp., and its predecessor-in-interest Twitter, Inc.  I do not believe that Bluebird's inclusion of a small-font disclaimer at the very bottom of its

---

[29] *Id*. at 3, 50, 57, 60, 63, 64.

[30] *Id.* at 4, 61.

[31] *Id*. at 4.

[32] *Id*.

31

website, stating "Operation Bluebird Inc. is not affiliated with X Corp or Twitter, Inc.,"[33] is likely to dispel confusion. Putting aside that the size and placement of the disclaimer is not likely to be seen by visitors to the site, its inclusion itself is a recognition that consumers are likely to be confused into believing that X Corp. and/or Twitter are associated with Bluebird's website.

71.     In my view, Bluebird has made no secret that it is trying to trade on TWITTER's goodwill and reputation. Although Bluebird could have chosen from nearly limitless options of brand names (like any of X Corp.'s other competitors), its intent appears to be to capitalize off the goodwill of a brand that is already worth hundreds of millions of dollars. According to Mr. Peroff, no other social media network that has sprung up in recent years (such as Bluesky or Threads) has the scale or brand recognition as Twitter.[34] Similarly, Kevin Raper, one of Bluebird's financial backers, has admitted that Bluebird is intentionally capturing users who are searching for the X platform through its Twitter.com domain. Raper explained that "400M people search 'twitter' monthly"—evidencing the continuing vitality of the brand—and now, they are "finding TWITTER.new."[35] Raper acknowledged that associating Bluebird's platform with X Corp.'s TWITTER Marks will benefit Bluebird—explaining, "[t]he nostalgia play gets the headlines."[36]

---

[33] *Id*. at 37.

[34] Cyrus Farivar, *Operation Bluebird wants to relaunch "Twitter," says Musk abandoned the name and logo*, ARS TECHNICA (Dec. 10, 2025), https://arstechnica.com/information-technology/2025/12/can-twitter-fly-again-startup-wants-to-pry-iconic-trademark-from-musks-x/.

[35] *See* Ex. 14 at 54.

[36] *Id.* at 40.

72.     Despite Bluebird's stated plans, it cannot bring Twitter "back"—Twitter never left and continues to be exclusively owned by X Corp.  Raper has acknowledged as much, stating "[t]he Twitter brand isn't dead. It's one of the most valuable dormant assets in tech."[37]  The TWITTER Marks, and all associated consumer goodwill and recognition, were purchased by X Corp. in a transaction valued at billions of dollars[38] and remain X Corp.'s exclusive property.

73.     I have seen that Bluebird's public announcement of a "new" TWITTER has garnered significant attention and questions about the legality of its actions on social media and the press.  For example, a LinkedIn user questioned: "I don't understand why you think you have any claim to the Twitter trademarks?"[39]  Based upon my review of the comments on LinkedIn, I understand that one of Bluebird's co-founders, Michael Peroff, conceded "[a]t this time we do not own the Twitter marks."[40]  Instead of following proper trademark procedures, Bluebird has opted to simultaneously use the TWITTER Marks to its own advantage, while it petitioned to cancel X Corp.'s incontestable registrations.

**HARM TO X CORP.**

74.     Not only is it likely, but it is certain that Bluebird's use of "TWITTER" will cause confusion with X Corp.'s TWITTER-branded goods and services.  Bluebird's own employees and team members have referred to its TWITTER.new platform as "the familiar brand you know," and a "name that lives in millions of minds." [41]  Consumers are already drawing an

---

[37] *Id.* at 54.

[38] Bluebird's Chief Marketing Officer has also conceded that "$10–14B in brand value isn't a guess—it's measurable and material."  Ex. 14 at 52.

[39] Ex. 14 at 83.

[40] *Id.*

[41] *Id.* at 69, 71.

association between X Corp. and Bluebird—asking if they can transfer their existing X handle to TWITTER.new.[42] Even after filing this lawsuit, Bluebird's principals and founders continue to encourage users to "reclaim your handle" and get "#backwithyourex" inferring an inaccurate association between Bluebird's new platform and Twitter, Inc.[43] Such false association appears to be intentionally targeted to try and cause greater confusion. Put differently, as Raper has stated, the TWITTER brand "still has value" which is "exactly the



point."[44] Rather than compete fairly through innovation, Bluebird appears to be attempting to free-ride off of an already famous mark.

75.    Similarly, the media is conflating X Corp.'s platform and Bluebird's announcement—including a recent article discussing Bluebird's new platform, alleging that "Old Twitter" is "set to come back" and that Bluebird's actions are a "Twitter Relaunch."[45]

---

[42] *See* Ex. 14 at 23.

[43] *Id.* at 86.

[44] *Id.* at 75.

[45] Harry Boulton, *'Old Twitter' set to come back and compete against Elon Musk's X as startup seeks to reclaim trademarks*, UNILAD TECH (Dec. 11, 2025), https://www.uniladtech.com/social-media/twitter/old-twitter-could-return-company-seeks-

76.    Bluebird estimates that without marketing, it has received $10.5 million in earned media, and 850 million impressions[46] —all of which are based off X Corp.'s rightfully owned TWITTER marks. Bluebird has been reposting much of these media mentions on LinkedIn and its website at twitter.new/news to capture the public's attention—regardless of the veracity and relevance of the reporting therein.[47]

77.    Bluebird is specifically targeting X Corp.'s exact customers with its brand messaging encouraging users to switch from X to "new" TWITTER.  In the short time since its launch, according to its website, Bluebird has amassed over 150,000 handle requests, including more than 100,000 new requests only one day after Bluebird announced its launch.[48]  These are all customers that by Bluebird's own admission, may have been searching for TWITTER and are now finding "TWITTER.new."  X Corp. customers may switch to Bluebird believing it is affiliated with or endorsed by X Corp. or Twitter.  Even if confusion is later corrected, customers may not return, resulting in permanent loss of market position by X Corp.

78.    As Bluebird officially launches and expands its offerings and its use of "TWITTER" becomes more widespread, the initial association and likely confusion will only be exacerbated.  Consumers, businesses, and investors alike will believe that Bluebird's "TWITTER"-branded platform is the latest offering under X Corp.'s marks—or vice versa, that

---

reclaim-trademarks-152325-20251210; *Twitter Relaunch: US Startup Bid | News & Updates*, ARCHYNETYS (Dec. 19, 2025), www.archynetys.com/twitter-relaunch-us-startup-bid-news-updates/.

[46] Ex. 14 at 81.

[47] *See* Ex. 13 at 53-55; Ex. 14 at 3-4; 89.  For example, the media has recently harped on recent changes to X Corp.'s Terms of Service.  Notwithstanding the fact that changes to X Corp,'s terms of service are handled months in advance of roll-out and had nothing to do with this lawsuit, any such change reflects X Corp.'s intentions of continued use—not the "abandonment" that Bluebird claims is present here.

[48] *See* Ex. 13 at 35.

the TWITTER Marks now belong to Bluebird—neither of which are true.  Given that Bluebird's "TWITTER" platform is being advertised by Bluebird as "the all-new TWITTER," it is inevitable that consumers will think that Bluebird's platform is now just part of X Corp.'s family of brands.[49]

79.    This confusion will also dilute the distinctiveness of the TWITTER Marks.  The harm caused by this confusion, while real and irreparable, will be impossible to quantify.

80.    Bluebird's intentional deception also strips X Corp. of control over its trademarks and diverts consumers through outright fraud.  The resulting destruction of cultivated goodwill—particularly where, as here, Bluebird seeks to pass off its platform as the genuine article—is the paradigmatic form of irreparable injury.  The TWITTER brand remains a valuable, in-use asset, integrated into core features of X Corp.'s platform and accessed daily by millions of users.

81.    Trademark value depends on exclusivity.  Bluebird's decision to steal the TWITTER Marks as its own can deter potential licensees, distributors, or strategic partners, harming growth opportunities in ways that cannot be precisely measured.

82.    X Corp. has invested millions of dollars and substantial resources in developing and maintaining the TWITTER Marks.  Bluebird's decision to use our name for competing services will enable it to trade off the goodwill we have purchased and earned instead of earning and investing in its own reputation.  The harm caused by a competitor unfairly leveraging our goodwill is likewise irreparable and difficult to quantify.

83.    If Bluebird is not enjoined from further willful infringement of X Corp.'s TWITTER Marks and copyrights, X Corp. will suffer irreparable harm, and the goodwill that X Corp. and its predecessor Twitter, Inc. spent decades cultivating and investing in will be

---

[49] *See, e.g.,* Ex. 14 at 31, 65.

unacceptably eroded.  X Corp. therefore asks this Court to enjoin Bluebird's unlawful conduct and prevent this harm to X Corp. and its customers in Delaware, the United States, and around the world.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in _____*Hong Kong*_____ on this 23ʳᵈ day of December, 2025.

_____

Naser Baseer

37

**Appendix**

1.      Operation Bluebird Inc. (@Operation Bluebird Inc.), LINKEDIN, https://www.linkedin.com/company/operation-bluebird/ (captured Dec. 22, 2025).

2.      Stephen Coates, LINKEDIN, https://www.linkedin.com/posts/stephenjadiecoates_ backwithyourex-activity-7403799649222029312-D1o/?utm_source=social_share_send&utm_ medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 10, 2025).

3.      Stephen Coates, LINKEDIN, https://www.linkedin.com/posts/stephenjadiecoates_ handle-reservation-disclaimer-activity-7404219839432642561-451h/?utm_source=social_share_ send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hK qw09R0HE (captured Dec. 10, 2025).

4.      Michael Peroff, LINKEDIN, https://www.linkedin.com/posts/michaelperoff_us-startup-seeks-to-reclaim-twitter-trademarks-activity-7404218563755991040-e3dW/?utm_source =social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh 7TD4whF5hKqw09R0HE (captured Dec. 10, 2025).

5.      Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper-7a02a815_when-a-44b-acquisition-becomes-a-trademark-activity-7404565737987526656-SXe7/?utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADD jmEYBYblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 10, 2025).

6.      Rick Baker, LINKEDIN, https://www.linkedin.com/posts/rick-baker-bab2b93_its-been-a-while-since-i-started-my-role-activity-7404232847563055107-o3_r/?utm_source=social_ share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4wh F5hKqw09R0HE (captured Dec. 10, 2025).

7.      Durk Barnhill, LINKEDIN, https://www.linkedin.com/posts/durkbarnhill_us-startup-seeks-to-reclaim-twitter-trademarks-activity-7404159529812246528-hW60/?utm_ source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI 2yHsh7TD4whF5hKqw09R0HE (captured Dec. 11, 2025).

8.      Stephen Coates, LINKEDIN, https://www.linkedin.com/posts/stephenjadiecoates_ interview-the-tm-lawyers-taking-on-musk-activity-7404569780516720640-S8j0/?utm_source= social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7 TD4whF5hKqw09R0HE (captured Dec. 11, 2025).

9.      Durk Barnhill, LINKEDIN, https://www.linkedin.com/posts/durkbarnhill_ backwithyourex-activity-7404898114077085696-25z7/?utm_source=social_share_send&utm_ medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 11, 2025).

10.     Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper-7a02a815_twitter-started-with-140-characters-twitternew-activity-7404956647023984643-

6GEq/?utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADD jmEYBYblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 11, 2025).

11.    Michael Peroff, LINKEDIN, https://www.linkedin.com/posts/michaelperoff_ trademarkprotection-brandidentity-intellectualpropertylaw-activity-74049020013749985297 R6f/?utm_medium=ios_app&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hKqw09R0HE&ut m_source=social_share_send&utm_campaign=copy_link (captured Dec. 12, 2025).

12.    Michael Peroff, LINKEDIN, https://www.linkedin.com/posts/michaelperoff_ former-twitter-attorney-files-for-twitter-activity-7403832488999047168-mcSd/?utm_medium= ios_app&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hKqw09R0HE&utm_source=social_sh are_send&utm_campaign=copy_link (captured Dec. 12, 2025).

13.    Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper- 7a02a815_they-abandoned-the-trademark-publicly-for-activity-7403934654644473856SgdE/? utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYB YblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 15, 2025).

14.    Jeff Brooks, LINKEDIN, https://www.linkedin.com/posts/jeffreybrookschicago_ backwithyourex-activity-7404903928825532416-orjy/?utm_source=social_share_send&utm_ medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 17, 2025).

15.    Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper- 7a02a815_david-didnt-go-looking-for-goliath-he-came-activity-7407134394542424065Trwy/? utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYB YblI2yHsh7TD4whF5hKqw09R0HE (captured Dec. 17, 2025).

16.    Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper- 7a02a815_davidvsgoliath-wegotthestones-activity-7407817034299908096-j9Vm/?utm_s ource=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2 yHsh7TD4whF5hKqw09R0HE (captured Dec. 19, 2025).

17.    Rick Baker, LINKEDIN, https://www.linkedin.com/posts/rick-baker- bab2b93_built-for-journalists-in-the-last-decade-activity-7405283672523960320- 2LV-?utm_source=share&utm_medium=member_desktop&rcm=ACoAAFFj4b0B5JjqCG5MBI 13Jv4JbRShblvDnQk (captured Dec. 22, 2025).

18.    Durk Barnhill, LINKEDIN, https://www.linkedin.com/posts/durkbarnhill_ backwithyourex-activity-7406787219346108416-4OyK?utm_source=share&utm_medium= member_desktop&rcm=ACoAAFFj4b0B5JjqCG5MBI13Jv4JbRShblvDnQk (captured Dec. 22, 2025).

19.    Michael Peroff, LINKEDIN, https://www.linkedin.com/posts/michaelperoff_uspto- ttabvue-proceeding-number-92090266-activity-7403828834212417536-iKss/ (captured Dec. 22, 2025).

20.     Stephen Coates, LINKEDIN, https://www.linkedin.com/posts/stephenjadiecoates_backwithyourex-activity-7407871394190929920-l5wy/?utm_source=share&utm_medium=member_desktop&rcm=ACoAAFFj4b0B5JjqCG5MBI13Jv4JbRShblvDnQk (captured Dec. 23, 2025).

21.     Kevin Raper, LINKEDIN, https://www.linkedin.com/posts/kevin-raper-7a02a815_x-its-whats-happeningactivity-7406895876326973440-v7mx/?utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAADDjmEYBYblI2yHsh7TD4wh F5hKqw09R0HE (captured Dec. 17, 2025).

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of December, 2025, the attached

**DECLARATION OF NASER BASEER IN SUPPORT OF PLAINTIFF'S**

**MOTION FOR A PRELIMINARY INJUNCTION** will be served upon the

below-named registered agent at the address and in the manner indicated:


Operation Bluebird, Inc.                                     HAND DELIVERY
c/o Corporate Creations Network Inc. (registered agent)
1521 Concord Pike, Suite 201
Wilmington, DE 19803



/s/ Andrew C. Mayo

Andrew C. Mayo