## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| X CORP., | |
|     Plaintiff, | |
|   v. | C.A. No. 25-cv-1510-CFC |
| OPERATION BLUEBIRD, INC., | |
|     Defendant. | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Dated: February 2, 2026

Andrew Gerber (admitted *pro hac vice*)
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Christopher J. Sprigman (admitted *pro hac vice*)
Mark P. Mckenna (admitted *pro hac vice*)
Rhett O. Millsaps II (admitted *pro hac vice*)
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com
*Attorneys for Defendant Operation Bluebird, Inc.*

## **Table of Contents**

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . .1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      I.      X IS NOT LIKELY TO SUCCEED ON THE MERITS . . . . . . . . . . 6

      A.      Baseer's Declaration Does Not Demonstrate Current Or Intended Use of the Twitter Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.      X's Abandonment Also Is Demonstrated by Its Actions and Inactions at the U.S. Patent and Trademark Office. . . . . . . . . . . . . . . . . . . . . . 16

      C.      Consumer Recognition of the Twitter Marks Is Not Use of the Marks by X. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      D.      No Likelihood of Confusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      II.      BLUEBIRD'S LOGO DOES NOT INFRINGE X'S COPYRIGHT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# Table of Authorities

Page(s)

Cases

*A&H Sportswear, Inc., v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000) .................................................................. 6

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
  560 F.3d 1350 (Fed. Cir. 2009) ............................................................. 7

*Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, 2021 WL 3630091
  (N.D. Ill. Aug. 17, 2021) .................................................................. 8

*Christian M. Ziebarth v. Del Taco*, LLC, Cancellation No. 92053501
  (T.T.A.B. 2015) ........................................................................19

*Defiance Button Machine Co. v. C&C Metal Prods. Corp.*,
  759 F.2d 1053 (2d Cir. 1985) .............................................................. 19

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................................................ 23

*Elad v. Nat'l Collegiate Athletic Assoc.*,
  160 F.4th 407 (3d Cir. 2025) ............................................................... 5

*Emergency One, Inc. v. American FireEagle, Ltd.*,
  228 F.3d 531 (4th Cir. 2000) .............................................................. 19

*Exxon Corp. v. Humble Exploration Co., Inc.*,
  695 F.2d 96 (5th Cir. 1983) ............................................................... 18

*Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*,
  11 U.S.P.Q.2d 1843, 1989 WL 298658 (S.D. Cal. 1989) ................................... 19

*Franklin Mint Corp. v. National Wildlife Exchange, Inc.*,
  575 F.2d 62 (3d Cir. 1978) ................................................................ 21

*Imperial Tobacco Ltd. v. Philip Morris Inc.*,
  899 F.2d 1575 (Fed. Cir. 1990) ............................................................ 7

*In re Nostalgia Network, Inc.*,
  2005 WL 1463862 (T.T.A.B. 2005) ......................................................... 8

*Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*,
  331 F. Supp. 3d 1131 (D. Idaho 2018) ..................................................... 8

*Nichino America, Inc. v. Valent U.S.A. LLC*,
  44 F.4th 180 (3d Cir. 2022) ........................................................... 6, 21

*Rascal House, Inc. v. Jerry's Famous Deli*,
  2023 WL 11726807 (T.T.A.B. 2023) ........................................................ 18

*Sloan v. Auditron Elec. Corp.*,
  68 F. App'x 386 (4th Cir. 2003) .......................................................... 19

*Southco, Inc., Appellant v. Kanebridge Corporation*,
    390 F.3d 276 (3d Cir. 2004) ................................................................... 22
*Specht v. Google Inc.*,
    747 F.3d 929 (7th Cir. 2014) ......................................................... 6, 7, 9
*Specht v. Google, Inc.*,
    758 F. Supp. 2d 570 (N.D. Ill. 2010) ...................................................... 8
*TD Bank, N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) ................................................................... 23
*U.S. Jaycees v. Philadelphia Jaycees*,
    639 F.2d 134 (3d Cir. 1981) ..................................................................... 7

Statutes

15 U.S.C. § 1057 ............................................................................................... 6
15 U.S.C. § 1064(3) .......................................................................................... 7
15 U.S.C. § 1127 ............................................................................................... 7
15 U.S.C. §§ 1055 ........................................................................................... 16
17 U.S.C. § 504(a), (c) ................................................................................... 23

Other Authorities

2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (5th ed.
    2025) ..................................................................................................... 2, 7

Shari S. Diamond and Jerre B. Swann, Trademark and Deceptive Advertising
    Surverys: Law, Science, and Design (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff X Corp. ("X") filed its complaint on December 16, 2025, and filed a motion for a preliminary injunction on December 26, 2025. Defendant Operation Bluebird, Inc. ("Bluebird") filed a motion seeking expedited discovery on January 9, 2026, which the Court granted in part on January 12.

## SUMMARY OF ARGUMENT

X seeks the extraordinary remedy of a preliminary injunction, asking the Court to restrain Bluebird's use of TWITTER or TWEET for a new social media platform. X bears the burden of demonstrating its likelihood of success on the merits, and that it will suffer irreparable harm without a preliminary injunction. But X fails to demonstrate either.

X does not own valid rights in any of the former "Twitter marks."[1] X abandoned those marks in its complete rebrand of the platform and all related services. X's famously outspoken owner put that rebrand on full blast, chastising anyone who continued to refer to X as "Twitter." Declaration of Rhett O. Millsaps II dated February 2, 2026, ("Millsaps Decl.") ¶ 2, Ex. 1 at 1-2.

X cannot claim rights in marks it no longer uses to sell products or services just because traces of its former use remain online. Artifacts of former use left

---

[1] The former "Twitter marks" are the group of alleged marks asserted by X. Complaint ¶ 23.

floating on the internet are not current use any more than a defunct newspaper still exists because old issues can still be found.

X does not use the Twitter marks and has no intent to resume use; rather, X expressly and loudly abandoned the marks, forfeiting its right to exclude others from using those marks. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:2 (5th ed. 2025) ("Once abandoned, a mark may be seized immediately and the person doing so may build up rights against the whole world."). In any event, no one is likely to be confused by Bluebird's new use. Bluebird is not telling consumers that it is X; Bluebird's success depends on making clear it is *not* X.

Because X intentionally abandoned its rights in the Twitter marks, and because confusion is unlikely, X is unlikely to prevail on its trademark claims. For the same reasons, X cannot show likely irreparable harm from Bluebird's use. Nor is X likely to prevail on its copyright claim. X's copyright rights in the outline of a bird are narrow, and Bluebird has no plans to use an identical reproduction of the former Twitter bird. Bluebird plans instead to use its own bird icon that is not substantially similar and does not infringe X's copyright. The Court thus should deny X's motion.

**STATEMENT OF FACTS**

X's predecessors acquired Twitter, Inc. in 2022, and Twitter's assets were consolidated under the newly formed X Corp. Declaration of Naser Baseer dated December 23, 2025 (D.I. 11) ("Baseer Decl.") ¶ 18.  In July 2023, in a series of posts by Elon Musk, X unambiguously announced to the world it would no longer use the Twitter brand. Millsaps Decl. ¶ 3, Ex. 2.



As Musk promised, X swiftly and systematically rebranded away from Twitter to the X brand. There was nothing ambiguous about X's intentions. On July 23, 2023, Musk was recorded in an online audio chat stating, "We're cutting the Twitter logo off the building with blow torches." *Id*. ¶ 4, Ex. 3 at 2. By August 2023, "[t]he last parts of the old Twitter branding [were] seemingly being removed from Elon Musk's 'X' site." *Id*. ¶ 5, Ex. 4 at 1. In a post on May 16, 2024, Musk announced that "all core systems" had moved to X.com. *Id*. ¶ 6, Ex. 5.



The rebranding allowed Musk to fulfill his longstanding dream of using the x.com domain, which he purchased as a young entrepreneur, sold to PayPal, and then re-acquired. *Id*. ¶ 7, Ex. 6 at 5-6.

X's rebrand of Twitter is now so complete that X has even discontinued the @twitter handle on the X platform. *Id*. ¶ 8, Ex. 7.



Despite its clear public abandonment of the Twitter marks, X now claims continuing use, pointing to historical evidence online of prior use. But remnants of prior use are not evidence of continued use in the ordinary course of trade. If it were, then it would no longer be possible, in the internet age, for a mark ever to be abandoned.

## ARGUMENT

It "is well-established that a 'preliminary injunction is an extraordinary and drastic remedy.'" *Elad v. Nat'l Collegiate Athletic Assoc.*, 160 F.4th 407, 412 (3d Cir. 2025) (citation omitted). Thus, "the movant must make a 'clear showing' that an injunction is warranted." *Id.* "If a court finds no likelihood of success on the

merits, the inquiry ends and the injunction will be denied." *Nichino America, Inc.*

*v. Valent U.S.A. LLC*, 44 F.4th 180, 185 (3d Cir. 2022).

## I.    X IS NOT LIKELY TO SUCCEED ON THE MERITS

To prevail on a trademark infringement claim, a plaintiff must show that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc., v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). X is not likely to prevail because the evidence shows that X deliberately abandoned any rights in the Twitter marks.[2]

Registered marks are presumed valid, 15 U.S.C. § 1057, but that presumption can be overcome with proof of abandonment. *See Specht v. Google Inc.*, 747 F.3d 929, 936 (7th Cir. 2014) (affirming district court's cancellation of registration of plaintiff's abandoned mark). Abandonment reflects trademark law's most fundamental rule: trademark rights arise out of and depend on use. Without use, trademarks cannot fulfill their function of indicating the source of goods or services. Nor can they provide trademark owners an incentive to maintain the quality of those goods and services. Trademark rights are not laurels; a former owner may not rest

---

[2] X also asserts counterfeiting, dilution, unfair competition, and related state law claims. Complaint ¶¶ 67-110. Those claims all require ownership of valid trademark rights; all fail for the reasons X's trademark infringement claim fails.

on them. *See Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990) ("the Lanham Act was not intended to provide a warehouse for unused marks"). For that reason, abandonment is a defense even as to marks for which the registration has become incontestable. 15 U.S.C. § 1064(3); 1065.

A mark is abandoned when "its use has been discontinued with intent not to resume use." 15 U.S.C. § 1127; *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138 (3d Cir. 1981).[3] Critically, "use" of a mark "means the bona fide use…made in the ordinary course of trade, and not merely to reserve a right in a mark." *Id.* A mark is used in the ordinary course of trade for services "when [1] it is used or displayed in the sale or advertising of services and [2] the services are rendered in commerce." *Id.* "Use" must be in connection with currently available services offered under the mark. *Specht*, 747 F.3d at 934 (continued availability of website bearing trademark not use of the mark where no goods or services provided under the mark); *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1361 (Fed. Cir. 2009) (mark must be

---

[3] *Jaycees*, a case about the different issue of abandonment by failure to prosecute potential infringers, cited some pre-Lanham Act cases for the proposition that abandonment requires non-use and "intent to abandon." *Id.* at 138. The Third Circuit then said that the Lanham Act definition focused on intent not to resume use embodied the old common law rule. Because *Jaycees* was not about abandonment by non-use, the differences between those standards were immaterial to the case. But the statute is clear that the rule is intent not to resume use, not intent to abandon. 15 U.S.C. § 1127; MCCARTHY § 17:11 ("The Lanham Act requires proof of an "intent not to resume" use of the mark, *not* of an intent to abandon the mark.) (emphasis in original).

actually used in conjunction with services to support application for registration); *In re Nostalgia Network, Inc.*, 2005 WL 1463862, \*5 (T.T.A.B. 2005) (advertising of services to be available in the future not use of mark; services must be currently available).

This is a paradigmatic case of abandonment. X does not currently use the Twitter marks. It has no Twitter platform and offers no services under the Twitter marks. Remnants of X's former use of the Twitter marks do not count as use. *See*, *e.g.*, *Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18 C 1376, 2021 WL 3630091, at \*10 (N.D. Ill. Aug. 17, 2021) (residual references to SPAN mark in historic circulars and software links did not constitute use); *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) ("Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website…is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce."), *aff'd*, 747 F.3d 929 (7th Cir. 2014); *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC,* 331 F. Supp. 3d 1131, 1140 (D. Idaho 2018), *aff'd,* 775 F. App'x 350 (9th Cir. 2019) (mention of Nelson-Ricks Creamery Company on the "About Us" webpage was "mostly historical in nature;" that use was not "use in commerce").

A. **Baseer's Declaration Does Not Demonstrate Current Or Intended Use of the Twitter Marks.**

1. <u>Baseer included images of which he has no personal knowledge.</u>

Baseer contends that "more than 200,000 mobile users continue to maintain a version of the TWITTER mobile application, together with the TWITTER Marks and Bird Logo, on their mobile devices…." Baseer Decl. ¶ 42. But Baseer provides no documentary support for that claim, and he has no personal knowledge or corporate information about those "users," where the alleged number of users comes from, or how those "users" have avoided years of automatic push updates to X's app designed to ensure the transition to X branding.[4] Millsaps Decl. ¶ 9, Ex. 8 ("Baseer Tr.") at 50:8-57:22.

Most egregiously, Baseer's declaration includes images purporting to reflect how the "TWITTER branded platform continues to appear" on these supposed users' mobile phones. Baseer Decl. ¶ 42. But Baseer admitted those images came from an unidentified associate at X's law firm, Debevoise & Plimpton; Baseer has no personal knowledge of the images' provenance. Baseer Tr. at 49:3-50:1. On their face, the images appear manipulated. They are images from an unknown source onto which a fake phone "bezel" has been superimposed. Baseer Decl. at 18. Given that Baseer has no idea where the images came from, he cannot credibly assert that they are representative of any user's experience, let alone 200,000 "users."

---

[4] Indeed, at his deposition, Baseer claimed not to know what a "push" update was in the context of mobile phone apps. Baseer Tr. at 56:15-25.

2. <u>Nothing in Baseer's declaration provides any evidence of bona fide use by X of the Twitter marks in the ordinary course of trade.</u>

Baseer's declaration provides no evidence that X continues to make bona fide use of the Twitter marks in the ordinary course of trade.[5] Much of the declaration consists of bare assertions of use for which Baseer provides no documentary evidence.[6] The "evidence" Baseer does cite is overwhelmingly historical artifact—remnants of previous uses that have not been fully scrubbed from the internet. That is not current use, and it cannot avoid abandonment.

Baseer asserts that the fact that some users continue to access the X platform by way of the twitter.com domain name demonstrates X's continued use. Baseer Decl. ¶ 41. But that is not use by X, as twitter.com no longer functions as an

---

[5] The evidence does not show current use of any of the Twitter marks, but what Baseer presents predominantly refers to the name Twitter; the evidence is even weaker with respect to other alleged marks (*e.g.*, TWEET).

[6] For example, Baseer asserts that "X Corp. hosts client events that bring together customers and leaders across various industries to help customers understand X Corp.'s product offerings, grow their businesses and expand their networks. X Corp.'s marketing representatives attending such events, or otherwise corresponding with clients, also use the TWITTER name in their client-facing communications." Baseer Decl. ¶ 43. But Baseer provides no documentary evidence of that purported use, and there is no reason to think he would have personal knowledge of any such use. Baseer is Director of Legal at X and does not work in marketing. X has insisted that Baseer submitted his declaration in his personal capacity and not as a 30(b)(6) representative of X (Millsaps Decl. ¶ 12, Ex. 11 ¶¶ 3-6), so his lack of personal knowledge of marketing representatives' purported actions is disqualifying. More generally, because X has repeatedly misrepresented its purported use of the Twitter marks, there is no way to evaluate these claimed "uses" based on Baseer's unsubstantiated assertions.

independent domain name. X officially retired twitter.com on Nov. 10, 2025—meaning that all users who had enrolled two-factor authentication credentials at twitter.com were required to re-enroll at X.com or lose account access. Millsaps Decl. ¶ 10, Ex. 9. Now, when a user types twitter.com into their browser, it instantaneously resolves to x.com. Declaration of Stephen Coates dated February 2, 2026, ("Coates Decl.") ¶ 12, Ex. 1. Users see a page that contains exclusively X branding. *Id*.

The blog available at https://blog.twitter.com also does not reflect current use. Baseer Decl. ¶ 44. That domain name no longer operates independently. Instead, it resolves to blog.x.com—that is, users' internet browsers display the address "blog.x.com", not "blog.twitter.com", and users see a page branded with the X marks exclusively. Coates Decl. ¶ 15, Ex. 2.



Baseer also points to several articles on the X blog that mention Twitter. Baseer Dec. ¶ 44, Ex. 3. But those blog articles are all old—the most recent one was posted in April 2023. They do not show current uses of the Twitter marks in connection with any goods or services; they are just archived pages from before X stopped using the Twitter marks. Coates Decl. ¶¶ 16-17.

Likewise, the social media pages that Baseer references do not constitute current use of the Twitter marks. Baseer Decl. ¶ 45. The Twitter Facebook page has not been updated since October 21, 2021. *Id*., Ex. 4 at 3. There are no visible posts on the Twitter LinkedIn Page, and all of the "Past Events" are from 2021 or before. *Id*. at 6-7. The most recent post on the Twitter Instagram page is from February 19, 2022. *Id*. at 15. Every video on the Twitter for Business YouTube page is at least three years old. *Id*. at 17-21.

To the extent anyone goes to those defunct social media pages today (X offers no evidence anyone does), those users would see an archive of X's former use of Twitter marks, not bona fide current use of those marks. That is unsurprising: X no longer offers any goods or services under any of the Twitter marks, on social media or anywhere else.

The other webpages Baseer points to are misleadingly presented, but those also reflect historical uses and not current use of the Twitter marks. *Id*. ¶ 46. Like the

social media pages, those webpages are artifacts that are not genuinely accessible by users and simply have not yet been removed from the internet.

For example, Baseer claims that the "Grow Your Business with X, Twitter Ads" page is evidence that X uses the Twitter marks in consumer-facing materials. *Id*. ¶ 46, Ex. 5 at 3-4. But that webpage can be reached only by knowing and typing in the exact URL: https://ads.twitter.com/getstarted. Coates Decl. ¶ 19. If a user were to type in https://ads.twitter.com (the same URL without the "getstarted" restrictor), that user would immediately be taken to business.x.com/en/advertising:



*Id.* ¶ 21, Ex. 5.

There is no Twitter branding on that page. Nor can a user navigate from that page to the page Baseer cites (https://ads.twitter.com/getstarted). Moreover, a user who clicks on the "Get Started" button in the top right of

https://ads.twitter.com/getstarted would be taken to the same page shown above. *Id.* ¶ 22, Ex. 7.

The other pages Baseer offers as evidence of X's current use are similarly outdated flotsam. Baseer Decl. ¶ 46, Ex. 5. None of those pages are accessible in any ordinary way through the X website; they are findable only by typing in the exact URL. Coates Decl. ¶¶ 23-24. There is no reason to think that any consumers do that (and X easily could have identified server logs if they did).

The purported searches in the X Help Center are no better. Baseer Decl. ¶ 47. Notably, Baseer does not disclose actual results from those searches; he includes only the number of results. In fact, the first search result, for "Create X Account", uses no Twitter branding at all. Coates Decl. ¶ 25, Ex. 10. And for the few search results that refer to Twitter in the summary text that accompanies them, when a user clicks through, those references have been replaced by references to X. *Id.*

At his deposition Baseer was asked about a particular search result for "Twitter"—"Following FAQs."[7] The summary text accompanying that search result reads "Following FAQs: Following someone on Twitter means: You are subscribing to their Tweets as a follower …." But as Baseer testified, a user who clicks on the result is taken to a page that contains no Twitter marks whatsoever; those marks have been replaced by X marks. Baseer Tr. at 132:6-135:10, Ex. 25.

---

[7] FAQs stands for "frequently asked questions."

The Google results Baseer depicts in his declaration are similarly misleading. Baseer Decl. ¶ 48. While Baseer claims the images reflect results of a search for "Twitter," *id*., in fact the search was for ["Twitter" site:x.com], which means Baseer directed Google to search only pages within the X.com website. Baseer admitted he doesn't know how old the pages reflected in the image of Google results are. Baseer Tr. at 146:7.  Again, those results show that X has not yet scrubbed from its website every remnant of its old use of the Twitter marks. They are not evidence of use to brand currently available services.

Finally, Baseer contends that X continues to use the Twitter marks because X sometimes refers to "X, formerly Twitter." Baseer Decl. ¶¶ 51-52. But that is not current use of Twitter to indicate the source of X's products or services—in fact, it is the opposite. The dictionary meaning of "formerly" is "at an earlier time."[8] Accordingly, the formulation "X, formerly Twitter" announces to the world, in plain English, that X is no longer Twitter. That is yet another declaration of abandonment.

3.   <u>Third-party references to Twitter are not current use of the marks by X</u>.

X claims as evidence of its current use legacy references by third parties to their own social media accounts. Those referential uses by unrelated parties, X suggests, count as use of the Twitter marks that "inure[] directly to X Corp.'s benefit." Baseer Decl. ¶ 49. That argument is incorrect.

---

[8] https://www.merriam-webster.com/dictionary/formerly.

Under the Lanham Act, a third party's use of a mark "inures to the benefit" of a trademark claimant only when the claimant controls the quality of goods or services offered under the purportedly licensed mark. 15 U.S.C. §§ 1055; 1127. X does not license its mark to these third parties—"permission" under the Brand Guidelines is not a trademark license—and none of the third parties Baseer cites offer goods or services under the Twitter marks. Nor is there any evidence that X controls the quality of any of those third parties' services.

For example, JetBlue does not offer airline services under the Twitter marks, and it does not offer social media services at all. *See* Baseer Decl. ¶ 50. Baseer does not suggest that X controls the quality of JetBlue's airline services. JetBlue has buttons on its social media pages that direct its customers to JetBlue's social media accounts. The fact that JetBlue has not yet updated its button to the X logo doesn't mean X is "using" the Twitter logo on JetBlue's website. Indeed, users that click on the Twitter logo on JetBlue's website are taken to x.com/jetblue, a page containing no Twitter branding. Coates Decl. ¶ 26, Exs. 11, 12.

### B. X's Abandonment Also Is Demonstrated by Its Actions and Inactions at the U.S. Patent and Trademark Office.

1. <u>X has abandoned a number of registrations and applications to register Twitter marks</u>.

Baseer admitted that X has abandoned federal registrations and applications to register a number of Twitter marks, including TWTR, TWEET LOVE, 🐦 (the

16

Twitter bird logo), TWITTER AMPLIFY, TWITTER FLEET, TWITTER MIRROR, TWEETSTORM, HASHFLAG, HASHLOGO, and BIRDSIGNALS. Baseer Tr. at 190:16-205:8. X's abandonment of applications and registrations for so many Twitter marks is another strong signal that X has abandoned the Twitter marks altogether.

2.  <u>X admits that it has taken no action to complete registration for a number of currently suspended applications to register Twitter marks.</u>

Baseer admitted that X has taken no action to complete the registration process for a number of applications to register Twitter marks that the USPTO has suspended due to X's failure to file required documentation. Baseer Tr. at 21:8-35:6. These applications were based on purported prior foreign registrations. *Id*. All X must do to complete the registration process is file a copy of the relevant foreign registrations and affirm its bona fide intent to use the marks in commerce in the United States. Millsaps Decl. ¶ 11, Ex. 10. That X has failed for years to do so is further evidence that X has abandoned the Twitter marks altogether.

3.  <u>X makes misleading claims of use at the USPTO.</u>

Publicly-available information demonstrates that X has made material misrepresentations of use to the USPTO. Baseer Tr. at 216:7-266:4. For example, on October 23, 2023, X filed a declaration requesting renewal of the TWITTER mark (Reg. No. 4,422,235), including a specimen of purported use. Coates Decl. ¶ 29-30. But that specimen does not show use by X; it shows a reference by an unconnected

17

third-party website to an older version of the Twitter app, which that website offered for download. Baseer Tr. at 219:7-229:3. X has offered no evidence that X has a trademark license with that third-party; X cannot claim that reference as its own use in commerce.

That is not an isolated example: X has repeatedly misrepresented use to the USPTO by claiming third-party references as its own use or by claiming old use as evidence of current use. Coates Decl. ¶¶ 31-39.[9]

### C.  Consumer Recognition of the Twitter Marks Is Not Use of the Marks by X.

X suggests it has not abandoned the Twitter marks because those marks are recognized by consumers. Br. at 7. But "[s]ection 1127 of the Lanham Act, without mentioning goodwill, requires continued use of a mark or intent to resume use to avoid a finding of abandonment.…The [Lanham] Act does not allow the preservation of a mark solely to prevent its use by others."). *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 101-02 (5th Cir. 1983). That is why the Trademark Trial and Appeal Board has consistently held that "residual goodwill" is not a defense to abandonment. *See, e.g.*, *Rascal House, Inc. v. Jerry's Famous Deli*, 2023 WL 11726807 (T.T.A.B. 2023) (references to past use of a mark on menus not

---

[9] On this basis, Bluebird has petitioned to cancel a number of registrations of Twitter, alleging abandonment and fraud on the U.S. Patent and Trademark Office. Coates Decl. ¶ 42, Ex. 20.

use in commerce, regardless of recognition, when no services were currently offered under that mark); *Christian M. Ziebarth v. Del Taco*, LLC, Cancellation No. 92053501, at \*28 (T.T.A.B. 2015) ("The Board has never found residual goodwill to be a defense to abandonment, and we decline to do so here. The continued existence of enthusiasts of the old Naugles food items does not negate the statutory presumption of abandonment.").[10]

Even if consumer recognition were relevant (it is not), here the evidence shows that what consumers recognize is that X *used to be* Twitter—as X clearly tells them. Baseer Decl. ¶¶ 51-52. For example, X points to pop culture jokes about continuing to call the platform Twitter. *Id.* ¶¶ 53-54. But those are jokes only because everyone knows the platform is *not* Twitter anymore.

D.    **No Likelihood of Confusion.**

Because X abandoned the Twitter marks, X is unlikely to prevail, and the Court need not consider whether consumers are likely to be confused. *See Sloan v.*

---

[10] The few cases that have, contrary to the statute, given weight to "residual goodwill" are inapposite here. *See, e.g., Defiance Button Machine Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060-61 (2d Cir. 1985) (emphasizing short period of non-use during which time mark owner attempted to sell the brand, and immediate intent to resume business under the mark). Likewise, cases involving durable goods that continue to physically circulate in commerce are inapposite, as those cases emphasize ongoing repair or service, or turn on intent to resume use, neither of which are relevant here. *See Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q.2d 1843, 1989 WL 298658, at \*7-\*8 (S.D. Cal. 1989); *Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 537 (4th Cir. 2000).

*Auditron Elec. Corp.*, 68 F. App'x 386, 391 (4th Cir. 2003) (affirming summary judgment for defendant on ground that plaintiff abandoned claimed mark and noting no need to reach question of likelihood of confusion).

But confusion is unlikely regardless, so X cannot show a likelihood of success on the merits or irreparable harm. Bluebird's placeholder website unambiguously announces its distance from X. Coates Decl. ¶ 40, Ex. 19. Most obviously, the site is hosted at Twitter.**new**. The site also boldly announces that the public square is broken, one brand tried to fix it, but then burned it all down (a screen that renders in X's black and white format). *Id*.

No reasonable consumer would think the company accusing X of burning down the public square is actually X. The website available at twitter.new also includes a disclaimer that reads, "IMPORTANT: Operation Bluebird, Inc. is not affiliated with X Corp. or Twitter, Inc…." *Id*., Ex. 19 at 12. And the FAQ section of twitter.new discusses X's abandonment and this lawsuit. *Id*. Ex. 19 at 25-32.

X's survey, which uses as its stimulus undated images of the twitter.new website, primarily shows that consumers know that X used to be Twitter—and also that X is no longer Twitter. D.I. 13-1 at 43-49. Many of the respondents, when asked

20

what they knew about "Twitter," said that Twitter was the former name of a platform that had been rebranded as X. *Id*.[11]

Thus, X's own evidence shows there is no likelihood of irreparable harm even if X were likely to prevail on the merits. *See Nichino America*, 44 F.4th at 186 (once defendant makes a "slight evidentiary showing" to rebut the presumption of irreparable harm, the burden "returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction.").

## II.     BLUEBIRD'S LOGO DOES NOT INFRINGE X'S COPYRIGHT RIGHTS

X's copyright claim lacks merit. X claims copyright rights in the outline of a bird it previously used to brand Twitter. But X's copyright rights are necessarily narrow: X cannot claim copyright control over outline drawings of birds in general. X's rights are limited to the shape of its particular bird and close approximations. *See Franklin Mint Corp. v. National Wildlife Exchange, Inc.*, 575 F.2d 62, 66 (3d Cir. 1978) (affirming holding that painting shown below, right, did not infringe the painting shown below, left; the "similarity between the works necessarily reflected the common theme or subject….").

---

[11] That survey also demonstrates that X cannot claim the color blue as a separate mark. X's expert used a blue color scheme for the website he offered as the control. D.I. 13-1 at 17-23. A valid control must not include allegedly infringing features. *See* Shari S. Diamond and Jerre B. Swann, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN, 248 (2022).



Bluebird is not using and does not contemplate using the Twitter bird as a logo. Rather, Bluebird has its own bird:



Coates Decl. ¶ 41. Even a cursory look at Bluebird's bird (right) shows that it is not substantially similar to the former Twitter bird (left).

To the extent there are similarities between the Twitter bird and Bluebird's bird, they are shared generic features (beaks, feathers) of birds. *See Southco, Inc., Appellant v. Kanebridge Corporation*, 390 F.3d 276, 287 (3d Cir. 2004) (Judges

22

Becker, McKee, and Smith, concurring) (unprotectable "scènes à faire" are "those otherwise expressive elements of a work that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting") (cleaned up).

Injunctive relief would not be appropriate even if Bluebird's bird were substantially similar. X cannot obtain injunctive relief unless it shows that money damages are inadequate. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Copyright Act makes several forms of monetary damages available to remedy copyright infringement. 17 U.S.C. § 504(a), (c). The Third Circuit has interpreted those remedy provisions to allow a reasonable royalty to remedy future harm. *TD Bank, N.A. v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019). Thus, even if Bluebird's bird infringes (it does not), X has a perfectly adequate remedy at law, which removes any basis for an award of injunctive relief.

## CONCLUSION

Because X is not likely to prevail on the merits, and because X cannot show likely irreparable harm, the Court should deny X's motion.

Dated: February 2, 2026

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Andrew Gerber (admitted *pro hac vice*)
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Christopher J. Sprigman (admitted *pro hac vice*)
Mark P. Mckenna (admitted *pro hac vice*)
Rhett O. Millsaps II (admitted *pro hac vice*)
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com

*Attorneys for Defendant Operation Bluebird, Inc.*

24

## <u>CERTIFICATION OF COMPLIANCE</u>

The foregoing document complies with the type-volume limitation of this Court's November 10, 2022 Standing Order regarding Briefing in All Cases. The text of this brief, including footnotes, was prepared in Times New Roman, 14 point. According to the word processing system used to prepare it, the brief contains 4,997 words, excluding the case caption, signature block, table of contents and table of authorities.

 /s/ Brian E. Farnan                          
Brian E. Farnan (Bar No. 4089)

Dated: February 2, 2026