## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| |
|---|
| X CORP.,<br><br>           Plaintiff,<br><br>   v.<br><br>OPERATION BLUEBIRD, INC.<br><br>           Defendant. |

Case No. 1:25-cv-01510-CFC

### REPLY DECLARATION OF NASER BASER IN SUPPORT OF PLAINTIFF X CORP.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

I, Naser Baseer, hereby declare as follows:

1.      I am a Director, Legal at X Corp. ("X Corp."). I am over the age of 18 and competent to testify.

2.      On December 26, 2025, I submitted a declaration with accompanying exhibits, D.I. 11, ("First Declaration") in support of X Corp.'s motion for a preliminary injunction, D.I. 9, 10, against Operation Bluebird, Inc. ("Bluebird"). I submit this declaration in further support of X Corp.'s motion for a preliminary injunction against Bluebird. As with my First Declaration, I submit this declaration based on my personal knowledge and a review of company records, and on information from individuals at X Corp. upon whom I regularly rely.

3.      In my First Declaration, I explained the long history and fame of the TWITTER Brand and provided information regarding the TWITTER family of

trademarks and copyright registrations; X Corp.'s acquisition of the TWITTER Brand; the products, services, customers, advertising, promotion, and distribution of X Corp.'s goods and services; X Corp.'s continued use of the TWITTER Marks after its rebrand to X; Bluebird's trademark applications, unauthorized uses, and statements regarding the TWITTER Marks; and the harm X Corp. is facing from Bluebird's uses of the TWITTER Marks.  D.I. 11.

4.      With respect to X Corp.'s continued use of the TWITTER Marks, I attached several exhibits and provided examples of those uses, all of which were active at the time I submitted my declaration, and remain current today, including but not limited to, continued: use of the Twitter.com domain; use of the TWITTER-branded mobile application; use at marketing events and customer-facing communications; use on the X Corp. blog; use on social media profiles; use on websites and client materials; customer help materials; marketing and business guides; developer materials; vendor and supplier onboarding materials; approved third-party uses; and continued brand presence and consumer recognition.  D.I. 11 ¶¶ 39-54.

5.      I have reviewed Bluebird's opposition to X Corp.'s motion for a preliminary injunction and the accompanying declarations and exhibits, D.I. 29,

30, 31.  I have also reviewed the transcript from the deposition of Stephen Coates, Bluebird's General Counsel, which was taken on February 10, 2026.[1]

6.      I understand that Bluebird's opposition and declarations attempt to dispute my First Declaration and deposition testimony regarding X Corp.'s continued use of the TWITTER Marks.  I submit this declaration to respond to Bluebird's misstatements of fact.

7.      Bluebird's contention that I have provided no evidence of continued use of the TWITTER Marks is wrong.  *See* D.I. 29, 30.  Neither Bluebird's opposition brief nor declarations provide any objective evidence that negate the evidence of use I described in my First Declaration.  D.I. 11 ¶¶ 39-54.  Nothing in Bluebird's brief or declarations undermines X Corp.'s continued, valid use of the TWITTER Marks that I described in my First Declaration.

8.      The TWITTER Marks are valuable intellectual property in which X Corp., and its predecessor, Twitter, Inc., have invested and cultivated.  They are part of X Corp.'s brand identity, and they are marks that X Corp. continues to use today because of their widespread recognition among consumers who associate the marks with X Corp. and its services.  The webpages and materials depicted in Exhibits 3, 4, 5, 6, 7, 8, and 9 of my First Declaration are just some of the ways

---

[1] I understand a copy of the deposition transcripts at issue in this case, along with select exhibits submitted in those depositions are being separately submitted to the Court as part of the Declaration of Nicole Flores, filed concurrently herewith.

that X Corp. continues to use the TWITTER Marks on its social media, platform, website, blog, customer webpages, client-facing materials, and other authorized uses. D.I. 11-3 through 11-9. Bluebird's claims that these continued uses are merely "historical" or are "remnants" is simply wrong. All of these materials were collected and/or captured in December 2025 and illustrate X Corp.'s continued use of the TWITTER Marks even after it rebranded to X.

***Continued Use of Domain and Mobile Application***

9.    As I explained in my First Declaration and at my deposition, more than 200,000 mobile users continue to maintain a version of the TWITTER mobile application, together with the TWITTER Marks and Bird Logo, on their mobile devices for accessing the X platform. D.I. ¶ 42; Baseer Deposition Tr. 52:5-23.

10.    Bluebird contends that I have no personal knowledge regarding the 200,000 figure provided in my First Declaration. Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, D.I. 29 at 8-9. However, as I explained during my deposition, the 200,000 figure was derived from the number of active devices that maintain and use the Twitter-branded iOS app. Baseer Deposition Tr., 52:17-23. This data was provided to me by individuals upon whom I regularly rely in the course of my job responsibilities. D.I. 11 ¶ 1; Baseer Deposition Tr., 52:16-23; 92:21-93:9. This number is also underinclusive because it only represents the number of users running the iOS version of the application

4

(on iPhones) and does not account for those running the TWITTER-branded version of the application on Android devices. Nor does it account for the more than four million users accessing X Corp.'s platform through the Twitter.com domain each day. D.I. 11 ¶ 41.

11.    I understand that Bluebird is further contending I have no knowledge of the images depicting continued use of the TWITTER-branded mobile application in my First Declaration. D.I. 29 at 9. As I explained, these images were collected from an associate at Debevoise & Plimpton. Baseer Deposition Tr., 49:18-25. The image was captured by taking a screenshot of the phone. Although Bluebird did not ask further about the extent of my personal knowledge of the images during my deposition, if they had, I would have explained that these images are representative of how the Twitter-branded application appears on current mobile devices. I have knowledge of this because this is the same Twitter-branded application that I am familiar with through both my role at X Corp., and through personal use of the Twitter-branded application.

12.    The inclusion of the phone bezel in the images was a formatting choice made solely for purposes of its presentation in my First Declaration. Given Bluebird's unfounded contentions that these images were somehow doctored or "manipulated," D.I. 29 at 15, I once again provide those images below, without additional formatting.

5







13.     Further, as I previously explained, these images were captured in December 2025, in connection with X Corp.'s efforts to collect evidence in support of X Corp.'s motion for preliminary injunction.  D.I. 11 ¶ 42; Baseer Deposition Tr., 49:18-25.  As is clear in the screenshots themselves, the Twitter-branded application is still functioning, along with live tracking features provided by X Corp.

14.     Bluebird further contends that I have no personal knowledge as to "how users have avoided years of automatic push updates to X's app" and that I "did not know what a push update was in the context of mobile phone apps." D.I. 29 at 8-9.  As I explained during my deposition, mobile applications, including the X app, on my personal device can be manually updated. Baseer Deposition Tr., 55:18- 56:21, 57:13-22. Based on both personal experience and publicly available sources, I understand that many mobile phone users have the same settings. Attached hereto as Exhibit 1 to my Reply Declaration are true and correct copies of webpages available at

https://www.reddit.com/r/Twitter/comments/1ov5daw/still_twitter_not_x_havent_ updated_since_change/;

https://x.com/electionsjoe/status/2016324025966813622?s=46, reflecting user posts and comments who still retain the TWITTER branding on their mobile phones.  As evidenced by the over 200,000 current users of the TWITTER-branded

application, X Corp. has not taken any action to force all of its users to update to an X-branded version of its app.

15.     X Corp.'s consumers are also able to still download the TWITTER-branded version of its social media platform through third-party Android Package Kit ("APK") sites.  I understand that Bluebird claims that the use of APK sites submitted in connection with TWITTER trademark registration renewals is "misleading." D.I. 29 at 17, D.I. 30 ¶¶ 27, 29, 30.  Bluebird claims, without any legitimate factual basis, that the APK sites do not constitute X Corp.'s continued use of the TWITTER Marks.  D.I. 29 at 17.  However, while these are not uses that I relied upon in my First Declaration, they are additional evidence of continued and authorized use of the TWITTER Marks.

16.     As I explained during my deposition, these sites allow users to download the application, including the Twitter-branded application, developed by X Corp.  Baseer Deposition Tr., 220:2-224:24.  X Corp. is aware that these third-party sites distribute its materials, and it monitors such uses to ensure that they are authorized versions of X Corp.'s application and platform.  Baseer Deposition Tr., 224:14-24.  The versions shown in my declaration are authorized uses of X Corp.'s application.  Mr. Coates himself acknowledged that the APK sites show the Twitter-branded app, list the name TWITTER, depict the Twitter Bird Logo, and identify Twitter as being developed by X Corp.  Coates Deposition Tr. 136:3-

137:22.  Mr. Coates also admitted that he has no factual basis to dispute the

testimony I provided regarding how X Corp. allows its Twitter application to be

downloaded in various ways and that X Corp. monitors the Twitter applications

posted on APK sites to ensure that the applications being downloaded are actually

X Corp.'s application.  Coates Deposition Tr., 140:11-146:2.

### *Continued Use on Client-Facing Events, Materials, Communications, Blog, Social Media and Other Materials and Webpages*

17.    **Client-Facing Events, Materials and Communications**: Bluebird

claims that I was unable to attest to materials or communications that the X Corp.

marketing team shares with X Corp.'s clients and customers.  D.I. 29 at 10 n. 6.

As explained in my First Declaration, and during my deposition, the statements

and evidence provided as part of my First Declaration were developed in

collaboration with others at X Corp.  D.I. 11 ¶ 1; Baseer Deposition Tr., 92:14-

93:13.

18.    Based on information learned during these conversations, I described

in my First Declaration uses by the X Corp. team of the TWITTER Marks in its

client-facing communications, at client events, and with our vendors.  For example,

X Corp.'s entire vendor onboarding process remains TWITTER-branded, evidence

of which I included in my First Declaration.  D.I. 11 ¶ 46; 11-5 at 67-98.

Moreover, I reviewed and attached communications showing that these materials

were shared with new vendors in October 2025.  D.I. 11-5 at 67; Baseer Deposition

Tr., 114:9-20.  Based upon my review, it does not appear that Bluebird even addresses these vendor materials in its opposition brief or declarations.

19.    I understand that the Declaration of Stephen Jadie Coates asserts the webpages in Exhibits 5 to my First Declaration are "inactive webpages."  D.I. 30 at ¶ 19.  But that claim is demonstrably false, as Bluebird's counsel was able to access, download, and display some of the exact webpages to me during my deposition.  *See, e.g.,* Baseer Deposition Tr., 121:13-122:3; 119:17-21.  Mr. Coates also stated in his Declaration that he was able to access many of these materials.  D.I. 30 ¶¶ 18-24.  All of the webpages provided in my First Declaration were accessed and captured in December 2025 in connection with this litigation, as evidenced by both the dates in the citations in my First Declaration, as well as the capture receipts for the captured webpages.  As explained in my First Declaration, X Corp. maintains these pages and materials in large part to avoid loss of consumers who continue to think of the platform as TWITTER, and because of the substantial goodwill and investments in the TWITTER Marks.  These webpages and materials continue to be functional pages that consumers can continue to access and that consumers can use to be connected with X Corp.'s goods and services, including the provision of social media services and services related thereto.

20.    **Blog**: In his declaration, Mr. Coates claims that there is presently no TWITTER or TWEET branding on the webpage that https://blog.twitter.com and https://blog.x.com direct to.  D.I. 30 ¶ 15.  As I pointed out in my deposition, at the bottom of this webpage, one can see the "popular tag," "Twitter for Good," on display in Twitter Blue.  Baseer Deposition Tr., 60:25-61:17.  In his deposition, Mr. Coates admitted that he omitted the "Twitter for Good" tag from the exhibit he submitted with his declaration without explaining why.  Coates Deposition Tr., 44:12-45:22.  Mr. Coates also admitted that "Twitter for Good" remained a popular tag on X Corp.'s website as of February 2026.  Coates Deposition Tr., 70:5-8.

21.    In his declaration, Mr. Coates also incorrectly asserts that there was no use of the webpage hosted at blog.twitter.com from March 2019 until November 2023, and that in November 2023, there was no TWITTER or TWEET branding.  D.I. 30 ¶ 16.  In support of this assertion, Coates submitted Exhibit 3 to his declaration, showing printouts from the Wayback Machine of blog.twitter.com.  D.I. 30-3.  Mr. Coates's own exhibit refutes his assertions, showing that he ignored evidence of use present in the exhibits Mr. Coates himself submitted.  First, Exhibit 3 to the Coates Declaration (D.I. 30-3) shows active posting on blog.twitter.com during the period which Mr. Coates asserted the webpage was inactive, which Mr. Coates conceded at his deposition.  D.I. 30-3 at 7-8 (showing posts in July, August, September, and October of 2023); Coates Deposition Tr.,

56:15-57:9.  Further, in December 2023, blog.twitter.com depicted a large Twitter Bird Logo on the front page banner, a fact which Mr. Coates intentionally omitted from his declaration.  D.I. 30-3 at 6; Coates Deposition Tr., 60:14-61:25.

22.     **Social Media Profiles**: Bluebird refers to the X social media pages submitted as Exhibit 4 of my first declaration as "defunct," because it claims there is no evidence that users still access those pages.  D.I. 29 at 12.  But the public continues to engage with the Twitter Facebook page to this day.  The most recent post on the Twitter Facebook page has many comments from February 2026, which is accessible through the same URL that I included in my First Declaration.  D.I. 11 ¶ 45, n 12, @Twitter, FACEBOOK, https://www.facebook.com/TwitterInc/.  For example, a comment posted February 15, 2026 by verified user "He Yi" directs his message directly to Elon Musk. Other users continue to comment asking for assistance with their accounts on the X platform and otherwise trying to be connected to X Corp.'s customer service team. These types of comments appear both on posts of the Twitter Facebook page, and on photos posted by X Corp. on the account, as pictured below.  Notably, although X Corp. has never been an avid or overly active user on its Facebook page, the below image was posted in December 2023, after X Corp.'s rebrand, showing the same type of customer comments regarding their X accounts.



23.    Bluebird also ignores that all of these accounts remain readily available to X Corp.'s consumers, even though X Corp. could shut down these pages if it wished to abandon the TWITTER brand, which it does not.

24.    **Developer Materials**: Attached to my First Declaration as Exhibit 5 (D.I. 11-5 at 53-61), was a webcapture of an X Corp. webpage providing information to developers that utilized TWITTER branding, specifically as an example, the Display Requirements for a post.  In his declaration, Mr. Coates claimed that this page, which was hosted at https://developer.x.com/en/developer-terms/display-requirements, was only available by typing in the full URL with the restrictor, and not through searching on X.com or using the navigation links

embedded therein.  D.I. 30 at ¶ 19.  However, at the time Mr. Coates prepared his declaration and at his deposition, the Display Requirements page was accessible through navigation links on X.com.  Specifically, if a user had navigated to X.com, clicked on "Developers," then "Developer Terms," and selected the option to view the "Display Requirements," the user would have accessed the at-issue webpage through navigation links on X.com, contrary to Mr. Coates's baseless claim. Coates Deposition Tr., 115:23-120:23.  I understand that during his deposition Mr. Coates was unable to recall any attempt he made to navigate to this page, and further acknowledged that the full capture of this webpage includes the use of the TWITTER Marks (i.e., TWEET, TWITTER, and the Twitter Bird Logo).  Coates Deposition Tr., 114:2-21; 118:12-19; 119:16-120:7; 123:4-16.  The record also reflects that this page has been updated after the X rebrand, including references to X and X Corp.'s X logo throughout, while still maintaining the Twitter Marks throughout the webpage regardless.  D.I. 11-5 at 53-61, Coates Deposition Tr., 122:11-123:16.

25.    As is common for technology companies, the X.com website is always being updated.  I understand that since Mr. Coates's deposition, the Developer page on X.com has been reorganized, and the Display Requirements page is no longer accessible at the original URL.  However, the Display Requirements page remains active on X.com and accessible through navigation

links on the X.com site.  Now, users can access the exact webpage Mr. Coates's

claimed was inaccessible by visiting X.com, selecting "Developers," then

navigating to "Docs," "Resources," and finally "Developer Terms."  The new URL

for this webpage is https://docs.x.com/developer-terms/display-requirements.  As

the restrictors demonstrate, the only change for this URL is that it is now hosted as

"docs.x.com" as opposed to "developer.x.com."  Despite this change, which

occurred after February 6, 2026, X Corp. elected to retain Twitter branding from

the original page, including the use of TWEET and the Bird Logo throughout.

26.    **Webpages**: I understand that Bluebird and Mr. Coates have also

claimed that Twitter Ads webpages submitted in connection with my First

Declaration are only accessible by typing in the full URL.  D.I. 30 at ¶¶ 19, 21, 23.

Specifically, they state that the "Grow Your Business with X, Twitter Ad's" client

materials, available at https://ads.twitter.com/getstarted, and the "Get Started with

X Ads" webpage which includes the downloadable "Get Started with Twitter Ads"

guidelines are *only* accessible by typing in the full URL. D.I. 29 at 12-13 (citing

D.I. 30 at ¶¶ 19, 21-22).

27.    However, contrary to what Bluebird and Mr. Coates claim, both

pages, and the downloadable guide are easily accessible by consumers with a

simple Google search.  Deposition of Stephen Jadie Coates Exs. 7, 11.  I

understand that Mr. Coates did not recall looking for the webpage in the web

browser results or ever clicking on the results to see where he would be directed, and only attempted to altering the provided URL. Coates Deposition Tr., 108:7-110:22.  Notably, as Mr. Coates conceded, it is typical for consumers to access webpages by putting search terms in a web browser search. Coates Deposition Tr., 74:8-19.

28.   **Help Center**: I also understand that Bluebird has claimed the results of "Twitter" and "Tweet" that come up when searching the X Help Center also do not show use of the TWITTER Marks.  D.I. 29 at 14.  To the contrary, these results illustrate that X Corp. still relies on the TWITTER brand to navigate consumers to relevant support materials.  Moreover, even where TWITTER branding does not appear directly on the face of a document, the hyperlinks embedded within the help articles navigate consumers to domains originating from twitter.com.

29.   **Google Results**: Bluebird attempts to categorize the Google results affixed to my declaration as "misleading" because the search results only show results within the X.com website.  D.I. 29 at 14.  Not only are the search parameters plainly visible in the image provided in my First Declaration, but as previously stated, those results were derived from "images, posts, and support pages published *within X Corp.'s website*."  D.I. 11 ¶ 48 (emphasis added).  These results show continued use of the TWITTER Marks by X Corp. on X Corp.'s website.

30.     While Bluebird unsuccessfully tries to undermine the plethora of evidence, it glosses over the fact that the evidence exists to this day, remains accessible, including to them, and X Corp. is free to choose how to use its marks so long as it continues to use them, as evidenced here.

### X Corp.'s Continued Approval of Third-Party Uses

31.     Bluebird further criticizes third-party uses of the TWITTER Marks and fails to acknowledge both the brand guidelines and my sworn statements regarding the authorization of those uses.  *See* D.I. 29 at 15-16.  The use of the TWITTER Marks by third parties reflected in Exhibits 7 and 9 of my First Declaration are subject to our brand guidelines, contained in Exhibit 6 of my First Declaration.  D.I. 11-6, 11-7, 11-9.  These guidelines contain explicit language regarding the approved use and monitoring of the TWITTER Marks.  Specifically, they provide to third parties: "By using the Twitter trademarks in these Brand Guidelines, you agree to follow these Twitter Trademark Guidelines (the "Guidelines") as well as our Terms of Service and all other Twitter [now X Corp.] rules and policies."  D.I. 11-6 at 17.  Third-parties are "expressly authorized by [X Corp.]" to use the TWITTER Marks subject to "[s]trict compliance with [its] Guidelines," and "any use of the Twitter trademarks in violation of the[] Guidelines will automatically terminate any permission related to [the third-party's] use of the Twitter trademarks."  *Id*.  Use of the TWITTER Marks

constitutes express acknowledgement that "all rights to the Twitter trademarks are the exclusive property of [X Corp.], and all goodwill generated through your use of the Twitter trademarks will inure to the sole benefit of [X Corp.]." *Id.*

32.  Bluebird also ignores that the Boston Celtics and FanDuel press release attached as Exhibit 9 to my First Declaration was the result of a request by the NBA to utilize the TWITTER Marks.  D.I. 11-9; D.I. 11 ¶ 52.  X Corp.'s marketing team expressly granted the NBA permission to use the TWITTER Marks.  D.I. 11 ¶ 52.

33.  As I stated during my deposition, X Corp. monitors third-party uses of the TWITTER Marks to ensure compliance with these guidelines. Baseer Deposition Tr., 225:19-226:5.  Bluebird did not ask me any questions about the terms on page 17 of the guidelines during my deposition, referenced above, even though the full guidelines were attached as Exhibit 6 to my First Declaration.  D.I. 11-6.  X Corp.'s monitoring efforts of the TWITTER Marks has continued well after the rebrand, including by monitoring third-party trademark applications, sending cease and desist actions, and even filing this lawsuit against Bluebird. That X Corp. has intentionally allowed certain trademark registrations to lapse or abandon , (*see* D.I. 29 at 16), does not evidence an intent to abandon all of the TWITTER registrations and pending marks.  It is common for a company such as

X Corp. to allow certain marks to lapse that we are no longer using, and to renew the registrations that we continue to use.

34.    Bluebird cannot seriously dispute that X Corp.'s decision to allow third parties to continue use of the Twitter Bird Logo on their webpages has created an association between the Twitter Bird Logo and X Corp.  I understand that when Mr. Coates was presented with one of the third-party webpages containing the Twitter Bird Logo at his deposition, he testified that he associated the Twitter Bird Logo on the webpage with X Corp. and understood that clicking the Twitter Bird Logo would direct him to X.com.  Coates Deposition Tr., 132:20-135:9.

***Ongoing Harm to X Corp.***

35.    Along with the reasons previously provided in my First Declaration, X Corp. continues to be concerned about the ongoing harm it will face if an injunction does not issue against Bluebird's unauthorized uses of the TWITTER Marks.

36.    Bluebird argues that the site hosted at "Twitter.new" creates distance between X Corp. and Bluebird's infringing Twitter platform.  However, Mr. Coates admitted that Bluebird's platform will be referred to by name as "Twitter," standing alone.  Coates Deposition Tr., 154:10-14.

37.     In an effort to promote Bluebird's new platform, officers of Bluebird intentionally coopted X Corp.'s copyrighted Twitter Bird Logo in its marketing materials promoting Bluebird on LinkedIn.  D.I. 11-14 at 53, 78-79.  I understand that during his deposition, Mr. Coates was asked to provide an explanation as to why officers of Bluebird would use X Corp.'s copyrighted Twitter Bird Logo without authorization and that Mr. Coates stated, "some people on our team like to poke the bear." Coates Deposition Tr., 184:20-25.  That Bluebird is openly infringing X Corp.'s intellectual property rights in an attempt to "poke the bear" underscores the need for an order preventing Bluebird from harming X Corp. any further.

38.     I also understand that Bluebird has indicated its desire to bring advertisers from X Corp.'s platform onto Bluebird's infringing platform. 11-14 at 36.  Bluebird's rapid accumulation of user registrations and media impressions without any marketing spend, as it claims, only underscores the continued harm to X Corp.  *See* D.I. 11-14 at 35, 53, 81.

39.     On the other hand, Bluebird admits it will not be faced with any such harm.  Attached hereto as Exhibit 2 is a true and correct copy of Bluebird's updated FAQ section of its website, available at https://www.twitter.new/faq, representing that if Bluebird does not win the trademark outcome the "Twitter.new and the trust infrastructure still exist" and its "mission is to build [its] technology

21

regardless of legal outcomes." I understand that Mr. Coates also confirmed during

his deposition that Bluebird would be able to move forward with a launch of its

platform, and that it would suffer no harm aside from its use of the TWITTER

brand. Coates Deposition Tr., 194:21-195:9.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in ____New York____ on this 20th day of

February, 2026.

_____

Naser Baseer