IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| X CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-1510-CFC |
| | ) | |
| OPERATION BLUEBIRD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFF X CORP.'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION</u>

*Of Counsel:*

Megan K. Bannigan
Jared I. Kagan
Nicole M. Flores
Anita S. Kapyur
Daniel N. Cohen
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
askapyur@debevoise.com
dncohen@debevoise.com

Dated: May 1, 2026

ASHBY & GEDDES

Andrew C. Mayo (#5207)
Randall Teti (#6334)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for Plaintiff X Corp.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT...........................................................................1

ARGUMENT .....................................................................................................4

   I.  X Corp. Has Made Deliberate, Ongoing Use of the TWITTER Marks, Which Precludes Bluebird's Affirmative Defense of Abandonment...............4

       A. "Use" of a Mark Means Bona Fide Use in the Ordinary Course of Trade to Identify Source. ............................................................................5

       B. Courts Find Bona Fide Use Where the Marks Are Used to Preserve Source Identification or Exploit Existing Goodwill...................................7

       C. X Corp. Continues to Deliberately Use the TWITTER Marks. ................8

       D. Bluebird Cannot Strictly Prove Abandonment.......................................25

   II.  Even If the Court Finds Discontinuance of Use, Bluebird Cannot Prove Abandonment...................................................................................................28

       A. Bluebird Cannot Prove Intent Not to Resume Use. ................................28

       B. X Corp.'s Efforts to Transition Residual Goodwill Independently Defeat Bluebird's Abandonment Defense. ...............................................29

   III.Even if Bluebird Could Ultimately Prevail on Abandonment, Injunctive Relief is Still Warranted on X Corp.'s Trademark Infringement Claim........31

CONCLUSION ................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l*,
600 U.S. 412 (2023)................................................................................... 1

*Allard Enterprises v. Advanced Programming Resources*,
146 F.3d 350 (6th Cir.1998) ....................................................................27

*Am. Ass'n for Justice v. Am. Trial Lawyers Ass'n*,
698 F. Supp. 2d 1129 (D. Minn. 2010).................................................*passim*

*Am. Olean Tile v. Am. Marazzi Tile*,
1988 WL 29056 (E.D. Pa. Oct. 5, 1988) ...........................................25

*BIEC Int'l v. Glob. Steel Servs.*,
791 F. Supp. 489 (E.D. Pa. 1992)......................................17, 22, 30

*Birthright v. Birthright*,
827 F. Supp. 1114 (D.N.J. 1993)...................................................23

*Brown & Brown v. Cola*,
2011 WL 1103867 (E.D. Pa. Mar. 23, 2011) ...................6, 7, 27, 28

*Buying For The Home v. Humble Abode*,
459 F. Supp. 2d 310 (D.N.J. 2006)...................................................11

*Carter-Wallace v. Procter & Gamble*,
434 F.2d 794 (9th Cir. 1970) ...........................................................6

*Chi. Mercantile Exch. v. Ice Clear US*,
2021 WL 3630091 (N.D. Ill. Aug. 17, 2021) ..................................22

*Ciba-Geigy Corp. v. Bolar Pharm.*,
547 F. Supp. 1095 (D.N.J. 1982)....................................................26

*Ciphertrust v. TruSecure Corp.*,
2005 WL 8248105 (E.D. Va. Nov. 28, 2005) .............................14, 24

*Com. Bancorp v. Hill*,
2010 WL 2545166 (D.N.J. June 18, 2010)..................................5, 25

ii

*Cont'l Distilling Corp. v. Old Charter Distillery*,
   188 F.2d 614 (D.C. Cir. 1950) ...............................................................................3

*Cumulus Media v. Clear Channel Communications*,
   304 F.3d 1167 (11th Cir. 2002) ....................................................................17, 24

*Doeblers' Pa. Hybrids v. Doebler*,
   442 F.3d 812 (3d Cir. 2006) .........................................................2, 6, 23, 26

*Edwin K. Williams v. Edwin K. Williams*,
   542 F.2d 1053 (9th Cir. 1976) .............................................................................26

*EH Yacht v. Egg Harbor*,
   84 F. Supp. 2d 556 (D.N.J. 2000) ..............................................................*passim*

*Electro Source v. Brandess-Kalt-Aetna Group*,
   458 F.3d 931 (9th Cir. 2006) ........................................................................28, 26

*Fagnelli Plumbing v. Gillece Plumbing & Heating*,
   2010 WL 2994163 (W.D. Pa. July 27, 2010) ....................................................7, 9

*Ford Motor v. Summit Motor Prods.*,
   930 F.2d 277 (3d Cir. 1991) ..................................................................................4

*Hearts on Fire v. Blue Nile*,
   603 F. Supp. 2d 274 (D. Mass. 2009) .................................................................11

*In re Sones*,
   590 F.3d 1282 (Fed. Cir. 2009) .............................................................................5

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding*,
   2007 WL 30115 (E.D. Pa. Jan. 4, 2007) .......................................................11, 17

*Kusek v. Family Circle*,
   894 F. Supp. 522 (1995) ......................................................................................25

*Marketquest Grp. v. BIC*,
   316 F. Supp. 3d 1234 (S.D. Cal. 2018) .................................................................5

*Marks Org. v. Joles*,
   784 F. Supp. 2d 322 (S.D.N.Y. 2011) ...........................................7, 12, 13, 26

iii

*Marshak v. Treadwell,*
 240 F.3d 184 (3d Cir. 2001) ........................................................5, 6, 29

*Nelson-Ricks Cheese v. Lakeview Cheese,*
 775 F. App'x 350 (9th Cir. 2019) .....................................................25

*Network Automation v. Advanced Sys. Concepts,*
 638 F.3d 1137 (9th Cir. 2011) ..........................................................10

*S&P Glob. v. S&P Data,*
 619 F. Supp. 3d 445 (D. Del. 2022) ..................................................17

*Perry v. H. J. Heinz Company Brands,*
 994 F.3d 466 (5th Cir. 2021) ...........................................................6, 26

*Peter Luger v. Silver Star Meats,*
 2002 WL 1870066 (W.D. Pa. May 17, 2002) .............................*passim*

*Pizzeria Uno Corp. v. Temple,*
 747 F.2d 1522 (4th Cir. 1984) ...........................................................31

*Quality Cts. United v. Quality Cts.,*
 140 F. Supp. 341 (M.D. Pa. 1956) .....................................................17

*Rescuecom Corp. v. Google,*
 562 F.3d 123 (2d Cir. 2009) ..............................................................11

*Sanofi-Aventis v. Advancis Pharm. Corp.,*
 453 F. Supp. 2d 834 (D. Del. 2006) ...........................................8, 21, 22

*SM Licensing Corp. v. U.S. Med. Care Holdings,*
 2007 WL 2051009 (S.D. Fla. July 13, 2007) ....................................12

*Specht v. Google Inc.,*
 747 F.3d 929 (7th Cir. 2014) ............................................................22

*Three Rivers Confections v. Warman,*
 660 F. App'x 103 (3d Cir. 2016) ....................................................5, 26

*Tiger Lily Ventures v. Barclays Capital,*
 35 F.4th 1352 (Fed. Cir. 2022) .........................................................27

iv

*Timm Med. Techs. v. SOMA Blue*,
   2002 WL 64456 (D. Minn. Jan. 15, 2002) ...........................................................8

*U.S. Jaycees v. Philadelphia Jaycees*,
   639 F.2d 134 (3d Cir. 1981) .....................................................................*passim*

*Wells Fargo v. ABD Ins. & Fin. Servs.*,
   758 F.3d 1069 (9th Cir. 2014) ...........................................................6, 7, 10, 13

*Zinn v. Seruga*,
   2008 WL 482324 (D.N.J. Feb. 19, 2008) ..........................................................25

**Statutes**

15 U.S.C. § 1127 .......................................................................................*passim*

X Corp. respectfully submits this supplemental brief to address the meaning of "use" as it pertains to Operation Bluebird, Inc.'s ("Bluebird") affirmative defense of abandonment.

## PRELIMINARY STATEMENT

Bluebird's sole defense of abandonment to X Corp.'s motion for preliminary injunctive relief fails.  The record does not show that X Corp. discontinued use of the TWITTER, TWEET, and Bird Logo Marks (the "TWITTER Marks") when it rebranded to X.  Rather, it shows X Corp. makes deliberate, commercially meaningful use of the TWITTER Marks to identify its services, direct consumers to its platform, preserve brand continuity, and maintain its substantial goodwill in the marketplace.  Bluebird cannot satisfy its heavy burden to demonstrate the contrary.

The Lanham Act defines "use" as the "bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  That definition is broad by design.  Courts find bona fide use where a mark directs consumers to the owner's services, maintains public identification of the mark with its owner, preserves brand continuity after a rebrand, or capitalizes on the mark's goodwill.  *See infra* I.B.  The touchstone is source identification:  whether the mark continues to "identify and distinguish" the owner's services and "indicate the source" of those services to consumers.  *Abitron Austria GmbH v. Hetronic Int'l*, 600 U.S. 412, 428-29 (2023).  Where the mark is used to identify source and is

commercially exploited, courts find bona fide use.  *See infra* I.B.

Bluebird shoulders a "high burden of proof" to establish abandonment.  It must strictly prove both:  (1) discontinuance of use; and (2) intent not to resume use. *Doeblers' Pa. Hybrids v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006).  Bluebird cannot satisfy either prong, let alone both.  Far from sporadic or residual, X Corp.'s ongoing use of the TWITTER Marks are intentional, commercially significant, and source-identifying.  Among other uses:

- X Corp. uses TWITTER in its domain, "twitter.com," to redirect more than four million daily visitors to its platform;

- X Corp. identifies itself as "formerly known as Twitter" in the App Store, and authorizes third parties to use the same language, to signal source continuity;

- X Corp. uses the TWITTER Marks in commerce on vendor onboarding materials, customer-facing webpages, and blog posts;

- X Corp. actively purchases "Twitter" as a keyword from Google to direct users searching for the Twitter brand to X Corp.'s services;

- X Corp. distributes promotional materials such as the "Twitter Objective Playbook" and "Twitter Amplify" to attract advertisers and partners;

- X Corp. authorizes and controls third-party use of the TWITTER Marks

> pursuant to Brand Guidelines, under which all goodwill inures to X Corp.; and

- X Corp. maintains social-media accounts bearing the TWITTER Marks and authorizes use of legacy Twitter-branded mobile applications.

Each of these uses is independently sufficient to establish bona fide commercial use of the TWITTER Marks. Taken together, they overwhelmingly defeat Bluebird's abandonment theory and demonstrate X Corp.'s continued, deliberate, and source-identifying use of the marks. X Corp.'s ongoing uses further reflect its intent to continue use and refute an intent not to resume use—the second element of abandonment Bluebird must strictly prove.

In assessing the record, the Court cannot lose sight of Bluebird's heavy burden. Because abandonment works a forfeiture of rights, it is not—and was never intended to be—an easy standard for an infringer to satisfy. As one court observed, it is not the law that "the slightest cessation of use causes a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent." *Cont'l Distilling v. Old Charter Distillery*, 188 F.2d 614, 619 (D.C. Cir. 1950).

That principle has particular force in the rebrand context. Businesses must be free to modernize and evolve their brands without automatically forfeiting valuable rights in legacy marks that the public still associates with them. Treating reduced use after a rebrand as abandonment would chill legitimate brand evolution and invite

3

opportunistic newcomers to appropriate goodwill that consumers continue to associate with the original owner. These principles explain why nearly every circuit to address the issue holds that abandonment must be strictly proved by clear and convincing evidence. *See infra* I.D.[1]

Even if Bluebird could strictly prove abandonment—which it cannot—injunctive relief would still be warranted. The public interest does not permit a newcomer to deliberately adopt another company's famous name, trade on its goodwill, and sow confusion in the marketplace. "To hold otherwise would result in unfair competition through intentionally creating public confusion as to the source and origin of the products"—a result antithetical to trademark law's core purposes. *Peter Luger v. Silver Star Meats*, 2002 WL 1870066, at *2 (W.D. Pa. May 17, 2002).

## ARGUMENT

**I.    X Corp. Has Made Deliberate, Ongoing Use of the TWITTER Marks, Which Precludes Bluebird's Affirmative Defense of Abandonment.**

Because the TWITTER Marks are and remain federally registered and incontestable, their "validity, protectability, and ownership are proved." *Ford Motor v. Summit Motor Prods.*, 930 F.2d 277, 291 (3d Cir. 1991). To establish that X Corp.

---

[1]    A small minority of courts apply a lower "preponderance of the evidence" standard. *See* 2 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 17:12 (5th ed.). McCarthy notes the resulting "paradox"—abandonment may be easier to prove when opposing or canceling a registration than in most federal infringement litigation. *Id.*

has abandoned those rights, Bluebird must strictly prove:  (1) discontinuance of use; and (2) intent not to resume use.  *Three Rivers Confections v. Warman*, 660 F. App'x 103, 109 (3d Cir. 2016); 15 U.S.C. § 1127.  Bluebird cannot carry that burden.

### A.    "Use" of a Mark Means Bona Fide Use in the Ordinary Course of Trade to Identify Source.

Under the Lanham Act, "use" means "bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  For services, a mark is used in commerce when it is "used or displayed in the sale or advertising of services and the services are rendered in commerce."  *Id.*  A mark satisfies that standard when it "identif[ies] and distinguish[es]" the user's services "from the services of others" and "indicate[s] the source of the services."  *Id.*  Thus, where a mark appears in materials that advertise, promote, or identify the owner's services, it is used "in the sale or advertising of services."  *See id.*; *Marketquest Grp. v. BIC*, 316 F. Supp. 3d 1234, 1288 (S.D. Cal. 2018) (quoting *In re Sones*, 590 F.3d 1282, 1288 (Fed. Cir. 2009)).

In the Third Circuit, the relevant question when assessing abandonment is whether there is proof that the owner ceased to commercially exploit the mark's goodwill and source-recognition in the industry.  *Marshak v. Treadwell*, 240 F.3d 184, 199 (3d Cir. 2001).  The critical inquiry is whether the continuing use "maintains the public's identification of the mark" with its owner.  *Com. Bancorp v. Hill*, 2010 WL 2545166, at *12 (D.N.J. June 18, 2010) (citation modified).  Courts

5

therefore reject abandonment where the owner continues to exploit the mark's goodwill and source-identifying function in the marketplace. *See U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981) (no abandonment where marks had not "los[t] their significance as indications of origin"); *Marshak*, 240 F.3d at 199 (no abandonment where owner continued to commercially exploit the mark's secondary meaning); *Wells Fargo v. ABD Ins. & Fin. Servs.*, 758 F.3d 1069, 1072 (9th Cir. 2014) (no abandonment where plaintiff used the mark to benefit from its goodwill and recognition).

No particular quantum of use is required. "Even a ***single instance*** of use is sufficient against a claim of abandonment," because abandonment requires a "***complete cessation or discontinuance of trademark use***." *Brown & Brown v. Cola*, 2011 WL 1103867, at *11 (E.D. Pa. Mar. 23, 2011) (emphases added); *accord Carter-Wallace v. Procter & Gamble*, 434 F.2d 794, 804 (9th Cir. 1970); *see also Perry v. H. J. Heinz Company Brands*, 994 F.3d 466, 475 (5th Cir. 2021) ("[E]ven minor or sporadic good faith uses of a mark will defeat the defense of abandonment.").

The Third Circuit's decision in *Doeblers'* underscores how demanding that standard is. There, the court rejected an abandonment defense because "the simple fact [was] that the use of [the mark] never ceased," even though the mark was used by a related entity rather than the original owner. 442 F.3d at 823. Indeed, "even

6

total, but temporary non-use of a name has, at times, been found insufficient to support a finding of abandonment." *Jaycees*, 639 F.2d at 139.

**B.    Courts Find Bona Fide Use Where the Marks Are Used to Preserve Source Identification or Exploit Existing Goodwill.**

Courts find bona fide use of a mark where a trademark owner continues to exploit the mark and its goodwill in source-identifying ways.  Use of a legacy domain containing the mark to direct consumers to the owner's current business, for example, is evidence of continued use.  *See Brown & Brown*, 2011 WL 1103867, at *13-14 (finding evidence of use where plaintiff, after rebranding from "Doyle Consulting Group," maintained redirects from doyleconsultinggroup.com, used "@doyleconsultinggroup.com" email addresses, and described itself as "Formerly Doyle Consulting Group"); *Wells Fargo*, 758 F.3d at 1072 (no abandonment where Wells Fargo redirected legacy domain traffic and continued using the mark on solicitations as part of a "business calculation" to benefit from the acquired goodwill and recognition); *Fagnelli Plumbing v. Gillece Plumbing & Heating*, 2010 WL 2994163, at *6 (W.D. Pa. July 27, 2010) (domain redirection was use in commerce); *Am. Ass'n for Justice v. Am. Trial Lawyers Ass'n*, 698 F. Supp. 2d 1129, 1139-40 (D. Minn. 2010) (same).

Courts have likewise held that "advertising a business as 'formerly' another business does not constitute abandonment of the prior business name." *Marks Org. v. Joles*, 784 F. Supp. 2d 322, 328-29 (S.D.N.Y. 2011) (collecting cases); *see also*

*Am. Ass'n for Justice*, 698 F. Supp. 2d at 1139-40 (use of "formerly" on plaintiff's website and related materials preserved rights by capitalizing on the mark's "source identification and goodwill").

Even outside a traditional sales transaction, continued marketplace exploitation of a mark's goodwill or secondary meaning can constitute use. *See Sanofi-Aventis v. Advancis Pharm.*, 453 F. Supp. 2d 834, 846 (D. Del. 2006) (no abandonment after merger and rebrand where successor continued to distribute promotional materials bearing former mark produced prior to the rebrand, even though it no longer appeared on primary product packaging); *Timm Med. Techs. v. SOMA Blue*, 2002 WL 64456, at *7 (D. Minn. Jan. 15, 2002) (no abandonment where plaintiff rebranded but used the former mark at least twice).

### C.    X Corp. Continues to Deliberately Use the TWITTER Marks.

X Corp. makes deliberate, ongoing, and commercially significant use of the TWITTER Marks in the ordinary course of its business to preserve source identification, route customer traffic, and maintain the public's association of the marks with X Corp.  *See* Dkt. 58 ("Tr.")  79:24-81:4, 189:11-22, 191:19-24.  The record evidence includes the following:

***Twitter.com Domain.***  X Corp. "owns and operates the twitter.com domain name" and uses that domain to redirect more than four million daily visitors to its platform.  Tr. 76:12-13; D.I. 11 ¶ 41.  This was neither accidental nor due to passive

8

maintenance.  Tr.  181:21-183:16.  As Mr. Baseer testified, X Corp. could have allowed twitter.com to remain "static" and not resolve elsewhere, as it did with other domains, but instead made the deliberate decision to ensure that twitter.com "led to [X Corp.'s] platform."  Tr.  71:8-19, 75:16-76:1.

X Corp. made this decision because it understood that "customers still associate" Twitter with X, and preserving that source identification furthered X Corp.'s business interests.  Tr.  71:24-72:2, 73:14-74:5.  Millions of consumers type "twitter.com" into their browsers daily because they expect it to lead them to X Corp.'s platform—even Bluebird's own declarant, Mr. Coates, conceded that he used "twitter.com" to reach X's platform.  D.I. 36-2 at 36:7-17.

This deliberate use of "twitter" to redirect users to X Corp.'s platform constitutes use within the meaning of § 1127.  *See supra* I.B.; *Fagnelli Plumbing*, 2010 WL 2994163, at *65 (redirecting consumers from fagnelli.com to gilleceplumbing.com constituted use in commerce); *Am. Ass'n for Justice*, 698 F. Supp. 2d at 1139-40 (redirecting users from www.atla.org to plaintiff's rebranded website, among other uses, defeated abandonment); *EH Yacht v. Egg Harbor*, 84 F. Supp. 2d 556, 565 (D.N.J. 2000) ("the continued maintenance and active use" of trademark owner's website supported finding of continued use).

The display of X branding rather than Twitter branding on the landing page does not vitiate a finding of use.  Were it otherwise, any rebrand would effectively

constitute abandonment—a result that would ossify brand identities out of fear that a rebrand would allow competitors to steal a brand's goodwill.  That is not the law. The relevant inquiry is whether X Corp. continues to use its legacy domain to trade on the TWITTER Marks' goodwill and consumer recognition—the record confirms it does.[2]  *See* Tr. 73:14-74:17, 75:18-76:9; *Wells Fargo*, 758 F.3d at 1072.

**Keyword Purchases.**  X Corp. purchases "Twitter" as a keyword so that users searching for "Twitter" see X Corp.'s advertisements and links.  Tr. 189:11-22; *see Network Automation v. Advanced Sys. Concepts*, 638 F.3d 1137, 1142-43 (9th Cir. 2011) (explaining that Google sells "keywords," or search terms that trigger the display of a sponsor's advertisement when users search for a particular term).  As Mr. Baseer testified, X Corp. pays Google in this manner to ensure consumers searching for "Twitter" "find their way to [X Corp.'s] platform and … service."  Tr. 191:19-24.

Using trademarks in search engine keywords are well-established commercial uses under the Lanham Act.  *See, e.g.*, *Network Automation*, 638 F.3d at 1144-45

---

[2]  Bluebird's reliance on the TMEP to argue that the twitter.com domain is not "use" in commerce because it is "nothing more than an internet address where [X Corp.] can be contacted" is misplaced.  Tr. 62:21-25.  Bluebird's abandonment defense does not turn on whether twitter.com is itself registrable (though it surely is); it concerns whether X Corp. has forfeited rights in its already registered and incontestable TWITTER Marks.  X Corp.'s continued operation of the domain— which incorporates the TWITTER mark—is evidence of ongoing use in commerce.

(keyword purchases constitute use in commerce); *Rescuecom v. Google,* 562 F.3d 123, 127 (2d Cir. 2009); *Buying For The Home v. Humble Abode*, 459 F. Supp. 2d 310, 323 (D.N.J. 2006) (keyword purchase is "a commercial transaction" and use in commerce); *J.G. Wentworth v. Settlement Funding*, 2007 WL 30115, at *6 (E.D. Pa. Jan. 4, 2007) (Google keyword purchase constituted use); *Hearts on Fire v. Blue Nile*, 603 F. Supp. 2d 274, 280-83 (D. Mass. 2009) ("there is little question that the purchase of a trademarked keyword to trigger sponsored links constitutes a 'use' within the meaning of the Lanham Act").  X Corp.'s keyword purchases are a quintessential example of qualifying "use" that precludes abandonment.

*Identifying X as "Formerly Twitter".* X Corp. deliberately uses the TWITTER mark to preserve source continuity by identifying its platform as "X (formerly known as Twitter)" in the Apple App Store and by authorizing third parties—including the NBA, Brand Watch and Sprout Social—to use the same language in public-facing materials.  D.I. 11-8 at 3; D.I. 11 ¶ 52; Tr. 79:14-81:25. Mr. Baseer testified that X Corp. deliberately added this language to the App Store listing so users searching for the Twitter app would understand it is "the same app" and "same platform."  Tr. 79:14-80:14.

Such "formerly" language constitutes bona fide use because it capitalizes on a prior mark's goodwill and maintains public association with its owner.  In *American Ass'n for Justice,* after rebranding from "Association of Trial Lawyers of

11

America," the plaintiff identified itself as "formerly the Association of Trial Lawyers of America" in advertising and promotional materials.  698 F. Supp. 2d at 1139.  The court held that this usage preserved the plaintiff's rights by directing consumers drawn by the old mark to the rebranded entity and exploiting the mark's source-identifying goodwill.  *Id.* at 1139-1140.





*Id.*, No. 07-4626, Dkt. 144 at 12-13.

Likewise, in *Joles*, the plaintiff rebranded from "Gordon Carpet" to "Leader Carpet," but continued to identify itself as "formerly Gordon Carpet" in at least one advertisement.  784 F. Supp. 2d at 329.  The court found this use "plainly attempt[ed] to capitalize on the good[]will in the 'Gordon Carpet' name by holding [the plaintiff] out as the successor," and therefore defeated an abandonment defense.  *Id.*; *see also SM Licensing v. U.S. Med. Care Holdings*, 2007 WL 2051009, at *13 (S.D. Fla. July 13, 2007) (statement on website, "Although you have probably heard of our program as 'The Cookie Diet™,' it is actually called the One-Meal-A-Day Diet," was

12

evidence of use of Cookie Diet mark because it was an effort to "benefit from[] its strong public association with [owner's] program").



*Joles*, No. 09-10629, Dkt. 23-1 at 15.

X Corp.'s use of "formerly known as Twitter" (shown below) is the same.[3] Like the plaintiffs in both cases, X Corp. uses the TWITTER mark in the phrase "formerly known as Twitter" to attract users who "search[] for the Twitter app" and to signal source continuity with Twitter. Tr. 79:14-81:25. X Corp. further authorizes and controls third-party use of the identical language, which itself constitutes use of the mark and corroborates a finding of bona fide use. *See Jaycees*, 639 F.2d at 139 n.7 (a third party's use qualifies as the owner's use where the court can infer an

---

[3]   The size of the "formerly" text does not diminish its legal significance.  Courts have found continued use even where the reference was not prominent. *See, e.g., Am. Ass'n for Justice*, 698 F. Supp. 2d at 1139; *Joles*, 784 F. Supp. 2d at 328; *Wells Fargo*, 758 F.3d at 1072.

implied license); *Ciphertrust v. TruSecure*, 2005 WL 8248105, at \*19 (E.D. Va. Nov. 28, 2005) (third-party use corroborates a finding of use).

**Figure 3: X Corp.'s "formerly known as Twitter"**

D.I. 11-8; 11-9 at 6.

***Consumer-Facing Webpages and Vendor Materials.*** The record also shows ongoing use of the TWITTER Marks in public materials through which X Corp. conducts its business. X Corp.'s "entire vendor onboarding process" remains TWITTER-branded. D.I. 37 ¶ 18. Less than two months before Bluebird began its infringement, and more than two years after X Corp. began using "X," X Corp. sent new vendors materials bearing the TWITTER name, Bird Logo, and references to products such as Twitter Amplify and Twitter Vendor Management. *See* D.I. 11-5 at 67-98.

14





X Corp. likewise continues to use all of the TWITTER Marks on Help Center

webpages and blog posts directed to consumers.  *See, e.g.*, D.I. 11-3 at 6 (using the

TWITTER mark); D.I. 11 at 21 (X Help Center webpage using the TWITTER and

TWEET marks); D.I. 11-5 at 105 (X Help Center webpage using the TWITTER

15

mark); D.I. 11-5 at 99 (X Help Center webpage using the TWITTER and TWEET marks); D.I. 11-3 at 3 (X Blog post using the TWITTER and TWEET mark); D.I. 11-3 at 10 (X Blog post using the TWITTER and TWEET marks); D.I. 11-3 at 13 (X Blog post using the TWITTER mark); D.I. 11-3 at 16 (X Blog post using the TWITTER marks); D.I. 11-3 at 20 (X Blog post using the TWITTER and TWEET marks, and Bird Logo).



D.I. 11-3 at 6.

These materials are not "one-off" communications or historical remnants that X Corp. has neglected to update. Tr. 83:2-24. As Mr. Baseer testified, they are current, operative materials that X Corp. "regular[ly] . . . sends" to vendors with whom it collaborates. *Id.* Each use of the TWITTER, TWEET, or Bird Logo marks identifies X Corp. as the source of the relevant services—use "in the sale or

16

advertising of services" under § 1127.  *See BIEC Int'l v. Glob. Steel Servs.*, 791 F. Supp. 489, 538 (E.D. Pa. 1992) (continued circulation of marketing manuals and materials bearing the former logo constituted bona fide use); *Cumulus Media v. Clear Channel Communications*, 304 F.3d 1167, 1174 n.10 (11th Cir. 2002) (no abandonment where trademark holder used mark on one billboard, "some business cards, and a few promotional materials").

Bluebird's attempt to dismiss vendor-facing materials as irrelevant improperly imports a limitation that the Lanham Act does not contain.  Section 1127 requires that the mark be "used or displayed in the sale or advertising of services" and that the services be "rendered in commerce"; it does not require that every use be directed to end users.  15 U.S.C. § 1127.  The legally relevant question is whether the mark was used externally in a source-identifying manner, as opposed to being confined to purely internal company records.  *See Settlement Funding*, 2007 WL 30115, at *6. X Corp.'s vendor-facing materials, which include invoices and related commercial materials, satisfy that requirement.  *See Quality Cts. United v. Quality Cts.*, 140 F. Supp. 341, 346 n.3 (M.D. Pa. 1956) (use on "invoices, letterheads, or the like" constitutes use in commerce where services themselves are rendered in commerce); *S&P Glob. v. S&P Data*, 619 F. Supp. 3d 445, 466 (D. Del. 2022) (sales presentation and consulting agreement bearing mark constituted use in commerce).

17

***Advertising Webpages.***  X Corp. uses all of the TWITTER Marks on public, advertising-related webpages to attract advertisers, customers, and partners to its platform.  Multiple X Ads webpages, two of which are reproduced in part below, use the TWITTER Marks.  *See* D.I. 11-5.  X Corp. actively "maintain[s]" these webpages and has updated them as recently as fall 2025.  Tr. 180:11-181:16.



D.I. 11-5 at 3.[4]

---

[4]  This webpage is also accessible via a Google search for the phrase "get started with Twitter Ads."  D.I. 36-3.



D.I. 11-5 at 6.

X Corp. also distributes materials to prospective advertisers including the "Twitter Objective Playbook" and "Twitter Amplify" white paper, both of which use the TWITTER Marks to promote X Corp.'s products and services.  D.I. 11-5 at 11-39; *id*. at 40-52; Tr. 87:4-88:6.

19



D.I. 11-5 at 42.



D.I. 11-5 at 11.



**Where your ads appear**

Tweets in Pre-roll Views campaigns appear in a number of locations on Twitter.

D.I. 11-5 at 15.

These are not archival remnants or "flotsam and jetsam of historical use."  Tr. 129:2-3.  Nor are they akin to an old book published that sits on a library shelf long after it was first sold.[5]  X Corp. actively managed its digital presence throughout the rebrand, choosing to discontinue and remove stale webpages or references to the TWITTER Marks, while deliberately choosing to update and retain others that serve a commercial purpose.  *See* Tr. 75:16-76:1, 85:4-86:1, 179-181, 183:9-16.  The intentionality of X Corp.'s use of the TWITTER Marks is evidenced by X Corp.'s addition of "X" branding on certain webpages, while still retaining the TWITTER Marks on those same webpages.  *See* D.I. 11-5 at 3, 6; Tr. 85:4-13.

Moreover, consumers who search for "Twitter Ads" on search engines like Google are directed to X Corp.'s advertising pages that retain Twitter branding

---

[5]  Even if certain uses are analogous to a previously published book that remains in circulation, that analogy would not support a finding of abandonment.  *See Sanofi-Aventis*, 453 F. Supp. 2d at 846 (finding use where "materials created prior to the merger" remained in circulation).

through keyword purchases. *See* D.I. 36-3; Tr. 88:2-15. X Corp. has chosen to commercially exploit these webpages and materials to generate traffic, attention, advertiser interest, and revenue on which its business depends. *See* Tr. 87:16-88:15 (testifying that X Corp.'s sales team actively distributes these materials to prospective advertisers).

Such use constitutes bona fide use in commerce. *See Sanofi-Aventis*, 453 F. Supp. 2d at 846. That remains true even when the materials displaying the former mark were created years before the rebrand. *See id.* (no abandonment where legacy mark continued to appear on "old packaging and promotional materials"); *BIEC Int'l*, 791 F. Supp. at 538 (continued circulation of manuals and materials printed years earlier with former logo defeated abandonment).

Bluebird's reliance on *Specht* is unavailing. 747 F.3d 929, 934-35 (7th Cir. 2014). In *Specht*, the website was an empty shell; the plaintiff could not "identify any goods or services [it] could have provided through or in connection with the website," and had not run an active business for years. *Id.* By contrast, X Corp. uses the TWITTER Marks on webpages promoting its goods and services and uses "twitter.com" to direct millions of users to its live platform. Those uses are connected to X Corp.'s goods and services and preserve customer recognition and continuity.

22

***Authorized Use of the TWITTER Marks.*** X Corp. authorizes and controls third-party use of the TWITTER Marks pursuant to its Brand Guidelines. D.I. 11 ¶¶ 49-50, 52. X Corp. developed the Brand Guidelines "so that users can appropriately use [X Corp.'s] marks." Tr. 92:6-22. Those guidelines function as the governing terms under which third parties may use the TWITTER Marks: use is permitted only as authorized by X Corp., all rights in the marks remain X Corp.'s exclusive property, and all goodwill generated by third-party use inures solely to X Corp.'s benefit. D.I. 37 ¶ 31; D.I. 11-6 at 17. X Corp. also continues to "ensure that [the marks] are being used appropriately," and monitors compliance through "random periodic checks" and weekly "enforcement reviews." Tr. 96:6-97:8.

X Corp.'s grant of permission to use the TWITTER Marks, coupled with its quality control, establishes an implied license sufficient to preclude abandonment. *Doeblers'*, 442 F.3d at 824-825 (a trademark license can be "implied" where the owner grants permission to use the trademarks, and exercises reasonable control over such use); *Jaycees*, 639 F.2d at 139 n.7 (finding "some type of license agreement existed" sufficient to defeat abandonment defense where local chapters were permitted to use the owner's marks and the owner exercised at least minimal oversight); *Birthright v. Birthright*, 827 F. Supp. 1114, 1135 (D.N.J. 1993) (finding

23

implied license where the licensee "used the mark subject to the authorization and control of plaintiff, and [] both parties understood this arrangement").[6]

*X Corp.'s Additional Uses.* Additional record evidence confirms X Corp.'s bona fide use. X Corp. continues to permit users to download and use legacy Twitter-branded mobile applications through third-party "APK" sites, which X Corp. monitors to ensure distribution of authorized versions. D.I. 11 ¶ 42; Tr. 77:6-14, 185; D.I. 37 ¶ 10; D.I. 36-1 at 225:14-24. These applications use the TWITTER, Bird Logo, and TWEET marks. *See* D.I. 11 ¶ 42. X Corp. also maintains legacy social-media accounts bearing the Twitter name and Bird Logo on Facebook, Instagram, LinkedIn, and YouTube. D.I. 11 ¶ 45; D.I. 11-4. As Mr. Baseer testified, X Corp. maintains these accounts so that users who see the marks and "click" on these pages will be redirected to X Corp.'s platform. Tr. 89:7-90:8.

\* \* \*

Taken together, these are consistent, bona fide uses in commerce—not the "sporadic, casual, or transitory" uses Bluebird alleges. Tr. 51:10-14. They are continuous, deliberate, and commercial, and they serve precisely the source-

---

[6] Even assuming arguendo no implied license exists, that "third parties commonly reference" the TWITTER Marks in their marketing corroborates a finding of continued use in commerce. *Ciphertrust*, 2005 WL 8248105, at \*19 (no abandonment finding was "corroborate[d]" by the fact that third parties used the owner's marks).

24

identifying function the abandonment inquiry demands:  maintaining the public's identification of the TWITTER, TWEET, and Bird Logo marks with X Corp.

Bluebird's cited authorities are inapposite.  None involved the targeted, deliberate, multi-faceted, daily use at issue here.  *See Kusek v. Family Circle*, 894 F. Supp. 522, 532-533 (1995) (two isolated magazine back issues); *Chi. Mercantile Exch. v. Ice Clear US*, 2021 WL 3630091, at *10 (N.D. Ill. Aug. 17, 2021) (stale remnants on former licensee's website with no connection to current services); *Nelson-Ricks Cheese v. Lakeview Cheese*, 775 F. App'x 350, 351 (9th Cir. 2019) (website "virtually inaccessible" and plaintiff unaware it "still existed").  On this record, Bluebird cannot prove discontinuance of use.

### D.     Bluebird Cannot Strictly Prove Abandonment.

Because abandonment constitutes a forfeiture of property, it must be "strictly proved." *Jaycees*, 639 F.2d at 139.  The majority of courts—including courts in this Circuit—require "clear and convincing evidence."  *EH Yacht*, 84 F. Supp. at 565 (citing McCarthy § 17:12); *see also Zinn v. Seruga*, 2008 WL 482324, at *4 (D.N.J. Feb. 19, 2008); *Am. Olean Tile v. Am. Marazzi Tile*, 1988 WL 29056 (E.D. Pa. Oct. 5, 1988); *Peter Luger*, 2002 WL 1870066, at *15; *Com. Bancorp*, 2010 WL 2545166, at *11.  Although the Third Circuit has not directly addressed the meaning of "strictly proved," it has explained that it requires a "high burden of proof,"

25

*Doeblers'*, 442 F.3d at 822, which is inconsistent with a mere preponderance of the evidence standard.[7]

Because abandonment is an affirmative defense, the burden lies firmly with Bluebird.  *Warman*, 660 F. App'x at 109; *Ciba-Geigy Corp. v. Bolar Pharm.*, 547 F. Supp. 1095, 1114 (D.N.J. 1982) (granting preliminary injunction in part because defendant "failed to demonstrate a likelihood of ultimate success" on abandonment); *Joles*, 784 F. Supp. 2d at 328 ("The party asserting abandonment bears the burden of persuasion with respect to both non-use and lack of intent to resume use in the reasonably foreseeable future.").

Courts must therefore take care not to invert the burden by requiring the trademark owner to prove that its use was sufficient.  In *Perry*, the Fifth Circuit vacated a finding of abandonment for precisely that reason; the district court "misplace[d] the burden of proof" when it faulted the trademark owner for failing to prove qualifying sales.  994 F.3d at 474-76.  The proper question was not whether the owner could prove substantial use, but ***whether the challenger could strictly prove abandonment***.  *Id.*

---

[7]   *Doeblers'* relied on Ninth Circuit precedent, and the Ninth Circuit applies the clear-and-convincing standard to abandonment claims.  *See id.* (citing *Edwin K. Williams v. Edwin K. Williams*, 542 F.2d 1053, 1059 (9th Cir. 1976)); *Electro Source v. Brandess-Kalt-Aetna Group*, 458 F.3d 931, 935-36 (9th Cir. 2006).

At the hearing on April 8, the Court asked whether this burden, as a practical matter, requires Bluebird to "prove a negative." Tr. 205:8-9. It does not. The Lanham Act addresses this concern through a burden-shifting framework: where an alleged infringer establishes three consecutive years of nonuse, that showing constitutes "prima facie evidence of abandonment" and the burden of production shifts to the rightsholder to present evidence of intent to resume use. *See Cumulus*, 304 F.3d at 1176. But there is no burden shifting here. Even if X Corp.'s July 2023 rebrand announcement, D.I. 11 ¶ 27, marked the start of a period of nonuse—and it does not—three years have not passed.

Abandonment is a high bar by design. That is why a "complete cessation or discontinuance of trademark use" is required, *Brown & Brown*, 2011 WL 1103867, at \*11, and even limited, bona fide use suffices to avoid abandonment. *See Tiger Lily Ventures v. Barclays Capital*, 35 F.4th 1352, 1358-61 (Fed. Cir. 2022) (Barclays' "limited" use of the Lehman Brothers mark in legacy market research materials and domain name sufficed to avoid abandonment despite corporate restructuring); *see also Allard Enterprises v. Advanced Programming Resources*, 146 F.3d 350 (6th Cir.1998) (finding use where mark was used "on at least one fax, on at least one resume, and in numerous [oral] solicitations"). Companies need sufficient certainty that rebranding will not allow a competitor to steal their prior mark and create

27

confusion. Otherwise, companies would face strong disincentives to rebrand, and consumers would face genuine confusion if they did.

On this record, Bluebird cannot show that it is "highly probable" that X Corp. both discontinued use of the TWITTER Marks and intended not to resume their use. *EH Yacht*, 84 F. Supp. 2d at 565-66. Indeed, even under a preponderance standard, Bluebird's abandonment defense would fail given X Corp.'s uses detailed above.

## II. Even If the Court Finds Discontinuance of Use, Bluebird Cannot Prove Abandonment.

### A. Bluebird Cannot Prove Intent Not to Resume Use.

Bluebird's abandonment argument independently fails because the record contains no credible evidence that X Corp. intended not to resume use of the TWITTER Marks. *See* D.I. 29 (failing to meaningfully address intent prong of abandonment inquiry).

At most, Bluebird points to posts by Elon Musk, discussing Twitter's rebrand to X in 2023. D.I. 29 at 9. But a rebrand is not a forfeiture of rights, and a "prospective declaration of intent to cease use in the future" does not establish intent to abandon by clear and convincing evidence. *Brown & Brown*, 2011 WL 1103867, at \*11 (citing *Electro Source*, 458 F.3d at 937); *EH Yacht*, 84 F. Supp. 2d at 565-66 (defendant failed to establish the intent prong where some company principals intended to resume use of the mark, even though other principals intended not to resume use). Moreover, where X Corp. has continued to deliberately commercially

exploit the TWITTER Marks, there is "a strong inference of an intent not to abandon the mark." *Marshak*, 240 F.3d at 199; *see* Tr. 80:2-99:15 (testifying that X Corp. "deliberately" chose to "continue to use" the TWITTER Marks). Bluebird cannot prove the requisite intent for a finding of abandonment.

**B.    X Corp.'s Efforts to Transition Residual Goodwill Independently Defeat Bluebird's Abandonment Defense.**

Even assuming that X Corp. discontinued use of the TWITTER Marks, Bluebird's abandonment defense independently fails because X Corp. "undertook reasonable efforts to transition the residual goodwill" associated with the TWITTER brand to X. *Peter Luger*, 2002 WL 1870066, at *15.

*Peter Luger* is instructive. There, the successor had "ceased use" of the LUGER mark as a product name altogether, yet the court found no abandonment because the successor "undertook reasonable efforts to transition the residual goodwill" to its new brand—specifically, by distributing "flyers and other materials [] showing the Luger name and trade dress along with the announcement of the new name." *Id.* at *1, 15; *EH Yacht*, 84 F. Supp. 2d at 570 (no abandonment where the goodwill associated with the mark remained "alive and well" and consumers continued to associate it with the same source despite a change in ownership).

Those principles apply squarely here. X Corp. acquired the TWITTER Marks and goodwill in 2022 for substantial value. Rather than discard that goodwill, X Corp. took deliberate steps to preserve its source-identifying significance. Mr.

29

Baseer, for example, testified that X Corp. considered "scrub[bing]" Twitter references from the platform, but instead chose to retain them because customers "still associate[d]" Twitter with X. Tr. 72-74. X Corp. also continued operating the twitter.com domain so that it resolved to X's platform, and added "X (Formerly known as Twitter)" in the App Store so users searching for the Twitter app could find X Corp.'s platform. Tr. 80, 181; D.I. 11 at ¶ 41; D.I. 11-8 at 3. X Corp. also implemented the transition gradually across its communications and materials. *Compare* D.I. 30-3 at 5 (using only the TWITTER Marks on blog pages pre-rebrand) *with* D.I. 11-3 at 6, 13, 16 (using both the TWITTER Marks and X branding on blog pages post-rebrand).

These efforts parallel those in *Peter Luger*. X Corp.'s gradual transition has been highly effective: a recent survey shows that 95% of the public continues to recognize the TWITTER marks. *See* Jay Survey, D.I. 13-1 ¶ 4. Bluebird has presented no evidence that the market has ceased associating Twitter with X Corp., and indeed is banking on the confusion that it seeks to sow. Bluebird's failure of proof is fatal under authorities such as *EH Yacht*, which rejected abandonment absent evidence that the market had ceased associating the mark with the successor in interest. 84 F. Supp. 2d at 569-570; *see also BIEC Int'l*, 791 F. Supp. at 534 (no abandonment where there was "no evidence that the [plaintiff's] trademark [] ceased to be associated in the public's mind with [plaintiff's] goods or services").

30

Accordingly, even though the Court need not reach residual goodwill because X Corp.'s continued use is apparent, Bluebird cannot establish abandonment.

### III. Even if Bluebird Could Ultimately Prevail on Abandonment, Injunctive Relief is Still Warranted on X Corp.'s Trademark Infringement Claim.

Injunctive relief remains appropriate even if Bluebird could prove abandonment—which it cannot. As the court explained in *Peter Luger*, "a company which purchases the goodwill, trade name and trade dress of a product does not forfeit its right to any residual goodwill associated with those attributes merely because it transitions to a new brand name." 2002 WL 1870066, at *2. The court rejected the notion that abandonment, even if proven, would give a newcomer license to exploit that confusion: "Whether [the plaintiff] abandoned the name or not, that action did not confer a right upon the defendants to unfairly compete in this fashion." *Id.*

That reasoning applies directly here. Bluebird's deliberate adoption of the identical famous TWITTER Marks for a directly competing social-media platform reflects intent to create confusion and trade on X Corp.'s goodwill. As the Court acknowledged, Bluebird did not contest the *Lapp* factors, and irreparable harm is presumed. Tr. 203:1-13. Courts strongly disfavor allowing a newcomer to heist residual goodwill in this manner. *See Pizzeria Uno v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984) (intentional adoption of another's mark to profit from its reputation and goodwill is "strong evidence" of likelihood of confusion and supports injunctive

31

relief). This bad-faith conduct reinforces *Peter Luger*'s unfair-competition rationale. Absent injunctive relief, consumers will believe Bluebird's platform is X Corp.'s, affiliated with X Corp., or a continuation of the Twitter-branded service. Bluebird has no legitimate equitable interest in trading on that goodwill, and there is no public interest in misleading consumers.

## CONCLUSION

For the foregoing reasons, and those set forth in X Corp.'s motion for a preliminary injunction, the Court should grant X Corp.'s motion.

*Of Counsel:*

Megan K. Bannigan
Jared I. Kagan
Nicole M. Flores
Anita S. Kapyur
Daniel N. Cohen
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkbannigan@debevoise.com
jikagan@debevoise.com
nmflores@debevoise.com
askapyur@debevoise.com
dncohen@debevoise.com

Dated: May 1, 2026

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____
Andrew C. Mayo (#5207)
Randall Teti (#6334)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
rteti@ashbygeddes.com
*Attorneys for Plaintiff X Corp.*

32

## <u>WORD COUNT CERTIFICATION</u>

The undersigned hereby certifies that Plaintiff X Corp.'s Supplemental Brief in Further Support of its Motion For Preliminary Injunction contains 6,247 words (exclusive of the table of contents and signature block) in Times New Roman 14-point font, counted using Microsoft Word's word count feature.

*/s/ Andrew C. Mayo*
Andrew C. Mayo