# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| X CORP.,<br><br>    Plaintiff,<br><br>    v.<br><br>OPERATION BLUEBIRD, INC.,<br><br>    Defendant. | C.A. No. 25-cv-1510-CFC<br><br>**FILED UNDER SEAL** |

## DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Dated: May 1, 2026

Andrew Gerber*
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Christopher J. Sprigman*
Mark P. McKenna*
Rhett O. Millsaps II*
LEX LUMINA LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com

*Attorneys for Defendant Operation Bluebird, Inc.*

*admitted pro hac vice

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………...iii

ARGUMENT……………………………………………………………………….1

I.      INTRODUCTION………………………………………...…...……….1

II.     X DOES NOT MAKE BONA FIDE USE OF TWITTER IN THE
        ORDINARY COURSE OF TRADE……………….....................................5

        A.      Redirection of Users from the Twitter.com Domain Name is Not
                Use of Twitter as a Trademark……………………….………....7

                1.      Domain Names Do Not Function as Marks If They Aren't
                        Used as Marks...........................................................................9

                2.      Automated Redirection as Part of Rebranding Is Not Bona
                        Fide Use Because It Does Not Identify and Distinguish the
                        Source of Goods or Services……………………………..…11

                3.      Infringement Cases Finding Automated Redirection to
                        Infringe Do Not Apply the Bona Fide Use Requirement for
                        Maintaining Trademark Rights………………………………15

                4.      USPTO Precedents Teach that Automated Redirection Is
                        Not Bona Fide Use…………...…………………………….…18

        B.      Google Keyword Purchases of "Twitter" Are Not Use of Twitter
                as a Trademark...……………………………………………..........20

CONCLUSION………………………………………………………………...24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. JAND, Inc.*,
     608 F. Supp. 3d 148 (S.D.N.Y. 2022)……………………………………….…21

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
     722 F.3d 1229 (10th Cir. 2013)…………………………………………………...22

*1–800 Contacts, Inc. v. WhenU.Com, Inc.*,
     414 F.3d 400 (2d Cir. 2005)…………………………………………………16

*Abitron Austria GMBH v. Hetronic Int'l, Inc.*,
     600 U.S. 412 (2023)…………………………………………………………..8

*Bird v. Parsons*,
     289 F.3d 865 (6th Cir. 2002)…………………………………………………...20

*Brown & Brown, Inc. v. Cola*,
     Civil Action No. 10–3898, 2011 WL 1103867 (E.D. Pa. March 23, 2011)………5

*Channing Bete Co., Inc. v. Greenberg*,
     Case No. 3:19-cv-30032-MGM, 2021 WL 4691597 (D. Mass. Jul. 12, 2021)…16

*Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*,
     Case No. 18 C 1376, 2021 WL 3630091 (N.D. Ill. Aug. 17, 2021)……………..13

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*,
     108 F.4th 194 (3d Cir. 2024)……………………………………………………1, 3

*Doran v. Salem Inn, Inc.*,
     422 U.S. 922 (1975)…………………………………………………………..3

*Gen. Elec. Co. v. Am. Wholesale Co.*,
     235 F.2d 606 (7th Cir. 1956)……………………………………………………1

*GoForIt Entm't, LLC v. DigiMedia.com L.P.*,
     750 F. Supp. 2d 712 (N.D. Tex. 2010)…………………………………...16, 20

*Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*,
  720 F.2d 981 (8th Cir. 1983)……………………………………………….6

*Kusek v. Fam. Circle, Inc.*,
  894 F. Supp. 522 (D. Mass. 1995)……………………………………….6

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*,
  495 F.2d 1265 (2d Cir. 1974)……………………………………………6

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
  119 F.4th 711 (9th Cir. 2024)…………………………………………20, 23

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
  985 F. Supp. 949 (C.D. Cal. 1997)………………………………………..20

*Mallet & Co. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021)…………………………………………....1

*MB Financial Bank, N.A. v. MB Real Estate Serv., L.L.C.*,
  No. 02 C 5925, 2003 WL 21462501 (N.D. Ill. Jun. 23, 2003)…………………..15

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)…………………………………………………….1

*Metro. Life Ins. Co. v. O'M & Assocs. LLC*,
  No. 06 C 5812, 2009 WL 3015210 (N.D. Ill. Sept. 16, 2009)…………………....6

*Multi Time Machine, Inc. v. Amazon.com, Inc.*,
  804 F.3d 930 (9th Cir. 2015)……………………………………………...22

*PBI Performance Prods., Inc. v. Norfab Corp.*,
  514 F. Supp. 2d 725 (E.D. Pa. 2007)……………………………………14

*Rascal House Inc. v. Jerry's Famous Deli, Inc.*,
  2024 WL 4524585 (Trademark Tr. & App. Bd. Sept. 30, 2024)………………..14

*Rescuecom Corp. v. Google, Inc.*,
  562 F.3d 123 (2d Cir. 2009)…………………………………………….22, 23, 24

*Rosetta Stone Ltd. v. Google, Inc.*,
  676 F.3d 144 (4th Cir. 2012)…....…………………………………………………21

*Specht v. Google, Inc.*,
  758 F. Supp. 2d 570 (N.D. Ill. 2010)………………………………………….…14

*Specht v. Google Inc.*,
  747 F.3d 929 (7th Cir. 2014)………………………………………………….5, 14

*St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*,
  573 F.3d 1186 (11th Cir. 2009)……………………………………………...19

*Sterling Bank v. Sterling Bank and Trust, FSB*,
  928 F. Supp. 1014 (C.D. Cal. 1996)…………………………………………10

*Sterling Bank v. Sterling Bank and Trust, FSB*,
  No. 94–8378 KMW (MCX), 1996 WL 500946 (C.D. Cal. Jul. 5, 1996)……….10

*U–Haul Int'l, Inc. v. WhenU.com, Inc.*,
  279 F. Supp. 2d 723 (E.D. Va. 2003)……………………………………16, 23

*UHS of Delaware, Inc. v. United Health Serv., Inc.*,
  227 F. Supp. 3d 381 (M.D. Pa. 2016)………………………………………..9, 10

*Vision Center Northwest, Inc. v. Vision Value, LLC*,
  673 F. Supp. 2d 679 (N.D. Ind. 2009)……………………………………..13

*Warren Publ'g Co. v. Spurlock*,
  645 F. Supp. 2d 402 (E.D. Pa. 2009)…………………………………………5, 13

*Wells Fargo & Co. v. WhenU.com, Inc.*,
  293 F. Supp. 2d 734 (E.D. Mich. 2003)…………………………………16, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)……...………………………………………………...……1, 2

*Yakus v. U.S.*,
  321 U.S. 414 (1944)……………………………………………………………..3

iv

**Statutes & Legislative History**

15 U.S.C. § 1114…………………………………………………………………..23
15 U.S.C. § 1125……………………………………………………………………19, 23
15 U.S.C. § 1127…………………………………………………...5, 17, 23, 24

S. Rep. 106-140 (1999)…………………………………………………………19

**Treatises & Other**

5 J. Thomas McCarthy, McCarthy on Trademarks &
Unfair Competition § 7:17.50…………………………………………………..19
5 J. Thomas McCarthy, McCarthy on Trademarks &
Unfair Competition § 25A:18…………………………………………………..10

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948…………………………….....1
11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1……………………….....3

Trademark Manual of Examining Procedure § 904.03(i)(B)(1) (Nov. 2025 ed.)..….11
Trademark Manual of Examining Procedure § 1215.02(a) (Nov. 2025 ed.)……...18

## ARGUMENT

### I.    INTRODUCTION

A preliminary injunction "is an extraordinary remedy[ ] [that] should be granted only in limited circumstances." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024) (quoting *Mallet & Co. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021)) (internal quotation marks omitted). Specifically, a preliminary injunction should not be granted unless the movant carries the burden of persuasion on each of the four canonical elements—(1) the likelihood of success on the merits; (2) the risk of irreparable injury absent preliminary relief; (3) the balance of equities; and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And because "a preliminary injunction is an extraordinary and drastic remedy," the movant bears the burden of making "a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948, at 129-30).

Of particular importance in this case, in assessing the movant's likelihood of success on the merits in the context of an application for preliminary injunction, "the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 609 (7th Cir.

1

1956) (citing cases). The substantial and determinative legal questions at the heart of this case counsel against a preliminary injunction.

As a matter of law, neither X's use of twitter.com to redirect to x.com, nor its purchase of "twitter" as a keyword for the purpose of Google advertising, are uses sufficient to prevent abandonment. Keyword purchases by non-trademark owners are so standard that X did not even mention the keyword purchase until the Court asked about it at the hearing. D.I. 58 (April 8, 2026, transcript) ("Tr.") 190:23-191:4. Because neither of X's purported "uses" are bona fide uses in the ordinary course of trade, X is unlikely to succeed in demonstrating that it owns valid rights in Twitter. But at minimum, and as the Court previously noted, there are substantial questions of law regarding whether either of the purported uses are bona fide uses, and those questions counsel against issuance of preliminary relief. Tr. 144:5-145:11; 153:19-154:14; 190:13-191:11.

Even if X could demonstrate that it is likely to succeed in showing that it has continued to use Twitter as a trademark (it cannot), the Court should not issue a preliminary injunction because X cannot establish, as it must, that the balance of equities favors an injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Instead, it "is a matter of equitable discretion" that "does not follow from success on the merits as a matter of course." *Id.* at 32. The same is true even if the harm to the movant is presumed irreparable.

*Yakus v. U.S.*, 321 U.S. 414, 440 (1944) (award of interlocutory injunction by courts of equity "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff"). *See also* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1, at 129 ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.").[1]

The evidence adduced so far suggests that the harm here is unbalanced in a manner that counsels against preliminary relief. Even if the Court were to credit any of X's purported uses of the "Twitter" mark, that use is at most the barest minimum, aimed more at preserving its rights in a mark for which it does not make bona fide use, rather than advancing a substantial interest in the mark as the basis for a continuing business. Any harm to X—whether presumed irreparable or not—is correspondingly slight relative to the irreparable harm that Operation Bluebird is likely to suffer from the issuance of a preliminary injunction.

---

[1] Sometimes, harm threatens to moot a case, as when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy, "for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). As the Third Circuit has held, however, much more often, even nonpecuniary injury does not rise to that level. "Case preservation is thus the main reason that the benefits of a preliminary injunction may outweigh its risks. Courts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case. That approach is often, perhaps usually, the wiser course." *Delaware State Sportsmen's Assoc.*, 108 F.4th 194 at 201.

3

The Court's questions about the status of the twitter.com domain name and keyword purchases of "twitter" do not relate to acts that could change the calculus with respect to irreparable harm. There is no prospect, for example, of Operation Bluebird seizing from X the twitter.com domain name, which X presently uses solely for the purpose of re-directing users to its X-branded platform at x.com. Nor is there any possibility of Operation Bluebird interfering with X's ability to purchase "twitter" as a keyword for searches on Google and similar search engines. That term is presently made available by Google and its competitors for auction to the highest bidder, and it will remain so regardless of Twitter's trademark status. Google, Trademarks, https://support.google.com/adspolicy/answer/6118?hl=en (visited Apr. 26, 2026) ("Google Ads and Display & Video 360 will not restrict…using trademarks as keywords").

On the other hand, the harm to Operation Bluebird from a wrongly-issued injunction is certain to be significant, and perhaps even existential. Operation Bluebird's entire business model is aimed at restoring, with improvements, the kind of online speech community that used to exist under the name Twitter, but which X has purposely destroyed. By far the most effective way for Operation Bluebird to communicate that very specific intent to the public is through use of the name Twitter. Thus, depriving Operation Bluebird of use of the mark during the pendency

4

of the litigation is likely to do significant damage to the company's prospects at this early and possibly determinative stage of its life.

## II.   X DOES NOT MAKE BONA FIDE USE OF TWITTER IN THE ORDINARY COURSE OF TRADE

Under the Lanham Act, a party abandons a mark when it no longer uses the mark and has no intent to resume use. 15 U.S.C. § 1127. "Use" has a particular meaning here—it means bona fide use of a mark in the ordinary course of trade, and not merely to reserve rights in the mark. *Id*. To avoid abandonment, X must be using Twitter to identify the source of currently available goods or services that it is actually offering under the mark. *See Specht v. Google Inc.*, 747 F.3d 929, 934-35 (7th Cir. 2014) (continued availability of website bearing trademark not use of the mark where no goods or services provided under the mark).[2]

"To prove bona fide usage, the proponent of the trademark must demonstrate that use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Brown & Brown, Inc. v. Cola*, Civil Action No. 10–3898, 2011 WL 1103867, at *11 (E.D. Pa. Mar. 23, 2011) (quoting *Warren Publ'g,* 645 F. Supp. 2d

---

[2] Because X insists that online references to its former use count as current use of the Twitter Marks, X has never even contended that it intends to resume use. X's claimed intent to maintain its legal rights, *see* D.I. 35 at 9-10, is irrelevant. What matters is intent to resume *use*. *See Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 442 (E.D. Pa. 2009) (distinguishing acts taken with intent to protect rights and acts taken with the intent to make commercial use of the mark, and noting that only the latter is relevant to abandonment).

5

at 434); *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1272 (2d Cir. 1974) (use must be "part of an ongoing program to exploit the mark commercially"). *See also Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.,* 720 F.2d 981, 984 (8th Cir. 1983) (resale of returned potato chips not sufficient use to avoid abandonment); *Kusek v. Fam. Circle, Inc.*, 894 F. Supp. 522, 533 (D. Mass. 1995) (noting that "nominal or residual use is not sufficient to avoid abandonment" and concluding that making available back issues of magazine was inconsequential use that could not forestall abandonment); *Metro. Life Ins. Co. v. O'M & Assocs. LLC*, No. 06 C 5812, 2009 WL 3015210, at *3 (N.D. Ill. Sept. 16, 2009) ("Residual use, such as token use…are [sic] not bona fide uses under the Lanham Act.") (internal quotation marks and citations omitted).

Applying the statutory standard, this Court already concluded that X has no credible evidence of use of the claimed Tweet or Twitter Bird marks. Tr. 202:13-19. Most of X's purported evidence of use of Twitter consists of the same floating bits of historical use that X has simply not yet removed from the internet. *See* D.I. 29 at 9-16. Notably, X cannot point to a single use of its so-called "secondary" Twitter brand on the homepage of its social media site at x.com. Tr. 100:14-102:2.

The evidence of alleged use that is unique to the claimed Twitter mark involves activities that are not legally sufficient even where ongoing, including (a) the use of twitter.com purely to redirect to X's actual website, x.com, which is

6

branded exclusively with X's *only* brand, X; and (b) X's purchase of "twitter" as a keyword for Google searches. Neither of these amounts to a current use of Twitter in commerce to indicate the origin of X's services, and therefore neither is a use sufficient for X to avoid a judgment that it has abandoned the Twitter mark.

### A.    Redirection of Users from the Twitter.com Domain Name is Not Use of Twitter as a Trademark.

X claims that it uses the Twitter mark by maintaining the domain name registration for twitter.com and redirecting users from that domain to x.com. D.I. 10 at 7; D.I. 35 at 7-8; Tr. 6:13-20. But twitter.com does not even function as an independent domain name, let alone as a trademark. Since almost immediately after X acquired the former Twitter in 2023, twitter.com has instantaneously redirected to x.com—meaning that anyone who types twitter.com into their browser (or uses a bookmark or other saved shortcut) is immediately taken to a page that shows x.com in the address bar, and where they see a website with exclusively X branding. Tr. 100:14-25; 101:22-102:2. Indeed, X officially retired twitter.com on Nov. 10, 2025, meaning that any users who had two-factor authentication credentials at twitter.com were required to re-enroll at x.com or lose account access. D.I. 31-9.

Automated redirection as part of rebranding is not bona fide use in the ordinary course of trade. Where users are instantaneously redirected from an old domain name to a new domain name that corresponds to the new brand (X), and the website at the new domain name is branded exclusively with the new mark (X), the

old domain name (twitter.com) functions only as an address on the internet and not as a trademark identifying the source of any goods or services offered by X.

X may cite cases holding that a defendant's automated redirection of a domain name using a plaintiff's mark *infringes*, but those cases deal with a different question than the one presented here. The infringement cases often proceed from the assumption that a defendant need not make bona fide use of a mark in order to infringe because the statutory definition of use does not apply to infringement. That assumption is debatable, particularly after the Supreme Court's decision in *Abitron Austria GMBH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023) (holding that application of the Lanham Act requires "infringing use in commerce," which means "the bona fide use of a mark in the ordinary course of trade, where the mark serves to identify and distinguish [the mark user's] goods … and to indicate the source of those goods") (cleaned up); *see also id.* at 429 (Jackson, J., concurring) (the Lanham Act "embodies a distinction between 'trademark uses' (use of a symbol or equivalent to identify or brand [a defendant's] goods or services) and 'non-trademark uses' (use of a symbol—even the same one—in a non-source-identifying way)." (cleaned up).

But regardless of whether courts in infringement cases correctly interpreted the *infringement* provisions, those cases are irrelevant to the issue here, where X claims that automated redirection from twitter.com constitutes bona fide use of Twitter sufficient to maintain rights in its former mark.

1.   <u>Domain Names Do Not Function as Marks If They Aren't Used as Marks</u>.

Use purely as an address on the internet is not use as a mark even when the web browser continuously shows the domain name during use of the website. In *UHS of Delaware, Inc. v. United Health Serv., Inc.*, defendant, a hospital system in southern New York, used the registered domain name uhs.net continuously since 1997. 227 F. Supp. 3d 381, 400 (M.D. Pa. 2016). It claimed that continuous use of that domain name gave it priority in the use of the UHS mark (and a defense to plaintiff's infringement action) in the geographic region where the hospital system offered services. The court rejected that argument, finding that defendant had discontinued use of the UHS mark when it rebranded as "United Health Services." *Id*. at 401. "Following its rebranding initiative in 1997," that court concluded, "United Health Services took no action to continue commercial exploitation of the 'UHS' mark." *Id.* Applying standard principles that "a domain name may become a trademark only if it is used as a trademark," the court found that use of a domain name merely as a "location on the internet," *without other use of UHS by defendant to brand its hospital services*, was not "use" as a mark. *Id*. at 401-02 (internal quotation marks omitted; emphasis removed) (citing 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25A:18).

Compared with the facts of *UHS*, X's use of the twitter.com domain name purely to re-direct to its x.com website even more clearly fails to qualify as

9

trademark use by X. Like the plaintiff in *UHS*, X rebranded following Elon Musk's takeover and no longer uses the former mark (Twitter) to brand its services. *See* D.I. 30 at 3-4. But unlike in *UHS*, where the hospital system continued to use uhs.net as the domain for its main website, X uses twitter.com purely to redirect to x.com, which is both its primary domain name *and* contains the sole mark—X—that X uses to brand its social media services. For these reasons, X's use of twitter.com is the archetype of use of a domain name purely as a "location on the internet," as opposed to use as a mark. *UHS of Delaware, Inc.*, 227 F. Supp. 3d at 402*; see also Sterling Bank v. Sterling Bank and Trust, FSB*, 928 F. Supp. 1014, 1020 (C.D. Cal. 1996), ("Defendant does not use its registered mark in any of its advertisements, does not use its registered mark in connection with its daily operations, and, in fact, no longer holds itself out to the public as Sterling Savings Bank. … At most, the evidence indicates that Defendant has not yet removed the registered mark from all of its offices and materials. Defendant's continuing use of the registered mark is *de minimis*, does not constitute a bona fide use in the ordinary course of trade, and does not prevent a finding of abandonment.") (citation omitted), *vacated pursuant to settlement*, 1996 WL 500946 (C.D. Cal. Jul. 5, 1996).[3]

---

[3] X also points to a blog that it claims is available at blog.twitter.com. There is no evidence that any consumers ever use that domain, but it also does not function separately—it immediately redirects to blog.x.com, where blog.twitter.com is instantaneously replaced in the browser's address bar by blog.x.com and users see a

2. <u>Automated Redirection as Part of Rebranding Is Not Bona Fide Use Because It Does Not Identify and Distinguish the Source of Goods or Services.</u>

Automated redirection from a former site to a new site is both mechanical (it simply redirects traffic to a different address) and historical (it reflects branding that has been superseded). In rebranding, redirection manifests the abandonment of the trademark corresponding to the redirected domain name and teaches consumers the new reality—that X's platform now is called X.

In that way, automated redirection is no different from the use of "formerly Twitter" that X attempted to convince the Court was a trademark use. Both are part of X's rebranding. Both are ways of telling customers that X *no longer is Twitter*, and that its social media services have been rebranded to X.[4] Internet users who type

---

page branded exclusively with the X marks. D.I. 30 ¶ 15, Ex. 2. For the same reasons use of twitter.com to redirect to x.com does not constitute use, use of blog.twitter.com to redirect to blog.x.com also does not constitute use. The historical references to Twitter in old blog posts still archived on the blog are also not evidence of current use. *See* D.I. 29 at 11.

[4] X's uses of "formerly Twitter" in small explanatory text on the App Store page and press release announcing a partnership between the Boston Celtics and FanDuel are not trademark use for another reason—those uses are not in the location or the format of trademarks; they simply give historical information (X used to be called Twitter). Tr. 114:5-118:22 (discussing D.I. 11 ¶¶ 51-52, Exs. 8 and 9). *See* T.M.E.P. § 904.03(i)(B)(1) (Nov. 2025 ed.) (section of Trademark Office manual for examiners stating that prominently-presented terms—*i.e.*, terms presented in larger font size, different stylization or color, at the beginning of a line or sentence, next to a picture or description of the relevant goods, or accompanied by the TM designation—are

11

"twitter.com" into the address bar of their browser are taken immediately to the x.com social media site, where "twitter.com" has disappeared from the browser's address bar, replaced by "x.com." Tr. 100:14-25. And the website that they see at x.com is branded *exclusively* with the X mark: as X's witness admitted during his cross-examination, there is not a single appearance of X's so-called "secondary" mark on the homepage of x.com. Tr. 101:17-21.

X's use of twitter.com can be understood as just another example of X's *historical* uses of its former mark. And indeed, there are many examples of domain names that correspond to defunct old brands that redirect to sites corresponding to new brands. For example, pets.com now redirects to Petsmart.com. *See* CNET, "Petsmart.com snaps up rival domain name" (Dec. 4, 2000), https://www.cnet.com/ tech/tech-industry/petsmart-com-snaps-up-rival-domain-name/ ("As part of the agreement, Pets.com customers are already being sent to Petsmart.com."). But that does not mean that PetSmart is using pets.com (or "pets") as a trademark identifying the source of PetSmart's products. The same is true here. X is not branding any current goods or services under the Twitter mark when it uses twitter.com purely to re-direct to x.com. It is instead directing users to X's current x.com domain and to the services X is currently providing exclusively under the X brand. In re-directing

---

more likely to be perceived as trademarks and therefore more likely to be federally registrable).

from twitter.com, X is using that domain purely as a web address. The mark that X is using in commerce—the only mark that appears on x.com—is X.[5]

In the internet age, the practical consequence of treating automated redirection of a domain name corresponding to an old trademark as continued use of that mark would be effectively to remove abandonment from the Lanham Act. It would be trivially easy for former mark owners to avoid abandonment, even though their continued "use" of their old domain names serves purely to reserve rights in the former marks. *See* Tr. 145:9-11 (The Court: "It's going to be like your book. It's going to be like, 'Hey, I published a book 200 years ago. It is in a library somewhere. I am using my mark.'"). Nor would the absurd consequences stop there. If use only as an internet address that re-directs to a new domain name is held to constitute use as a mark, then a claimant could assert rights to a potentially infinite number of

---

[5] Courts have rejected similar historical uses of a former mark as insufficient to maintain bona fide use, especially when they are used merely as location tools. *See, e.g., Vision Center Northwest, Inc. v. Vision Value, LLC*, 673 F. Supp. 2d 679, 687-88 (N.D. Ind. 2009) (use of mark in alphabetical, white-pages telephone directory is not bona fide use as a mark); *Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, Case No. 18 C 1376, 2021 WL 3630091, at *10 (N.D. Ill. Aug. 17, 2021) (presence of mark in "historic circulars and software links" with "legacy" files using the former marks during a rebranding period was not bona fide use); *Warren Publ'g Co.*, 645 F. Supp. 2d at 442 (noting the "important distinction between acts taken with the intent to protect rights to the mark and acts taken with the intent to make commercial use of the mark").

marks by registering countless domain names and redirecting them all to a single website.

Those results would undermine the fundamental basis of trademark rights: that a mark must be used to *identify and distinguish* one's goods and services from those of others, not merely to send consumers to a different mark that does that job. *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) ("Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website, at such a nominal expense, is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce."), *aff'd*, 747 F.3d 929; *PBI Performance Prods., Inc. v. Norfab Corp.*, 514 F. Supp. 2d 725, 729 (E.D. Pa. 2007) (finding abandonment where claimant made "considered decision" not to sell product despite continued offering of display samples showing mark); *Rascal House Inc. v. Jerry's Famous Deli, Inc.*, 2024 WL 4524585, *8-9 (Trademark Tr. & App. Bd. Sept. 30, 2024) (distinguishing Ninth Circuit *Wells Fargo* case because Wells Fargo "continued to use its mark from its solicitation of customers through its acceptance of their payments. Its services were both advertised and rendered under the mark," whereas claimant in *Rascal House* stopped rendering services under its claimed mark; "discontinued restaurant service marks displayed in restaurants operating under different service marks" were still abandoned as marks).

14

Automated redirection cannot change the fact that X has noisily and decisively rebranded. *See* D.I. 29 at 3-4; *MB Financial Bank, N.A. v. MB Real Estate Serv., L.L.C.*, No. 02 C 5925, 2003 WL 21462501, at *3-4, 9-11 (N.D. Ill. Jun. 23, 2003) (finding abandonment where, even though the bank did not extirpate all historical uses of the mark, it rebranded and "heavily promot[ed]" its new logos and word mark, discontinued "active" use of the original mark and publicly disparaged its past mark, and heavily advertised the switch).

    3. Infringement Cases Finding Automated Redirection to Infringe Do Not Apply the Bona Fide Use Requirement for Maintaining Trademark Rights

X will likely cite cases holding that automated redirection by a defendant can *infringe* a plaintiff's trademark rights. In those cases, plaintiffs alleged that the defendant's use of a domain name that corresponds to another party's trademark for the purpose of redirecting users to the defendant's website constituted infringing use of the plaintiff's mark as a kind of "bait and switch." But as some of those cases recognized, the purported "uses" by the defendants would plainly be insufficient to constitute bona fide use by a trademark *claimant*.

Indeed, where courts in infringement cases have applied the statutory definition of "use," rather than treating infringement as different, defendants have prevailed. For example, in *GoForIt Entm't, LLC v. DigiMedia.com L.P.*, the defendant used Wildcard, a technology whereby users who typed plaintiff's website GOFORIT.org into their browser address windows would be directed instead to

15

defendant's site if the users were also using certain keyboard shortcuts. 750 F. Supp. 2d 712, 718-20 (N.D. Tex. 2010). That court ruled that "the fact that the … Wildcard function processes a trademarked input does not constitute a 'use' in 'sale or advertising' of services." *Id.* at 727 (citing *1–800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 408–09 (2d Cir. 2005); *U–Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 729 (E.D. Va. 2003) (declining to find "use" for Lanham Act purposes where defendant did not advertise or promote plaintiff's trademarks); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) ("There can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the products and services being advertised by the defendant.")). The court further ruled that there was no trademark use by the defendant even though plaintiff's trademark remained visible to the user in the browser address bar: "[T]he Wildcard function … does not handle the third-party user's trademark input *as a trademark*, but merely as a web address that internally redirects to the domain name's homepage." *GoForIt Entm't*, 750 F. Supp. 2d at 728 (emphasis in original).

Similarly, in *Channing Bete Co., Inc. v. Greenberg*, the court found that automated redirection from a domain name incorporating a former licensor's mark to the ex-licensee's rebranded webpage did not constitute infringing use of the former licensor's mark. Case No. 3:19-cv-30032-MGM, 2021 WL 4691597, at *5

16

(D. Mass. Jul. 12, 2021). That is, automated redirection was not a trademark use because it merely facilitated a transition to a new mark.

By contrast, the cases that have found infringement based on defendants' uses of domain names to redirect focused on the distinct question of whether the defendant has used the plaintiff's protected mark in a confusing way. They have not assessed whether a defendant's use of the domain name is bona fide use of the mark in the ordinary course of trade.

In all the contested cases of which Bluebird is aware that have found infringement via automated redirection, the defendants had an ongoing, differently-named business; they were not using automated redirection as an attempt to rebrand. Instead, the defendants in those cases were making confusing use of a protected mark that no one argued was abandoned. The courts in those cases treated the *defendant's* confusing use of a mark as sufficient to satisfy the "use in commerce" requirement—meaning that they did not require the bona fide use defined in the Lanham Act. But where abandonment is at issue, there is no question that the statutory definition of use governs. 15 U.S.C. § 1127. And in the context of rebranding, use of the domain name twitter.com to redirect to x.com, which does not offer any goods or services under the Twitter mark, is not "bona fide use" sufficient to maintain trademark rights in Twitter.

17

4. <u>USPTO Precedents Teach that Automated Redirection Is Not Bona Fide Use</u>

Though the decisions of the U.S. Patent and Trademark Office about what constitutes use of a trademark are not formally binding here, they are helpfully instructive. The USPTO deals with the question of "bona fide use" constantly in registration decisions.[6] The USPTO's Trademark Manual of Examining Procedure, which sets out the Office's view on when domain names are used as marks, states that a domain name that serves only to indicate location on the internet and is not used in *advertising and promotion of goods or services* does not function as a trademark and therefore is not registrable. T.M.E.P. § 1215.02(a) (Nov. 2025 ed.) ("If the proposed mark is used in a way that would be perceived as nothing more than an Internet address where the applicant can be contacted, registration must be refused.").

The leading trademark law treatise, authored by Professor McCarthy, agrees with the USPTO's approach, stating that "[t]he key to legal protection and

---

[6] Notably, X has never once tried to claim to the USPTO that automated redirection of twitter.com demonstrates its continued use of the Twitter mark, even with respect to registrations for which X has had to file maintenance documents since X's acquisition of the former Twitter.

18

registration of a domain name as a mark is to use it in advertising and promotion to identify and distinguish the user's goods or services, not solely as a domain name."[7]

Additionally, the fact that maintaining a domain name as an internet address is not itself trademark "use" was one reason that Congress enacted the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"). In enacting the ACPA, Congress expanded the set of circumstances in which federal law offered redress against people who register domain names that are confusingly similar to others' marks. Specifically, Congress wrote the statute to cover not just bad faith "use" of a domain name, but also "registration" and "trafficking in" domain names, even in the absence of what would constitute trademark use. Congress did that because of the uncertainty over whether non-trademark uses of domain names were reachable under ordinary trademark law. S. Rep. 106-140, at p. 7 (1999) ("For example, many cybersquatters are now careful to no longer offer the domain name for sale in any manner that could implicate liability under existing trademark dilution case law. And, in cases of warehousing and trafficking in domain names, courts have

---

[7] McCarthy, *supra*, § 7:17.50. *Compare St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1207 (11th Cir. 2009) (finding that domain name "LaserSpecialist.com" was used as a mark when it was used on each page of the LaserSpecialist.com website, was highlighted with blue and yellow lettering and a "swoosh" (like a logo) and the logo was strategically placed in the upper left corner of each page).

19

sometimes declined to provide assistance to trademark holders ….”); *see also*

*GoForIt Entm’t*, 750 F. Supp. 2d at 728 (“But mere display of a domain name to indicate an address is not enough to constitute ‘use’ in sale or advertising of services.”) (citing *Bird v. Parsons*, 289 F.3d 865, 878 (6th Cir. 2002) (citing *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 956 (C.D. Cal. 1997) (agreeing with analysis in case where “[defendant] merely uses domain names to designate host computers on the Internet,” and concluding that “[t]his is the type of purely nominative function that is not prohibited by trademark law”)).

### B.    Google Keyword Purchases of “Twitter” Are Not Use of Twitter as a Trademark.

X belatedly contends that its purchase of the keyword “twitter” constitutes trademark use of that term. X never mentioned keyword purchases or contended that they could amount to trademark use until the Court asked about them at the preliminary injunction hearing. Tr. 190:23-191:4. Regardless, purchasing and using a keyword is not making use of that keyword to identify the source of the purchaser’s own goods or services. Indeed, companies *routinely* buy keywords that are the names or trademarks of their competitors and use those to engage in comparative advertising. *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 717 (9th Cir. 2024) (buying trademarks as keywords is a “common internet marketing tool”).

20

For instance, eyewear and contact lens seller Warby Parker bought the keyword "1-800-Contacts," the trademark of its competitor. *See 1-800 Contacts, Inc. v. JAND, Inc.*, 608 F. Supp. 3d 148, 158-60 (S.D.N.Y. 2022) (finding that Warby Parker's use of 1-800 Contacts mark, including in keyword advertising, was not infringing). It did so because Warby Parker and 1-800 Contacts are competitors in the market for contact lenses: if a consumer is searching on Google for "1-800 Contacts," Warby Parker wants to make sure that the consumer also sees a "sponsored search result"—in plain English, an advertisement—for Warby Parker's similar and competing products. *See id*. at 153. And the traffic flows in all directions. Warby Parker buys "1-800-Contacts" as a keyword, but other eyeglass sellers may also buy "Warby Parker" as a keyword. This is why keyword advertising is so important for competition.

According to X's newly adopted argument, when Warby Parker buys the keyword "1-800 Contacts," it is making bona fide use of 1-800 Contacts as its own trademark—using 1-800 Contacts to identify the source of Warby Parker's products. If that were true, advertisers who accept Google's autosuggestions for keyword ads would find themselves with an unexpected and unearned portfolio of trademark rights. *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 151 (4th Cir. 2012) (describing autosuggestion tool). Of course, entities that purchase keywords corresponding to competitors' marks aren't making trademark use of competitors'

21

marks; they have their own trademarks distinct from the keyword. Warby Parker's trademark is Warby Parker, not 1-800 Contacts. And X's trademark is X, not Twitter.

In short, keyword purchasing is a competitive activity, and one in which the workings that associate the trademark with particular, sponsored search results *are hidden to the consumer*—it is not a use by the keyword purchaser to brand its own products or services.

Over the past two decades, courts have adjudicated many infringement claims involving keyword advertising. As with automated redirection, those cases are not about abandonment or bona fide use. Sometimes the cases involve claims by trademark owners against keyword purchasers alleging that the purchaser's use of the keyword and the advertisements to which searchers are directed are infringing.[8] Other cases involve claims by trademark owners against Google or other search engines that sell keywords to others. *See, e.g.*, *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123 (2d Cir. 2009). In many of the keyword advertising cases, the defendants

---

[8] In general, courts have found that purchasing a competitor's trademark as a keyword is not infringing so long as the advertisement to which searchers are delivered is not confusing. *See, e.g.*, *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 938-39 (9th Cir. 2015); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242-43 (10th Cir. 2013); *1-800 Contacts*, 608 F. Supp. 3d at 158-60. In other words, the mere purchase and use of another's trademark as a keyword is not infringing.

22

have argued that the statutory "use in commerce" requirement entails a requirement that the defendant make trademark use of the plaintiff's mark, and that trademark use is a threshold question, separate from likelihood of confusion. *See*, *e.g.*, *id.* at 129-31; *U–Haul Int'l, Inc.,* 279 F. Supp. 2d at 727-29; *Wells Fargo & Co.,* 293 F. Supp. 2d at 762-64.

Most courts in the keyword advertising cases concluded that trademark use is not a separate threshold element of infringement, and that a use likely to cause confusion about source, sponsorship, or affiliation is all that is required. *See, e.g.*, *Rescuecom*, 562 F.3d at 130. In other words, like some of the redirection cases, those courts refused to interpret the statutory use in commerce requirement to entail a requirement that the defendant make trademark use as defined in 15 U.S.C. § 1127. *See Rescuecom*, 562 F.3d at 132 ("the definition provided in § 1127 [for acquisition and maintenance of rights] is not intended to apply to §§ 1114 & 1125(a) [for infringement]"; § 1127's definition "was not intended as a limitation on conduct of an accused infringer that might cause liability"); *see also Lerner & Rowe,* 119 F.4th at 727 (Desai, J., concurring) (suggesting that courts should renew their attention to the statutory definition of "use in commerce" in keyword infringement cases).

As noted above, that conclusion is questionable. But again, whatever the proper interpretation of "use in commerce" for purposes of infringement, there can be no doubt that the statutory definition applies to acquisition and maintenance of

trademark rights, which is the issue here. *Rescuecom Corp.*, 562 F.3d at 133-34. Indeed, the keyword infringement cases that find infringement are possible only because they explicitly reject equivalence between infringing use and rights-claiming use, while reiterating that rights-claiming use must be bona fide and not token. *Id.* at 134 ("In 1988, when Congress enacted the present form of § 1127's definition, which was designed to deny registration to an owner who made merely token use of his mark, the accompanying Congressional report made clear that the definition was understood as applying only to the requirements of qualification for registration and other benefits of the Act, and not to conduct causing liability."). Keyword purchases do not appear to the public, and they are routinely used by non-trademark owners to target advertising. They do not constitute bona fide use of a mark to indicate the source of the purchaser's goods or services.

## CONCLUSION

For the foregoing reasons, as this Court already found regarding X's lack of evidence of bona fide use in commerce of the Tweet mark and Twitter bird logo, X has provided no evidence of a single instance of bona fide use in commerce of the Twitter mark. Even if it could do so at this point, the balance of the equities favors Bluebird. Accordingly, the Court should deny X's motion for a preliminary injunction in its entirety.

24

Dated: May 1, 2026

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Andrew Gerber*
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Christopher J. Sprigman*
Mark P. McKenna*
Rhett O. Millsaps II*
LEX LUMINA LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com

*admitted pro hac vice

Attorneys for Defendant Operation Bluebird, Inc.

25

## CERTIFICATION OF COMPLIANCE

The foregoing document complies with the type-volume limitation of this Court's November 10, 2022, Standing Order regarding Briefing in All Cases and the Order for Supplemental Briefing in Connection with Motion for Preliminary Injunction (D.I. 62).  The text of this brief, including footnotes, was prepared in Times New Roman, 14 point. According to the word processing system used to prepare it, the brief contains 6,235 words, excluding the case caption, signature block, table of contents and table of authorities.

/s/ Michael J. Farnan

Michael J. Farnan (5165)

Dated: May 1, 2026