## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| X CORP., | C.A. No. 25-1510-CFC |
| Plaintiff and Counterclaim-Defendant, | |
| v. | |
| OPERATION BLUEBIRD, INC., | |
| Defendant and Counterclaim-Plaintiff. | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Dated: May 22, 2026

Andrew Gerber (*pro hac vice*)
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Christopher J. Sprigman (*pro hac vice*)
Mark P. Mckenna (*pro hac vice*)
Rhett O. Millsaps II (*pro hac vice*)
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant Operation Bluebird, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES………………………………………………………………...ii

PRELIMINARY STATEMENT…………………………………………………………...1

ARGUMENT……………………………………………………………………………….4

I.    TWITTER.COM REDIRECT IS NOT USE IN COMMERCE…….....……….4

II.    KEYWORD PURCHASES ARE NOT BONA FIDE USES IN THE
ORDINARY COURSE OF TRADE……………….......................................8

III.    X'S USE OF "FORMERLY KNOWN AS TWITTER" IS
NOT TRADEMARK USE …………………......................................................9

IV.    X'S OTHER MATERIALS ARE HISTORICAL USE—NOT
CURRENT USE IN COMMERCE TO BRAND X'S PRODUCTS
OR SERVICES......................................................................................15

V.    SOCIAL MEDIA PAGES ON OTHER PLATFORMS ARE
NOT EVIDENCE OF CURRENT USE BY X.................................................18

VI.    X MISREPRESENTS THIRD-PARTY USES...............................................19

VII.    X BASELESSLY ARGUES THAT IT SHOULD GET AN
INJUNCTION EVEN IF IT HAS ABANDONED......................................22

CONCLUSION………………………………………………………………………...24

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
    600 U.S. 412 (2023)…………………………………………………………7, 9, 17

*Alliant Energy Corp. v. Alltel Corp.*,
    344 F. Supp. 2d 1176 (S.D. Iowa 2004)………………………………………...11

*American Association for Justice v. The American Trial Lawyers Association*,
    698 F. Supp. 2d 1129 (D. Minn. 2010)……………………………………6, 10

*Brown & Brown, Inc. v. Cola*,
    Civ. Action No. 10-3898, 2011 WL 1103867 (E.D. Pa. Mar. 23, 2011)…………6

*Delaware State Sportsmen's Ass'n, Inc. v.*
*Delaware Dep't of Safety and Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024)………………………………………………...24

*Doeblers' Penn. Hybrids, Inc. v. Doebler*,
    442 F.3d 812 (3d Cir. 2006)……………………………………………...21, 22

*Fagnelli Plumbing Co., Inc. v. Gillece Plumbing & Heating. Inc.*,
    Civ. Action No. 2:10–CV–00679–AJS, 2010 WL 2994163
    (W.D. Pa. July 27, 2010)………………………………………………...5

*First Fed. Sav. & Loan Ass'n of Council Bluffs*
*v. First Fed. Sav. and Loan Ass'n of Lincoln*,
    929 F.2d 382 (8th Cir. 1991)………………………………………………...11

*Grubbs v. Sheakley Group, Inc.*,
    807 F.3d 785 (6th Cir. 2015)………………………………………………7

*In re Shenandoah Growers, Inc.*,
    Serial No. 76620753, 2008 WL 885947 (T.T.A.B. Feb. 14, 2008)……………...13

*Jack Daniel's Prop., Inc. v. VIP Products LLC*,
    599 U.S. 140 (2023)……………………………………………………….7

*Marks Org., Inc. v. Joles*,
    784 F. Supp. 2d 322 (S.D.N.Y. 2011)……………………………………………..14

*Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011)………………………………………………...9

*Peter Luger, Inc. v. Silver Star Meats, Inc.*,
    No. Civ.A.01–1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002)…….22, 23, 24

*Rescuecom v. Google*,
    562 F.3d 123 (2d Cir. 2009)………………………………………………..9

*Sazerac Brands, LLC v. Peristyle, LLC*,
    892 F.3d 853 (6th Cir. 2018)…………………………………………………7

*SM Licensing Corp. v. U.S. Med. Care Holdings LLC*,
    No. 07-20293-CIV, 2007 WL 2051009 (S.D. Fla. July 13, 2007)……………...14

*UHS of Delaware, Inc. v. United Health Serv., Inc.*,
    227 F. Supp. 3d 381 (M.D. Pa. 2016)…………………………………………5

*Wells Fargo and Co. v. ABD Ins. and Financial Svcs.*,
    No. C 12–3856 PJH, 2013 WL 898140 (N.D. Ca. Mar. 8, 2013)………………10

*Wells Fargo and Co. v. ABD Ins. and Financial Svcs., Inc.*,
    758 F.3d 1069 (9th Cir. 2014)…………………………………………………10

**Statutes**

15 U.S.C. § 1055…………………………………………………………………..19
15 U.S.C. § 1127…………………………………………………………..*passim*

**Treatises & Other**

2 J. Thomas McCarthy, McCarthy on Trademarks &
Unfair Competition § 18:48……………………………………………………22

Trademark Manual of Examining Procedure § 1202………..………………...13

## PRELIMINARY STATEMENT

X spends nearly all of its supplemental brief rehashing its argument that remnants of historic use count as current use of the Twitter marks just because it has not scrubbed the remnants from the internet. Barely more than two pages of its brief address the issues the Court indicated it was most interested in: use of the twitter.com domain name to redirect to x.com, and X's purchase of Twitter as a search engine keyword.  *See* D.I. 68 at 8-11.

As Bluebird explained in its brief in opposition to X's motion for preliminary injunction, the continued availability of old references does not constitute bona fide current use of Twitter in the ordinary course of trade. D.I. 29, *passim*. X is not offering any goods or services under the Twitter mark. There is no Twitter platform.

Because X cannot point to any current uses or any real future plans for the Twitter brand, it attempts to recharacterize its deliberate and unambiguous abandonment of the Twitter mark. At the preliminary injunction hearing, X's witness Baseer claimed that, despite X's public announcements that Twitter was gone, X uses Twitter as a "secondary brand." D.I. 58 at 71:3. That new claim does not withstand scrutiny. X does not use Twitter as any kind of brand—indeed, Baseer could not identify *a single use* of the term "Twitter" on the homepage of X's

1

platform. *Id.* at 101:4-21.[1] Now, in its supplemental brief, X suggests that its abandonment of Twitter was actually just modernization and evolution of the brand. D.I. 68 at 3. But this is not a case about brand evolution—X has not adopted some new variation on the Twitter word mark or its logo, like Pepsi did when it "evolved" its brand:



Pepsi logo 2023: unveiling a bold spirit, March 31, 2023 (https://dorve.com/blog/pepsi-logo-2023-unveiling-a-bold-spirit/).

X stopped using Twitter, announced that Twitter was no longer, and replaced Twitter with an entirely different brand (X) that bears no resemblance to Twitter. In other words, X did exactly what Elon Musk promised when he told the world in July 2023 that X would soon "bid adieu to the twitter brand and, gradually, all the birds." D.I. 29 at 3. True to Musk's word, X immediately and permanently discarded its former brand—Musk reported that X was "cutting the Twitter logo off the building

---

[1] X's so-called "secondary brand" no longer even has a handle on the X platform. X discontinued that handle after rebranding Twitter to X. D.I. 58 at 162:11-23.

with blow torches" (*id.*)—and adopted a new and completely different brand. X does not offer any products or services under the Twitter mark, or under anything resembling the Twitter mark.

X also attempts to move the legal goalposts in its supplemental brief, asking the Court to define "use" in a way that abstracts away from the question of whether X currently offers any goods or services under the Twitter mark. X suggests that it "uses" the Twitter mark when the mark "appears" in the advertising of goods or services. D.I. 68 at 5. But that captures only part of what it means to use a mark in commerce. Many words appear in advertisements but do not function as trademarks identifying the source of goods or services. The word "apple" might appear in a grocery store advertisement announcing that red delicious apples are on sale. But that "use" of "apple" is not a bona fide use of a mark in the ordinary course of trade. The Lanham Act requires that the claimed mark be used as a trademark—that is, to identify the source of goods or services. Bona fide use requires more than simply appearing in advertising; the claimed mark must function in that advertising *as a trademark*. None of X's references to Twitter do that, because they do not use the word "Twitter" to identify the source of any goods or services. They are mere historical references.

Finally, X also asks the Court to give it credit for the fact that some consumers continue to associate Twitter with X. D.I. 68 at 1. But as the Court noted repeatedly

3

at the hearing, consumers' knowledge that X's platform used to be called Twitter is not use of the Twitter mark by X. D.I. 58 at 7:5-15; 206:25-207:24.

Because the evidence shows that X does not use any of the Twitter marks in commerce, the Court should deny X's motion for preliminary injunction in its entirety.

## ARGUMENT

## I.    TWITTER.COM REDIRECT IS NOT USE IN COMMERCE

The uncontroverted evidence is that twitter.com immediately redirects to x.com, and the website at x.com is exclusively branded as X. D.I. 58 at 100:18-102:2. There is not a single use of the Twitter name or any other Twitter mark on the homepage of that website. *Id.* X offers no goods or services under the Twitter mark on that page or anywhere else.

The twitter.com domain name is just an address on the internet that delivers users to X's social media platform. That is not bona fide use of Twitter, as extensively discussed in Bluebird's brief. D.I. 67 at 7-20.[2] It would not be bona fide

---

[2] X dismisses the Trademark Manual of Examining Procedure (TMEP), claiming that "Bluebird's abandonment defense does not turn on whether twitter.com is registrable…." D.I. 68 at 10 n.2. But that misses the point. Domain names are not registrable when they serve only as addresses on the internet because those domain names do not function as trademarks. And if those domain names do not function as trademarks, they are not being used in a way that maintains trademark rights and avoids abandonment. The same definition of use applies in the context of abandonment as in acquisition of rights. 15 U.S.C. § 1127.

4

use even if the twitter.com domain name remained visible at the new website. *See UHS of Delaware, Inc. v. United Health Serv., Inc.*, 227 F. Supp. 3d 381, 401-02 (M.D. Pa. 2016). But twitter.com does not remain visible—it vanishes instantaneously, replaced by x.com, making the case for trademark use even weaker for X.

In its single page of argument on the redirect issue, X cites three district court decisions. All are inapposite. First, X cites *Fagnelli Plumbing Co., Inc. v. Gillece Plumbing & Heating, Inc.,* Civ. Action No. 2:10–CV–00679–AJS, 2010 WL 2994163 (W.D. Pa. July 27, 2010), an infringement case involving defendant's use of plaintiff's trademark in a domain name that redirected to *defendant's* website. *Id.* at *1. There was no abandonment issue in *Fagnelli*. That case, like other infringement cases described by Bluebird in its supplemental brief, proceeds from the assumption that the kind of "use in commerce" necessary for infringement does not require bona fide use in the ordinary course of trade. That is, *Fagnelli* treated the domain name redirect as "use in commerce" because it did not apply the statutory definition relevant to abandonment—bona fide use in the ordinary course of trade. 15 U.S.C. § 1127. *See* D.I. 67 at 15-17. And in the context of rebranding, use of the domain name twitter.com to redirect to x.com, which does not offer any goods or services under the Twitter mark, is not "bona fide use" sufficient to maintain trademark rights in Twitter.

The two other cases cited by X also are not helpful. The court in *Brown & Brown, Inc. v. Cola* found material factual issues on abandonment despite the redirection, supporting Bluebird's position that a preliminary injunction is unwarranted. Civ. Action No. 10–3898, 2011 WL 1103867, at *14 (E.D. Pa. Mar. 23, 2011). Moreover, that court relied on additional evidence, including continued *consumer* use, the relevance of which this Court has already correctly rejected. *Id.* at *13 (discussing continued customer association as well as other active uses); *see* D.I. 58 at 7:5-15.

*American Association for Justice v. The American Trial Lawyers Association* is an out-of-circuit district court case, the outcome of which did not turn on domain name redirection. 698 F. Supp. 2d 1129 (D. Minn. 2010). In contrast to X's attempt to extirpate its ongoing active uses of "Twitter," the plaintiff in that case adopted "a seal containing both marks," licensed the mark with quality control (rather than passively accepting continued third-party uses), and earned substantial revenue from publications bearing the mark. *Id*. at 1139.

Unlike the cases cited by X, the Sixth Circuit's cases defining the elements of trademark infringement offer helpful insight about the kind of use necessary to maintain trademark rights. The Sixth Circuit requires, as an element of the plaintiff's prima facie case in a trademark infringement action, that plaintiff establish that defendant is using plaintiff's mark "in a trademark way"—that is, to indicate the

6

source of defendant's products or services—and not in some other way, such as referentially or descriptively. *See, e.g.*, *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 793 (6th Cir. 2015) ("In some cases, a threshold question exists as to whether the challenged use of a trademark identifies the source of goods; if not, that use is in a 'non-trademark way' outside the protections of trademark law."); *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018) (recasting use "in a trademark way" requirement as functionally equivalent to descriptive fair use inquiry).

While the Sixth Circuit cases are not directly on point here, they offer a helpful model for how to think about "use" in the context of abandonment. The Lanham Act defines use of a mark for purposes of abandonment as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The same section of the Lanham Act defines a *mark* as a word, symbol, or device that identifies and distinguishes the source of the user's goods or services. *Id*. Identifying the source of goods and services is what trademarks do. *See Jack Daniel's Prop., Inc. v. VIP Products LLC*, 599 U.S. 140, 146 (2023) ("[W]hatever else it may do, a trademark is not a trademark unless it identifies a product's source …."); *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023) (defining "use in commerce" as a use of a mark to "identify

7

and distinguish [the mark user's] goods ... and to indicate the source of the goods")
(quoting 15 U.S.C. § 1127).

X is not using Twitter to identify the source of any goods or services when a user types "twitter.com" into an address bar, or when the user relies on a saved bookmark for that address, and X redirects the user to its homepage at x.com. The user arrives at x.com within milliseconds. Once the user arrives at that destination, he or she no longer sees the twitter.com address, and the Twitter term appears nowhere on that page. That is not use by X to identify the source of X's services. It is, rather, a kind of historical-referential use. Specifically, it refers to knowledge that *users* possess regarding the former branding of X's social media site. It leverages that knowledge to tell them that X's brand is now X, *not Twitter*. It communicates the opposite of use in commerce as the Lanham Act defines that concept in the context of abandonment.

## II.   KEYWORD PURCHASES ARE NOT BONA FIDE USES IN THE ORDINARY COURSE OF TRADE

As Bluebird anticipated, D.I. 67 at 22-24, X relies on infringement cases to support its claim that "[u]sing trademarks in search engine keywords are well-established commercial uses under the Lanham Act." D.I. 68 at 10. Those cases are not relevant to the abandonment question here because they do not engage with the statutory definition of use in commerce; they instead conclude (or at least assume) that bona fide use is not required for infringement. X's citation of *Rescuecom v.*

8

*Google* is particularly revealing here: the Second Circuit opinion in that case includes an entire Appendix devoted to explaining the panel's view that the statutory definition of use in commerce does not apply in infringement cases *because it is only relevant to acquisition and maintenance of rights*. 562 F.3d 123, 131-41 (2d Cir. 2009); *see also Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1144-45 (9th Cir. 2011) (relying on *Rescuecom* for its conclusion that use of a trademark as a search engine keyword is "use in commerce" for infringement purposes). As Bluebird previously noted, the Second Circuit's interpretation is questionable, particularly after the Supreme Court's decision in *Abitron*, 600 U.S. at 428. D.I. 67 at 8. But *Rescuecom* announces on its face its irrelevance to the abandonment question here, where the statutory definition unquestionably applies. Only bona fide uses in the ordinary course of trade can forestall abandonment. X does not make any such use of Twitter.

Keyword purchases are not bona fide use in the ordinary course of trade. They do not on their own identify the source of anything; they do not even necessarily indicate the source of the advertisements generated as a result of their use. Indeed, companies routinely buy keywords associated with their *competitors*' trademarks. D.I. 67 at 20-22.

9

### III. X'S USE OF "FORMERLY KNOWN AS TWITTER" IS NOT TRADEMARK USE

X again argues that it makes current use of Twitter because it sometimes reminds consumers that it was "formerly known as Twitter." D.I. 68 at 11. That formulation communicates exactly the opposite of what a trademark is supposed to communicate—it explicitly tells consumers that X is no longer offering services under the Twitter mark, and that Twitter has been replaced by X. Reminding consumers that X used to use another mark—which X expressly abandoned—does not constitute continued trademark use of the former mark.

*Wells Fargo & Co. v. ABD Ins. and Financial Svcs, Inc.*, 758 F.3d 1069 (9th Cir. 2014) is not to the contrary. The evidence credited by the Ninth Circuit in that case was ABD's use of the mark "in customer presentations and solicitations." *Id.* at 1072. Specifically, ABD used the phrase "ABD Insurance and Financial Services—A Wells Fargo Company" on the footer of presentations to customers. *See Wells Fargo and Co. v. ABD Ins. and Financial Svcs.*, No. C 12–3856 PJH, 2013 WL 898140, *6 (N.D. Ca. Mar. 8, 2013). And ABD's solicitation emails stated, "Our firm, ABD Insurance, was acquired by Wells Fargo 4 years ago." *Id.* at *7. These uses, directed at customers and prospective customers, communicate a change in

ownership and a continued use of the mark; they do not merely say that the company was "formerly" known as something else.[3]

X's use of "formerly known as Twitter" does not constitute bona fide use for another reason. Even if the formulation did not inherently communicate the opposite of trademark function, X's actual presentation of those references is not indicative of trademark use. Here is what X's page on the Apple app store—the place where X offers its software—looks like, as depicted in Exhibit 8 to Mr. Baseer's declaration:

---

[3] *American Association for Justice* also is not good authority here. In addition to being an out-of-circuit district court case in which there was other meaningful evidence of continued use, that court relied for its conclusion regarding the significance of the "formerly" reference on two cases that do not support the court's conclusion. The first of those cases, *First Fed. Sav. & Loan Ass'n of Council Bluffs v. First Fed. Sav. and Loan Ass'n of Lincoln,* was not an abandonment case; the issue there was whether the court should dissolve an injunction that was entered before the plaintiff was purchased and renamed by another institution. 929 F.2d 382, 385 (8th Cir. 1991). The court cited the plaintiff's identification of itself as "the former First Federal" as a reason to continue the injunction, not to determine whether First Federal Council Bluffs had abandoned the mark, a question not raised there. The second case, *Alliant Energy Corp. v. Alltel Corp.,* treated the "formerly" reference as evidence of intent to resume use, not as evidence of continued use. 344 F. Supp. 2d 1176, 1187 (S.D. Iowa 2004). X does not even contend here that it intends to resume use—and the evidence is clear that it does not.

11



D.I. 11-8 at 3.

It is difficult even to see the "formerly known as Twitter" reference, which is why X had to highlight it in this exhibit. *See* D.I. 58 at 114:6-116:2. But that difficulty is precisely the point. This is not use of a mark in the ordinary course of trade—it is a small textual use of the kind that the Trademark Office would not accept as a specimen of use.[4] Compounding the lack of prominence, the reference is just providing historical information—noting that X used to be, but no longer is, Twitter.

The same is true of the supposed use by the Boston Celtics and FanDuel:



---

[4] *See* TMEP § 1202; *In re Shenandoah Growers, Inc.*, Serial No. 76620753, 2008 WL 885947, at *2 (T.T.A.B. Feb. 14, 2008) ("[T]he overall impression of the phrase 'For more great Freshherb ideas, visit fresherbs.com' on the specimen is of an invitation to visit a website for ideas on how to use fresh herbs. As such, 'freshherbs.com' does not function as a source indicator.").

D.I. 11-9 at 3-4. This document is an announcement of a partnership between the Celtics and FanDuel for FanDuel to present a docuseries about the Celtics 2024 NBA postseason, where all of the episodes were to premier on the Celtics account on X. Buried in the text, again hard to see, the story mentions in a parenthetical that X was formerly Twitter. *See id*. That's it—that was the full mention, again so hard to see that X had to highlight it in the exhibit. D.I. 58 at 117:22-118:10. The reference to Twitter was not even in the heading or title. And its presentation stands in notable contrast with the Celtics and FanDuel logos, which are prominently presented at the top of the announcement.

X's references to "formerly known as Twitter" also contrast sharply with the prominent uses in the cases X cites. In *SM Licensing Corp. v. U.S. Med. Care Holdings LLC*, although the claimant used "formerly" on his website, he also continued actively marketing under the mark in oral conversations with patients and thus continued use in a major marketing channel. No. 07-20293-CIV, 2007 WL 2051009, *13 (S.D. Fla. July 13, 2007). Likewise, *Marks Org., Inc. v. Joles* involved paid, traditional advertisements giving prominence to the "former" mark. 784 F. Supp. 2d 322, 329 (S.D.N.Y. 2011). X presents cropped screenshots of "former" uses from some of these cases—but the cropped screenshots, crucially, do not show *prominence*, a keystone of trademark use and a key distinguishing feature here.

14

The textual uses of "formerly known as Twitter" do not identify the source of any goods or services offered by X—they do not direct consumers to any goods or services offered under that name. Indeed, if X's evidence were enough to avoid abandonment, it would be trivially easy to reserve rights in a mark without making any bona fide use of the mark in connection with goods or services that are actually available. *See* D.I. 67 at 13-14. The Lanham Act makes clear that mere attempts to reserve rights in a mark are not bona fide uses of the mark in the ordinary course of trade. 15 U.S.C. § 1127.

## IV.  X'S OTHER MATERIALS ARE HISTORICAL USE—NOT CURRENT USE IN COMMERCE TO BRAND X'S PRODUCTS OR SERVICES

X misrepresents materials as "consumer-facing" just because they continue to be available on the internet. But these materials are not evidence of bona fide use in the ordinary course of trade. For one thing, Baseer admitted in in his testimony at his deposition and the preliminary injunction hearing that he does not know anything about when or how these documents were shared. Declaration of Rhett O. Millsaps II in Further Support of Bluebird's Opposition to X's Motion for Preliminary Injunction dated May 22, 20226 ("Millsaps Decl."), Ex. 1 at 99:16-101:5; D.I. 58 at 119:1-120:3; 157:9-158:22. Baseer simply assumes that they are shared, just because they remain available. That is not evidence of use to identify the source of currently available goods or services.

Take, for example, the Twitter Objective Playbook (Amplify Your Videos):

15



D.I. 11-5 at 11-52. That document is an undated PDF; X has supplied no evidence regarding whether or how it is currently used with clients or in what capacity. The document itself seems to have been created years ago—before X bought Twitter. D.I. 58 at 157:9-158:22; Millsaps Decl., Ex. 1 at 92:2-96:23. The fact that the digital file still exists does not prove anything about X's current use. Baseer, in his testimony, was unable to give any details about current use and admitted that there was no evidence in the record documenting current use. D.I. 58 at 157:9-158:22.

Or take the Twitter Supplier Registration Invitation, D.I. 11-5 at 67-98, which Baseer emphasizes in his rebuttal declaration. D.I. 37 ¶ 18. That document appears to be a printout of an email with an attachment of a vendor form. Notably, in the email the recipient information is concealed, so it's not possible to determine who

16

the email was sent to. It is not possible to know if this was sent to someone outside of X, let alone whether that person was in the United States.



The timestamp on that email is 4:01 a.m. At his deposition, Baseer said he did not think the timestamp was unusual because X does business all across the world. Millsaps Decl., Ex. 1 at 114:21-115:4. But if the email was sent at 4:01 a.m. because it was directed at a very different time zone, then that just further calls into question whether this document demonstrates anything related to US commerce. This document cannot be evidence of use in the United States if the email is directed at someone outside the United States. *Abitron*, 600 U.S. at 419-21 (Lanham Act does not apply extraterritorially).

17

Even ignoring those problems, the document is fundamentally incapable of demonstrating use of Twitter to identify the source of any goods or services that X is offering, because it is a vendor form—a document sent to people who are *selling things to X; not a document showing anything that X is selling*, let alone proof of use for social media services. D.I. 58 at 118:23-120:24.

## V.    SOCIAL MEDIA PAGES ON OTHER PLATFORMS ARE NOT EVIDENCE OF CURRENT USE BY X

X also points to social media pages that continue to exist on other platforms like Facebook, LinkedIn, and YouTube. But those pages are not evidence of current use by X. Those are residual; none of them have been updated recently.[5] The posts are years old. D.I. 58 at 159:5-162:10.

Baseer claims in his reply declaration that the fact that users have commented more recently on old posts demonstrates that X is currently using the marks. D.I. 37 ¶ 22. But those comments are not evidence that X is offering any goods or services under that mark. Indeed, what those defunct social media pages show is that recent commenters are talking into the void: X has not responded to any of them, even when they are asking for help. *Id*. X left the posterboard up on the wall, and occasionally

---

[5] *See* D.I. 11-4. Twitter's Facebook page has not been updated since October 21, 2021. Additionally, there are no posts on Twitter's LinkedIn page, and all of the Past Events on that page are from 2021 or before. The most recent post on Twitter's Instagram page is from February 19, 2022.

someone walks by and writes on it. No one notices. That is not bona fide use of the marks in commerce by X.

## VI.    X MISREPRESENTS THIRD-PARTY USES

X asserts that third-party references to Twitter are uses of the Twitter mark that inure to its benefit. D.I. 68 at 23-24. What X means is that it thinks that X should get credit for other companies linking to their profiles on X's platform with icons that have not been updated. That is wrong.

First, those references are not uses in connection with the offering of any goods or services by the user. JetBlue is not offering *anything* under the Twitter mark. D.I. 11-7. It is simply offering users a way to get to its own social media accounts; if a user clicks on the icon on JetBlue's webpage, the user would be taken to the JetBlue account page on X. D.I. 58 at 170:15-172:1.

X's argument also is wrong on the law. The only uses that "inure to the benefit" of someone else are uses that are licensed, where the licensor controls the quality of the other party's goods or services. Those are the uses the Lanham Act defines as uses by "related companies." 15 U.S.C. §§ 1055; 1127 ("The term 'related company' means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."). X has offered no evidence whatsoever that it controls the quality of any goods or services those third parties offer. Because

19

of course it does not. X obviously does not control the quality of JetBlue's airline services. D.I. 58 at 173:17-25. Baseer admitted in his testimony that X does not have a license agreement with JetBlue, and that JetBlue's use does not imply anything about X's endorsement. D.I. 58 at 169:10-170:14, 193:8-193:25. In fact, Baseer admitted that X has not licensed *anyone* to use Twitter since X bought Twitter. *Id*. at 195:17-196:25.[6]

X's argument that it should get credit for companies linking to their own social media accounts on X just because those companies follow the brand guidelines is an argument that X should get credit for other people following its requests about the form of the reference (what icon to use). But that is not "permission" that has legal significance.[7] Guidelines for the depiction of the icon are not control over the quality of the goods or services offered under the mark. And it is only that kind of control that would make third-party uses "inure to the benefit of X."[8]

---

[6] "THE COURT: When is the last time Twitter licensed its trademark to anyone? THE WITNESS: It's been a very long time, Your Honor. We don't license the core marks. Even when --before the rebrand, we -- THE COURT: Let me just ask you this: Has X ever licensed the Twitter mark to anyone? THE WITNESS: No, it hasn't. X hasn't licensed X mark to anyone." D.I. 58 at 195:17-25.

[7] Notably, the supposed "Twitter Brand Guidelines" to which Baseer refers are dated October 2020. D.I. 11-6 at 2.

[8] Along similar lines, X continues to insist that it uses Twitter by "continu[ing] to permit users to download and use legacy Twitter-branded mobile applications through third-party 'APK' sites …." D.I. 68 at 24. But as the Court correctly noted when X's counsel brought up the APK sites, "passively sitting on the sidelines, while other people use a mark, that's not use of the mark, except by the third parties who are using it." D.I. 58 at 24:6-9.

20

X cites *Doeblers' Penn. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006), for the proposition that there was no abandonment because the trademark owner's use never ceased, even though the mark was used by a related entity rather than the original owner. D.I. 68 at 6. But the *Doeblers'* court explicitly recognized that third-party use inures to the benefit of a trademark owner only when third-party use is licensed by the mark owner and the mark owner exercises quality control. 442 F.3d at 823-24. The issue in *Doeblers'* was whether the trademark claimant in fact exercised sufficient control over the third party—or whether, because it did not, the claimant had engaged in naked licensing. *Id*. The court was unable to "conclude that the facts establish[ed] naked licensing as a matter of law" because it thought there might have been an implied license and that the parties' relationship may have evidenced sufficient quality control. *Id.*

But in this case, there is no evidence that X had a license agreement with any third parties—Baseer admitted as much when the court asked him directly. D.I. 58 at 195:17-25. And the brand guidelines expressly distinguish uses that are licensed. D.I. 11-6 at 17; D.I. 58 at 169:10-170:13. Nor is there even plausibly a special relationship between X and any third parties that would allow X to rely on a third party for quality control.

If third-party references like JetBlue's were to be treated as licensed uses, then X has engaged in naked licensing and would forfeit the marks for that reason. There

21

is no evidence whatsoever that X has ever controlled the quality of the goods or services of companies like JetBlue who used the Twitter icon. If X really believes that these referential uses by JetBlue and others are equivalent to licensed uses, then it has abandoned the marks by naked licensing. *See Doeblers'*, 442 F.3d at 823-24 ("When the trademark owner fails to exercise reasonable control over the use of the mark by a licensee, the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods and services that are under the control of the owner of the mark.") (quoting 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:48).

## VII.   X BASELESSLY ARGUES THAT IT SHOULD GET AN INJUNCTION EVEN IF IT HAS ABANDONED

Relying entirely on *Peter Luger, Inc. v. Silver Star Meats, Inc.*, No. Civ.A.01–1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002), X argues that it deserves an injunction even if it is not likely to prevail on its trademark claims because it does not own valid trademark rights. D.I. 68 at 4. But *Peter Luger* does not remotely support X's audacious claim. Indeed, that case is a very different kind of case that is not so much an abandonment case as one about equity.

Hatfield purchased a company called Peter J. Luger and Sons, a company that had sold processed meats for nearly 100 years primarily in Western Pennsylvania. *Peter Luger*, 2002 WL 1870066 at *1. Hatfield purchased Luger-PA's name, marks,

22

trade dress, and associated goodwill. *Id*. After the purchase, Hatfield was sued by a different Luger company from New York, and Hatfield agreed to stop using the Luger name on its meat products as part of the resolution of that lawsuit. *Id*. Hatfield therefore transitioned away from the Luger name, announcing the transition and using the trade dress to bridge to the new name (eventually Hatfield Delichoice). *Id*.

After Hatfield agreed to change the name of its meat products, Regis Luger, a relative of the original Luger-PA family that sold its rights to Hatfield, tried to capitalize on the situation and started licensing his name to a meat processor selling in Western PA under the name R. Luger Classics, using trade dress that was substantially similar to the trade dress formerly used by Luger-PA. *Id*. The unsurprising result was that consumers thought the new Luger Classics were the same as the original Luger meat products or were a successor to those products.

The court ruled that it was "persuaded that a company which purchases the goodwill, trade name and trade dress of a product does not forfeit its right to any residual goodwill associated with those attributes merely because it transitions to a new brand name." *Id*. at *2. "At the least," the court continued, "any newcomer acts outside legal boundaries when it intentionally adopts the same name for a directly competing product in the same market, and uses substantially similar trade dress and even the word 'Classic', thus implying that it is somehow a successor product." *Id*.

23

*Peter Luger* is thus a case about the seller of a brand trying to continue using the mark and its related trade dress despite having sold the brand, and using those marks in a way that was calculated to communicate to consumers that it was the original Luger seller, including by using the same packaging and calling itself "classic." That is the opposite of the message of TWITTER NEW, which clearly announces itself as not being X. *Peter Luger* does not support an injunction in this case.

## CONCLUSION

For the foregoing reasons, X has failed to show even a single bona fide use of Twitter in commerce. X has not met its significant burden to show that it is entitled to the extraordinary remedy of a preliminary injunction. *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024) (A preliminary injunction "is an extraordinary remedy[ ] [that] should be granted only in limited circumstances.") (quotations and citation omitted). The Court should deny X's motion for preliminary injunction in its entirety.

24

Dated: May 22, 2026

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Andrew Gerber (admitted *pro hac vice*)
Gerber Law
27 Union Square West, Suite 301
New York, NY 10003
(212) 658-1810
andrew@gerberlaw.com

Christopher J. Sprigman (admitted *pro hac vice*)
Mark P. Mckenna (admitted *pro hac vice*)
Rhett O. Millsaps II (admitted *pro hac vice*)
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
chris@lex-lumina.com
mark@lex-lumina.com
rhett@lex-lumina.com

*Attorneys for Defendant Operation Bluebird, Inc.*

25