IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| X CORP.,<br><br>Plaintiff,<br><br>v.<br><br>OPERATION BLUEBIRD, INC.,<br><br>Defendant. | Civil Action No. 25-1510-CFC |

Andrew C. Mayo and Randall Teti, ASHBY & GEDDES, Wilmington, Delaware; Megan K. Bannigan, Jared I. Kagan, Nicole M. Flores, Daniel N. Cohen, and Anita S. Kapyur, DEBEVOISE & PLIMPTON LLP, New York, New York

*Counsel for Plaintiff*

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Andrew Gerber, GERBER LAW, New York, New York; Christopher J. Sprigman, Mark P. McKenna, and Rhett O. Millsaps II, LEX LUMINA LLP, New York, New York

*Counsel for Defendant*

**MEMORANDUM OPINION**

September 3, 2026
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

Plaintiff X Corp. has sued Defendant Operation Bluebird, Inc. (Bluebird) for trademark infringement, counterfeiting, false designation of origin and unfair competition, trademark dilution, and copyright infringement in violation of federal law and common law trademark infringement and unfair competition, deceptive trade practices, and trademark dilution in violation of Delaware law. *See* D.I. 1 ¶¶ 59–120. Pending before me is X Corp.'s motion for a preliminary injunction. D.I. 9. X Corp. seeks by the motion an order enjoining Bluebird from using until the final resolution of this case what X Corp. calls "the TWITTER Marks" and any other marks that are confusingly similar to those marks. D.I. 9-1 at 1–4.

The parties completed their initial briefing on the motion on February 20, 2026. *See* D.I. 35. Five days later, on February 25, I scheduled a hearing on the motion for the following week. 2.25.26 Oral Order. The next day, to accommodate the travel schedules of counsel and witnesses, I moved the hearing date to April 8. D.I. 38; 2.26.26 Oral Order. On April 6, I denied the motion insofar as it sought an order enjoining Bluebird from using X Corp.'s copyrighted works. 4.6.26 Oral Order. On April 8, I heard testimony and argument in a full-day hearing on what remained of the motion, and ordered supplemental

briefing. 4.8.26 Dkt. Entry; 4.8.26 Hr'g Tr. (docketed as D.I. 58) 201:7–9, 18. The parties completed their supplemental briefing on May 22. D.I. 72; D.I. 76.

I have reviewed the parties' initial and supplemental briefing and the declarations and exhibits they filed in support of their respective positions. This Memorandum Opinion constitutes my findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a)(2).

I.

X Corp. defines the TWITTER Marks as thirteen trademarks currently registered with the United States Patent & Trademark Office (PTO). D.I. 9-1 at 1–2. The applications for those thirteen registered marks were filed by Twitter, Inc. between 2006 and 2022. Three of the applications were for "TWITTER," one was for "twitter," one was for "TWITTER AMPLIFY," and three were for "TWITTER FLIGHT." *See* D.I. 11-1 at 2, 9, 10, 13, 30, 32, 34–35, 37. I will refer to the eight marks covered by these applications as "the Twitter-formative marks." Two of the applications were for "TWEET" (the Tweet mark). *See* D.I. 11-1 at 5, 7. Of the remaining three applications, each was for a Twitter Bird logo (the Bird logo). *See* D.I. 11-1 at 15–21, 23–25, 27–28.

It is undisputed that Twitter, Inc. launched the social media internet platform Twitter with a distinctive sky blue color scheme in 2006; that between 2006 and 2023 millions of people accessed Twitter through its website twitter.com, short

message service, and mobile-device application software to share and comment on short messages known as "tweets"; and that Twitter, Inc. promoted Twitter during this timeframe with its PTO-registered Bird logo that evolved over the years until it took on this form in 2012:

D.I. 11-6 at 7.

As of February 28, 2023, the PTO had granted ten of Twitter, Inc.'s thirteen trademark applications and issued to Twitter, Inc. the marks covered by those applications. *See* D.I. 11-1 at 2, 5, 9, 10, 13, 15, 23, 27, 30, 34. At some point in March 2023 (the exact date is not clear from the record), X Corp. acquired Twitter, Inc.'s assets. D.I. 11 ¶ 18. Those assets included the ten trademarks the PTO had issued to Twitter, Inc. and Twitter, Inc.'s three then-pending trademark applications. *See* D.I. 11 ¶ 19. Bluebird alleges—and X Corp. does not dispute—that Elon Musk has owned X Corp. since before the time it acquired Twitter, Inc.'s assets. *See* D.I. 29 at 3–4; D.I. 31 ¶ 7; D.I. 31-6 at 2; *see generally* D.I. 10; D.I. 35.

It is undisputed that "X Corp. rebranded the Twitter platform to X in July 2023." *See* D.I. 11 ¶ 27 (some capitalization removed); D.I. 31-6 at 2. And it is undisputed that as part of that rebranding, X Corp. removed from the platform the Bird logo and all references to "Twitter" and "Tweet," *see* 4.8 Tr. 101:17–20, and adopted this X logo as the platform's mark:

D.I. 11-8 at 3. On July 22, 2023, Musk posted on X: "And soon we shall bid adieu to the twitter brand and, gradually, all the birds." D.I. 31-2. A day later, Musk announced: "We're cutting the Twitter logo off the building with blow torches." D.I. 31-3 at 3.

Notwithstanding Musk's comments, X Corp. did not withdraw the trademark applications it had acquired from Twitter, Inc. that were pending before the PTO. On August 29, 2023, the PTO granted the applications Twitter, Inc. had filed for TWITTER FLIGHT and issued those marks to X Corp. *See* D.I. 11-1 at 32, 37. And on April 30, 2024, the PTO granted the application Twitter, Inc. had filed for TWEET and issued that mark to X Corp. *See* D.I. 11-1 at 7.

It is undisputed that X Corp. continues to this day to own and maintain the domain twitter.com. 4.8 Tr. 8:9–20, 62:7–8. But X Corp. has configured the domain to instantaneously redirect any user who accesses twitter.com to x.com. 4.8 Tr. 75:1–2, 100:14–101:3, 101:22–102:1. Thus, web-based access to the X platform now occurs exclusively on the domain x.com. *See* 4.8 Tr. 101:22–102:1. Users can also access the X platform with a smart phone through the X app. *See* D.I. 11-8 at 3.

On December 2, 2025, Bluebird filed two intent-to-use trademark applications with the PTO to register "TWITTER" and "TWEET." D.I. 11 ¶ 59; *see also* D.I. 11-12 at 2, 6. Also in December, Bluebird announced on the domain twitter.new its intent to launch a social networking platform called "twitter.new."[1] *See* D.I. 11 ¶ 61. The backdrop of the twitter.new home page is the same sky blue color of twitter.com's backdrop and the Bird logo. A slide show occupies the top portion of the twitter.new home page. It consists of eight slides that appear one at a time and move from the right of the frame to the left of the frame before disappearing. *See* Twitter.new, https://www.twitter.new/ [https://perma.cc/2QB3-ZWZS] (last visited Sept. 3, 2026). The first slide reads: "The Public Square Is Broken." *See* D.I. 11-13 at 3. It is followed by slides that read in sequential order: "But We Still Believe In It"; "One Brand Tried To Fix It"; "Then Burned It All

Down"; "We Are Bringing It Back"; "This Time With Trust"; "Welcome To Twitter.new"; "#Back With Your Ex." D.I. 11-13 at 7, 11, 15, 19, 23, 27, 31.

Below the slide show is a prompt to "Request Your Handle." D.I. 11-13 at 3–4. A "Handle Reservation Disclaimer" next to the prompt states that "All requested handles must comply with Twitter's Terms of Service, Privacy Policy, Community Guidelines and any applicable laws. Twitter reserves the right to deny or reassign handles at any time." D.I. 11-13 at 4. The last line of text on the home page reads: "**IMPORTANT:** Operation Bluebird Inc. is not affiliated with X Corp or Twitter, Inc. Handle reservations are for the Operation Bluebird platform only and do not guarantee any rights to handles you may have on other platforms." D.I. 11-13 at 5 (emphasis in the original). Twitter.new's Frequently Asked Questions (FAQ) page explains that "[t]he name [twitter.new] reflects [Bluebird's] mission of building a new Twitter — one focused on trust infrastructure and user empowerment." D.I. 11-13 at 61. By December 22, over 140,000 people had reserved handles (i.e., usernames) on the platform. D.I. 11 ¶ 61; D.I. 11-13 at 3, 60.

II.

The standards that govern the resolution of the pending motion were succinctly set forth by the Supreme Court last year in *Lackey v. Stinnie*, 604 U.S. 192 (2025):

> Preliminary injunctions . . . do not conclusively resolve legal disputes. In awarding preliminary injunctions, courts determine if a plaintiff is likely to succeed on the merits—along with the risk of irreparable harm, the balance of equities, and the public interest. The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward. Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."

*Id.* at 200 (emphasis, citations, and internal quotation marks omitted). Notwithstanding the discretionary nature of crafting a preliminary injunction, "[i]f [the] court finds no likelihood of success on the merits, the inquiry ends and the injunction will be denied." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 185 (3d Cir. 2022); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction *must* establish that [it] is likely to succeed on the merits[.]") (emphasis added).

A.

X Corp. argues that it is likely to succeed on the merits of two categories of its claims—trademark infringement and trademark dilution. *See* D.I. 10 at 5–6, 16.

It is undisputed that (1) the elements of X Corp.'s common law trademark infringement claim are the same as the elements of its trademark infringement claim under the Lanham Act, 15 U.S.C. § 1051 *et seq*, *see* D.I. 10 at 5 n.1; *see generally* D.I. 29; (2) the elements of X Corp.'s common law trademark dilution claim are the same as the elements of its trademark dilution claim under the Lanham Act, *see* D.I. 10 at 16 n.3; *see generally* D.I. 29; and (3) ownership of a valid and legally protectable mark is an element of both infringement and dilution claims under the Lanham Act, *see* D.I. 10 at 5–6, 16; D.I. 29 at 5, 6 n.2.[2] And Bluebird has conceded that X. Corp. is likely to succeed in establishing all the elements of its infringement and dilution claims except for ownership of a valid and legally protectable mark. Bluebird's sole argument with respect to the likelihood of success prong of the preliminary injunction analysis is that X Corp. cannot prevail on its infringement and dilution claims because X Corp. deliberately abandoned and thus no longer owns any rights in the TWITTER Marks. *See generally* D.I. 29.[3]

Section 45 of the Lanham Act provides in relevant part:

> A mark shall be deemed to be "abandoned" . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. . . . "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127. Determining whether a mark has been abandoned is therefore a two-part inquiry: (1) Has the mark's owner discontinued bona fide use of the mark? and (2) Does the owner intend not to resume bona fide use of the mark?

Under the Act, the bona fide use of a service mark in the ordinary course of trade "shall be deemed" to have occurred if the mark was "used or displayed in the sale or advertising of services" "to identify and distinguish the services of one person . . . from the services of others" and "to indicate the source of the services." *Id.* Determining whether an owner is or has engaged in the bona fide use of a mark is "a highly fact-specific 'totality of the circumstances' inquiry." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1208 (9th Cir. 2012).

As the party asserting the affirmative defense of abandonment, Bluebird bears the burden of proving that X Corp. stopped using the TWITTER Marks with an intent not to resume use of the marks. *See Marshak v. Treadwell*, 240 F.3d 184, 199 (3d Cir. 2001); *see also Gonzales v. O Centro Espírita Beneficente Uniã do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."). Because Bluebird bears the burden on the sole issue it says X Corp. cannot prevail on, X Corp. must be deemed likely to succeed on its infringement and dilution claims unless Bluebird has shown that X Corp. has abandoned the TWITTER Marks. *See Gonzales*, 546 U.S. at 429.

Under Third Circuit law, abandonment "must be strictly proved." *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981). The question before me then is whether Bluebird has shown that it is likely to succeed in strictly proving at trial that X Corp. does not use and intends not to resume using the TWITTER Marks. *Cf. Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253, 260–62 (3d Cir. 2026) (analyzing, in the context of a preliminary injunction on a copyright infringement claim, whether the defendant was "likely to succeed in proving the affirmative defense of fair use").

1.

Bluebird has not made that showing with respect to the Twitter-formative marks. I make that finding based on X Corp.'s current listing of the X app on the Apple App Store from which users can learn about the X platform and download the platform's app to their phones. X Corp. states in that listing: "Welcome to X (formerly known as Twitter), your trusted digital town square where conversations unfold in real time, and the world connects through breaking news, live events, podcasts, and everything in between." *See* D.I. 11 ¶ 51; D.I. 11-8 at 3. Naser Baseer, a Legal Director at X Corp., testified at the April hearing that X Corp.

> deliberately added "Welcome to X ([f]ormerly known as Twitter)" [to the Apple App Store listing] to ensure that people who were searching for the Twitter app within the App Store, as well as people who were searching for the Twitter app outside of the App Store, would find the Apple

> app link and have an understanding that this is one and the same app, same platform.

4.8 Tr. 80:8–14; D.I. 11 ¶ 1. This testimony is supported by survey evidence X Corp. adduced that shows that "the TWITTER mark is well-known, commercially strong, and famous among the general consuming public in the United States." *See* D.I. 13 ¶ 4; *see also* D.I. 13-1 at 2.

X Corp.'s use of "formerly Twitter" in a listing designed to advertise and promote the X platform takes advantage of the goodwill associated with the Twitter-formative marks X Corp. acquired when it purchased Twitter, Inc. and identifies and distinguishes the source of the service in question—i.e., the platform X Corp. purchased and is rebranding. The listing therefore constitutes evidence of bona fide use of the Twitter-formative marks. *See Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*, 758 F.3d 1069, 1072 (9th Cir. 2014) (holding that Wells Fargo's use in customer presentations and solicitations of the service mark of an insurance company that Wells Fargo had purchased and rebranded "demonstrate[d] Wells Fargo's business calculation that it could continue to benefit from the goodwill and mark recognition associated with" the purchased company and constituted "bona fide use of the mark in the ordinary course of business"); *Am. Ass'n for Just. v. Am. Trial Laws. Ass'n*, 698 F. Supp. 2d 1129, 1139 (D. Minn. 2010) (holding that summary judgment in favor of the plaintiff American Association for Justice (AAJ) on the issue of abandonment of the Association of Trial Lawyers of

America marks was warranted because AAJ "identified itself as 'formerly the Association of Trial Lawyers of America' on its website, in advertisements, and in the e-mail signature blocks of some AAJ staff" and its "use of the designation 'formerly' to capitalize on the goodwill and source identification of the marks constitute[d] bona fide use"); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) (holding that "Plaintiff's advertisements, where it identified its Tappan store as 'formerly Gordon Carpet,' plainly attempt[ed] to capitalize on the good will in the 'Gordon Carpet' name by holding Plaintiff out as the successor to Gordon Carpet" and that "[i]n light of Plaintiff's express use of the 'Gordon Carpet' name, and its evident intent to exploit the good will in the name, the . . . Defendant ha[d] not met its burden to establish that Plaintiff [had] discontinued use of the name (let alone that Plaintiff d[id] not intend to resume such use)"). And based on the record before me, I find that the listing makes it unlikely that Bluebird can strictly prove that X Corp. does not use the Twitter-formative marks. *See Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 475 (5th Cir. 2021) ("Abandonment generally requires a complete discontinuance of the trademark's use and even minor or sporadic good faith uses of a mark will defeat the defense of abandonment.").

Bluebird argues that X Corp.'s Apple App Store listing does not constitute bona fide use of the Twitter-formative marks because the listing is "telling

customers that X *no longer is Twitter*, and that its social media services have been rebranded to X." D.I. 67 at 11 (emphasis in the original). According to Bluebird, "[t]hat formulation communicates exactly the opposite of what a trademark is supposed to communicate—it explicitly tells consumers that X is no longer offering services under the Twitter mark, and that Twitter has been replaced by X." D.I. 72 at 10. But the purpose of a service mark is "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." § 1127. And that is exactly what the "formerly known as Twitter" parenthetical in X Corp.'s app listing does—the parenthetical identifies and distinguishes X Corp.'s platform as the Twitter platform X Corp. acquired from Twitter, Inc. and is rebranding as X. By virtue of the parenthetical, the listing is telling customers that what they knew as Twitter is now X and can be accessed by downloading the X app from the Apple App Store.

Bluebird also argues that the "formerly known as Twitter" parenthetical is "not trademark use" because it is written "in small explanatory text" and "not in the location or the format of trademarks." D.I. 67 at 11 n.4; *see also* D.I. 72 at 13 (stating that the "formerly known as Twitter" reference is "a small textual use of the kind that the Trademark Office would not accept as a specimen of use"). But Bluebird does not cite, and I am not aware of, a case where a court determined that

a mark was not in use based on the mark's font size or location in an advertisement. Bluebird points me to § 904.03(i)(B)(1) of the PTO's Trademark Manual of Examining Procedure. D.I. 67 at 11 n.4. That section directs a trademark examiner to consider when deciding if a mark is federally registrable that "[a] web-page display specimen must in some way evince that the mark is associated with the goods and serves as an indicator of source." TMEP § 904.03(i)(B) (Nov. 2025) (internal quotation marks and citation omitted). The section further provides that "the prominence and placement of the mark, the content and layout of the web page [on which the mark is displayed], and the overall impression th[at] web page creates" are among the "many variables" the examiner can consider in "[a]ssessing the 'mark-goods association.'" *Id.* Even assuming § 904.03(i)(B) applied here, it would not make it likely that Bluebird could strictly prove that the size and location of the "formerly known as Twitter" parenthetical does not constitute bona fide use of the Twitter-formative marks. The parenthetical is in the opening clause of the first sentence of the listing's description of the X app. *See* D.I. 11-8 at 3 ("Welcome to X (formerly known as Twitter), your trusted digital town square where conversations unfold in real time, and the world connects through breaking news, live events, podcasts, and everything in between."). And it is written in the same font and size as the surrounding text.

To sum up: X Corp.'s use of the "formerly known as Twitter" parenthetical in its Apple App Store listing makes it unlikely that Bluebird will strictly prove that X Corp. discontinued its use of the Twitter-formative marks. And because an intent not to resume use presupposes a discontinuance of use, I find that Bluebird is unlikely to strictly prove that X Corp. intends not to resume use of the Twitter-formative marks. Finally, since Bluebird has not demonstrated a likelihood of success on its abandonment defense, I find that X Corp. is likely to succeed on the merits of its trademark infringement and dilution claims with respect to the Twitter-formative marks.[4]

2.

I turn next to the Tweet mark and Bird logo. Bluebird has persuaded me that it is likely to succeed in strictly proving that X Corp. has discontinued bona fide use of these marks. It has also demonstrated to my satisfaction that it will likely succeed in strictly proving X Corp.'s intent not to resume use of these marks.

a.

Starting with X Corp.'s discontinuation of use of the marks, neither the Tweet mark nor the Bird logo appears in X Corp.'s listing of the X app on the Apple App Store. *See* D.I. 11-8 at 3. In addition, X Corp. conceded (eventually) at the April hearing that the Tweet mark and Bird logo are nowhere to be found on x.com's home page. 4.8 Tr. 101:17–20. At the April hearing, counsel for Bluebird

walked Baseer through the x.com home page on the courtroom projector and asked him to point to any instances of "Twitter," "Tweet," or the Bird logo. 4.8 Tr. 100:21–101:15. Baseer ultimately testified that he did not see the marks, and when asked if "[i]t's true . . . that on the X home page, there are no occurrences of the word 'Twitter,' the word 'tweet' or the Twitter bird logo;" he responded, "Yes, there are no references." 4.8 Tr. 101:17–20. Counsel for Bluebird then pursued with Baseer the same line of questioning with respect to X's blog at blog.x.com. 4.8 Tr. 102:15–23. Here again, Baseer was unable to identify any references to "Tweet" or postings of the Bird logo. *See* 4.8 Tr. 102:22–103:5 (identifying only "Twitter"). This evidence and the absence of record evidence adduced by X Corp. to the contrary establishes that X Corp. has discontinued use of the Tweet mark and Bird logo on its main user web pages.

X Corp. argues that its "entire vendor onboarding process remains TWITTER-branded," D.I. 68 at 14, and that its "vendor onboarding materials" constitute evidence of its bona fide use of the TWITTER Marks, D.I. 68 at 2. But the sole example of these "materials" it adduced—an October 28, 2025 email with attachments, *see* D.I. 68 at 14–15 (citing D.I. 11-5 at 67–98)—is unavailing. The email is from an unknown sender to an unknown recipient. (The email's "To" and "Cc" lines and the name of the recipient in the first line of the body of the email are redacted. D.I. 11-5 at 67.) The email's subject line is "Twitter Supplier

Registration Invitation," and its opening paragraph invites the email's recipient "to register as a supplier for X Payments LLC." D.I. 11-5 at 67. The email's attachments consist of forms for "Twitter Supplier/ Payee On-Boarding," a "Twitter Supplier Onboarding Guide," and a "Twitter Supplier Portal Overview." *See* D.I. 11-5 at 68–98. Each page of the attachments has the Bird logo at the top. *See* D.I. 11-5 at 68–98. But the Tweet mark is not in the email or in any of the attachments. *See* D.I. 11-5 at 67–98. Significantly, Baseer was unable at the April hearing to identify the types of vendors such emails are sent to, let alone the vendor to whom X Corp. purportedly sent this particular email. *See* 4.8 Tr. 119:14–15 ("Q. You don't know who this was sent to? A. I don't know who this was specifically sent to, no."); *see also* 4.8 Tr. 82:1–83:24. Thus, there is no record evidence that confirms that the email was sent within the United States (so as to fall within the scope of the Lanham Act, *cf. Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023) (holding that the trademark infringement provisions of the Lanham Act do not apply extraterritorially)). Even if there were credible evidence that someone from X Corp. actually sent the email within the United States in October 2025, nothing in the email or anywhere else in the record suggests that X Corp. was using the email to advertise or sell X Corp.'s services. The purpose of the email and attachments was to solicit the services of

potential vendors, not to promote or identify X Corp.'s services. The email is therefore not evidence of X Corp.'s bona fide use of any of the TWITTER Marks.

X. Corp. next argues that twelve web pages it downloaded from the internet in December 2025 show its continuing use of the TWITTER Marks. *See* D.I. 68 at 15–16 (citing D.I. 11-3 at 6; D.I. 11-5 at 105; D.I. 11-5 at 99; D.I. 11-3 at 3; D.I. 11-3 at 10; D.I. 11-3 at 13; D.I. 11-3 at 16; D.I. 11-3 at 20); D.I. 68 at 18–19 (citing D.I. 11-5 at 3; D.I. 11-5 at 6; D.I. 11-5 at 11–39; D.I. 11-5 at 40–52).[5] I disagree.

As an initial matter, neither the Tweet mark nor the Bird logo can be found in four of the cited web pages. *See* D.I. 11-3 at 6–7; D.I. 11-5 at 105–10; D.I. 11-3 at 13–14; D.I. 11-3 at 16–18. Of the eight web pages that mention "Tweet" or depict the Bird logo, only three are dated. *See* D.I. 11-3 at 3; D.I. 11-3 at 10; D.I. 11-3 at 20. The oldest was created in 2012. *See* D.I. 11-3 at 3. The most recent is a blog entry from March 2023, *see* D.I. 11-3 at 10—the same month X Corp. acquired Twitter, Inc.'s assets and almost four months before Musk announced that X Corp. would "soon . . . bid adieu to the twitter brand and, gradually, all the birds" and "cut[] the Twitter logo off the building with blow torches." *See* D.I. 11 ¶¶ 18–19; D.I. 31-2; D.I. 31-3 at 3. As for the undated web pages, X Corp. has offered no credible evidence that it created or revised them recently or makes use of them currently. When questioned at the April hearing

about one of the documents—an undated PDF titled Twitter Objective Playbook that does not mention X—Baseer initially testified: "I know this document has been shared with various clients." 4.8 Tr. 158:13–14; *see* D.I. 11-5 at 11–39. But when he proved unable to identify a single instance when X Corp. shared the document with a client, he ultimately conceded that X Corp. had no evidence to show that it had used or is currently using the document with clients. 4.8 Tr. 158:15–22. Baseer similarly did not know when the undated ads.twitter.com/getstarted web page proffered by X Corp. was created. 4.8 Tr. 122:16–24; *see* D.I. 11-5 at 3–4. Nor did he know when X Corp. last reviewed the advertising-related web page X Corp.'s counsel showed him during the hearing. *See* 4.8 Tr. 177:3–5, 179:4–180:17. X Corp. did not adduce credible evidence that it intentionally maintained these web pages to reach consumers. Baseer testified that X Corp. made "deliberate" decisions to leave on the internet and use some web pages bearing the marks but not others. *See, e.g.*, 4.8 Tr. 71:4–7, 72:11–18, 85:4–13, 85:19–86:1. But I do not credit that testimony in light of his inability to identify a specific instance when X Corp. made such a "deliberate" decision, X Corp.'s failure to adduce any documentary evidence to support his conclusory assertions, and Musk's public pronouncements in July 2023.

The cited web pages are in short remnants of prior use of the Tweet mark and the Bird logo, not evidence that X Corp. is currently engaged in the bona fide

use of those marks. "Allowing a mark owner to preserve trademark rights" by neglecting to take down or update old web pages "is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce." *Specht v. Google Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010), *aff'd*, 747 F.3d 929 (7th Cir. 2014).

X Corp. also argues that it engages in bona fide use of the Tweet mark and Bird logo by "maintain[ing] legacy social-media accounts bearing the [marks]." D.I. 68 at 24. But there is no record evidence that shows that X Corp. has used any of the accounts it identified since the July 2023 rebrand. The most recent Facebook post under the name Twitter, for example, was on October 21, 2021, 4.8 Tr. 159:9–14; *see also* D.I. 11-4 at 3, and the most recent Instagram post under the name Twitter was on February 19, 2022, 4.8 Tr. 162:1–10; *see also* D.I. 11-4 at 15. The account @twitter on X has been deactivated, 4.8 Tr. 162:11–23, and currently directs users to "[f]ollow @x for updates," D.I. 31-7. These inactive accounts, too, are remnants of prior use. X Corp.'s characterization of the accounts in question as "legacy social-media accounts," D.I. 68 at 24, is telling. The account postings are a relic of the past. They do not constitute bona fide use today.

Next, X Corp. argues that it engages in bona fide use of the Tweet mark and Bird logo by "authoriz[ing] and control[ling] third-party use of the TWITTER Marks pursuant to Brand Guidelines, under which all goodwill inures to X Corp."

D.I. 68 at 2–3. The guidelines in question, issued in October 2020, set forth color, sizing, and other stylistic requirements for the TWITTER Marks that third parties must comply with if they want to use the marks. *See, e.g.*, D.I. 11-6 at 2, 6–7, 13, 17. In X Corp.'s telling, its "grant of permission to use the TWITTER Marks, coupled with its quality control, establishes an implied license sufficient to preclude abandonment." D.I. 68 at 23. The fatal defect of this argument is that the "quality control" X Corp. purports to exert by way of its guidelines is over the manner and form of third-party presentations of the TWITTER Marks, not over the *goods or services* of third parties. To be sure, under the Lanham Act, "a registered mark or a mark sought to be registered is or may be used legitimately by related companies," but "such use shall inure to the benefit of the registrant or applicant for registration" only if it "is controlled by the registrant or applicant for registration of the mark *with respect to the nature and quality of the goods or services*." 15 U.S.C. § 1055 (emphasis added); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) (holding that "[u]se of a trademark need not always be made directly by the trademark owner and is often made with the permission of the owner via a licensing agreement" but "[s]uch licensing arrangements are [only] permissible so long as the license agreement provides for adequate control by the licensor of the nature and quality *of the goods or services*") (emphasis added) (internal quotation marks omitted). X Corp. does

not purport to control or even approve the quality of the goods or services of any third party that is using the TWITTER Marks. On the contrary, the guidelines themselves expressly warn such parties that "[y]ou *may not* use the Twitter trademarks in any manner that implies sponsorship or endorsement by Twitter without an express written permission and license from Twitter," D.I. 11-6 at 17 (emphasis added), and Baseer admitted at the April hearing that X Corp. has never licensed the TWITTER Marks, 4.8 Tr. 195:17–25.

Finally, X Corp. argues that it engages in bona fide use of the Tweet mark and Bird logo by "authoriz[ing] use of legacy Twitter-branded mobile applications." D.I. 68 at 3. In support of this argument, X Corp. cites screenshots of the Twitter app on a device belonging to its outside counsel and Baseer's averment that "more than 200,000 mobile users continue to maintain" the legacy app on their phones. *See* D.I. 68 at 24 (citing D.I. 11 ¶ 42; D.I. 37 ¶ 10); D.I. 11 ¶ 42.

Bluebird cast serious doubt on the reliability of this evidence in its papers and at the hearing. First, despite multiple opportunities, X Corp. has produced no documentation to substantiate Baseer's claim that more than 200,000 users maintain the legacy app on their phones. *See* 4.8 Tr. 113:9–114:3. Second, as I explained at the hearing, there is no record evidence from which I may infer that X Corp. affirmatively makes the legacy version of the app available. *See* 4.8 Tr.

17:25–18:24. Baseer testified at his deposition that he did not know how software companies like X Corp. push software updates out to users or what version of X Corp.'s app last had the Bird logo. D.I. 31-8 at 56:15–25 ("I don't know what a push update is."); D.I. 31-8 at 53:16–54:15 ("Q. When was an app last distributed by X that had the bird as its icon? A. I can't tell you that."). To be clear, it is not X Corp.'s burden to prove bona fide use, but for X Corp. to enjoin Bluebird from using the Tweet mark and Bird logo it cannot stand silent as Bluebird discredits X Corp.'s evidence.

Here again, X Corp.'s description of the Twitter-branded version of the app its outside counsel screenshotted as "legacy" is fitting. *See* D.I. 68 at 24. Counsel's screenshots captured a remnant of the past. They do not demonstrate that X Corp. currently engages in bona fide use of the Tweet mark or Bird logo that would make it unlikely for Bluebird to meet its burden to strictly prove abandonment. *See MB Fin. Bank, N.A. v. MB Real Est. Servs., L.L.C.*, 2003 WL 21462501, at *4, *10 (N.D. Ill. June 23, 2003) (holding that the defendant was likely to succeed in proving abandonment even though the mark in question continued to appear "on all ATM cards, debit cards and checks that were issued prior to the adoption of the new logos," "customers continue[d] to use [those] items, and [the plaintiff] ha[d] no plans to recall them" because such "residual use

of the [mark] d[id] not constitute a bona fide use under the Lanham Act."), *report & recommendation adopted*, 2003 WL 22765022 (N.D. Ill. Nov. 21, 2003).

For all these reasons, I find it likely that Bluebird will succeed in strictly proving that X Corp. has discontinued bona fide use of the Tweet mark and Bird logo.

b.

X Corp. does not meaningfully dispute that Bluebird is likely to meet its burden to establish X Corp.'s intent not to resume use of the Tweet mark and Bird logo.[6] And it could not credibly do so in light of Musk's statements in July 2023 that X Corp. would "bid adieu to the twitter brand and, gradually, all the birds" and "cut[] the Twitter logo off the building with blow torches." *See* D.I. 31-2; D.I. 31-3 at 3. Musk's pre-litigation statements are far more probative than the conclusory statements Baseer and X Corp.'s counsel made to the contrary in the context of this litigation. Musk's pronouncements and X Corp.'s rebranding of the Twitter platform as X provide compelling evidence that X Corp. harbors an intent not to resume use of the Tweet mark and Bird logo.

* * * *

Because Bluebird is likely to succeed in proving both that X Corp. discontinued the bona fide use of the Tweet mark and Bird logo and that it intends not to resume the use of the marks, it is likely to strictly prove abandonment of

those marks. It follows that X Corp. is not likely to succeed on the merits of its trademark infringement and dilution claims with respect to those marks. That conclusion ends the inquiry with respect to those marks, and I will deny X Corp.'s motion insofar as it seeks an order enjoining Bluebird from using those marks. *See Nichino Am.*, 44 F.4th at 185 ("If a court finds no likelihood of success on the merits, the inquiry ends and the injunction will be denied.").

B.

Having found that X Corp. is likely to succeed on the merits of its trademark infringement and dilution claims with respect to the Twitter-formative marks, I must consider the risk of irreparable harm X Corp. will suffer in the absence of an order enjoining Bluebird from using those marks, the balance of equities, and the public interest.

Bluebird does not dispute that X Corp. is entitled to a presumption of irreparable harm upon a finding of likelihood of success on the merits. 4.8 Tr. 203:3–6; *see also* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits[.]"). It has offered no evidence to rebut this presumption. And in public postings, its co-founder has boasted that Bluebird's use of the Twitter-formative marks is benefitting Bluebird at X Corp.'s expense. *See* D.I. 11-14 at 54 (stating that "400M people search 'twitter' monthly" and that

those people are "finding twitter.new"). Thus, the risk of irreparable harm weighs in favor of an injunction.

Bluebird did not mention, let alone address, in its opposition to X Corp.'s motion the balance of equities and public interest factors. *See generally* D.I. 29. Nor did Bluebird mention those factors at the April hearing. It therefore forfeited its right to challenge the entry of an injunction based on them.

* * * *

It being likely in my view that X Corp. will prevail on its claims that Bluebird has infringed and diluted the Twitter-formative marks and that X Corp. will suffer irreparable harm in the absence of an order enjoining Bluebird from continuing to use those marks, and there being no dispute that the balance of equities and public interest favor the issuance of such an order, I will grant X Corp.'s motion insofar as it seeks an injunction precluding Bluebird from using the Twitter-formative marks pending the trial in this action.

III.

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The bond amount must be tied to the scope of the

preliminary injunction and account for the factual circumstances of the case." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 390 (3d Cir. 2021) (emphasis omitted).

Bluebird argues that a bond of at least $50 million is called for here based on what it calls a "very conservative" projection that it would generate at least ten million users and $55 million in revenue in the first year if it launched its platform under the "TWITTER mark."[7] D.I. 75 ¶¶ 4, 8. It says that it will generate one million users and $5.5 million in revenue over the same period if precluded from using the TWITTER Marks, and it asks for a bond amount to cover the difference in its revenue projections. D.I. 75 ¶ 8. Its request is troubling on many fronts. For starters, the only evidence it offers in support of its projection of ten million users is that Bluebird "obtained over 150,000 user sign-ups" between December 2, 2025 and May 21, 2026 "simply through press coverage related to its filing of a trademark cancellation action with the Trademark Trial and Appeal Board." *See* D.I. 75 ¶ 4. It does not explain why 150,000 sign-ups over a six-month period justifies a projection of ten million users in the first twelve months following the launch. The projection appears to be pure speculation. Bluebird's revenue projection is similarly unfounded, but even if it were sound, it is the wrong metric to consider in setting a bond. Lost revenue does not measure the harm an injunction might cause, and Bluebird has identified no costs or investments (and thus no profits) it stands to lose if an injunction were issued.

X Corp. says that a $500,000 bond is sufficient. D.I. 77 at 1. I agree. Record evidence supports X Corp.'s assertion that the average of the earliest publicly available average revenue per user data for four comparable social network platforms (Twitter, Pinterest, Snapchat, and Reddit) was $0.84. D.I. 77 at 8. Applying that figure to the 150,000 sign-ups results in a $126,000 lost revenue estimate, and as noted, Bluebird has not identified any start-up costs or investments it will lose if it uses a different name in connection with its platform until the trial of this case is completed. (I also note that I have repeatedly offered the parties to try the case on an expedited basis, *see* 4.8 Tr. 210:23–25; 8.28.26 Tr. (docketed as D.I. 94) 5:6–9, 11:23–24, 12:15–18, but they jointly asked for a trial in November 2027 and have yet to accept my offer, *see* D.I. 42 ¶ 18; D.I. 40-1 ¶ 18.) A bond of $500,000 is more than adequate to protect Bluebird from any harm it might suffer pending the trial of this action.

IV.

For the reasons discussed above, I will grant in part and deny in part X Corp.'s motion for a preliminary injunction. I will grant the motion insofar as it seeks to enjoin Bluebird from using the Twitter-formative marks and will otherwise deny the motion. Issuance of the injunction precluding Bluebird's use of the Twitter-formative marks is contingent on X Corp.'s posting of a $500,000 bond.

The Court will issue an Order consistent with this Memorandum Opinion.

[1] On or before August 26, 2026, after the parties had completed their briefing on the motion, Bluebird launched its social networking platform, which it is now calling "twitter.now." *See* D.I. 91 at 1–2, *see also, e.g.*, D.I. 91-1. Neither party suggested during a teleconference I held on August 28 that I should consider the launch of twitter.now in resolving the pending motion. *See generally* 8.28.26 Tr. (docketed as D.I. 94). Accordingly, I do not discuss twitter.now in this Memorandum Opinion.

[2] *See generally A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (holding that to prove trademark infringement under the Lanham Act, a plaintiff must demonstrate that: (1) it owns a "valid and legally protectable mark" and (2) "the defendant's use of the mark to identify goods or services causes a likelihood of confusion"); *Times Mirror Mags., Inc. v. L.V. Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000) (holding that to prove trademark dilution under the Lanham Act, a plaintiff must establish that: (1) it owns a famous mark; (2) the defendant is using a mark in interstate commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use causes dilution by making it more difficult for the plaintiff to identify or distinguish its services).

[3] Bluebird did not meaningfully dispute the other elements of X Corp.'s trademark infringement and dilution claims. With respect to infringement, Bluebird devoted a single page of its twenty-three page opposition brief to whether its use of the TWITTER Marks is likely to cause confusion. *See* D.I. 29 at 20. Bluebird did not mention—let alone address—the ten factors that courts in the Third Circuit consider when evaluating likelihood of confusion. *See* D.I. 29 at 20; *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) ("This Court has adopted a nonexhaustive list of factors to consider in evaluating likelihood of confusion, commonly referred to as the '*Lapp* factors.'") (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). At the April hearing, Bluebird's counsel stated that bona fide use is "clearly the primary issue," 4.8 Tr. 203:8–13, and he used the word "confusion" only once during the hearing—when he stated that "[if] the marks are abandoned, likelihood of confusion is irrelevant because the marks have -- X has no rights on the marks," 4.8 Tr. 208:8–10. Bluebird has thus forfeited its ability to contest likelihood of confusion. *See United States v. Shaw*, 891 F.3d 441, 455 n.17 (3d Cir. 2018) ("Arguments raised in such a cursory fashion, without adequate citation to the record and authority, are deemed [forfeited].").

---

In any event, Bluebird's conclusory argument fails on the merits. Bluebird argues that confusion is unlikely because twitter.new criticizes X and contains a disclaimer that it is not affiliated with X Corp. *See* D.I. 29 at 20. But a disclaimer is insufficient when the evidence otherwise suggests (as it overwhelmingly does here) that the defendant infringes and consumers are likely to be confused. *See, e.g.*, *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 303 (D.N.J. 1998) ("[D]efendant's appropriation of plaintiff's mark . . . cannot adequately be remedied by a disclaimer.") (citation omitted), *aff'd*, 159 F.3d 1351 (3d Cir. 1998).

With respect to dilution, Bluebird's entire argument consists of a single conclusory sentence in a footnote of its answering brief. *See* D.I. 29 at 6 n.2 (stating that X Corp.'s dilution claims "fail for the reasons [its] trademark infringement claim fails").

[4] Having found that X Corp.'s listing of the X app on the Apple App Store constitutes evidence of bona fide use of the Twitter-formative marks, I need not and do not address whether X Corp.'s configuration of twitter.com to immediately direct users to x.com constitutes bona fide use of the marks. *Cf. Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 609 (7th Cir. 1956) ("On an application for preliminary injunction the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.").

[5] X Corp. also cited D.I. 11 at 21, but D.I. 11 is a declaration and does not contain web pages. *See* D.I. 68 at 15 (citing D.I. 11 at 21); *see generally* D.I. 11.

[6] X Corp.'s primary argument is that "[w]here use has not ceased, the intent prong is irrelevant." D.I. 35 at 9. But for the reasons explained above, I find that Bluebird is likely to strictly prove that X Corp. has discontinued use of the Tweet mark and Bird logo.

[7] Bluebird does not identify what it means by "the first year," i.e., whether it is a year from when it announced its platform in December 2025, a year from when it launched the platform in August 2026, or a year from some other time. *See* D.I. 75 ¶ 4.